Filed 11/14/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff, Cross-defendant and Respondent,<br><br>　　　v.<br><br>CONAGRA GROCERY PRODUCTS COMPANY et al.,<br><br>　　　Defendants and Appellants;<br><br>THE SHERWIN-WILLIAMS COMPANY,<br><br>　　　Defendant, Cross-complainant and Appellant. | H040880<br>(Santa Clara County<br>Super. Ct. No. CV788657) |


After a lengthy court trial, the People of the State of California (plaintiff) prevailed in this representative public nuisance action against defendants ConAgra Grocery Products Company (ConAgra), NL Industries, Inc. (NL), and the Sherwin-Williams Company (SWC).[1] The trial court ordered ConAgra, NL, and SWC to pay $1.15 billion into a fund to be used to abate the public nuisance created by interior residential lead paint in the 10

---

[1] Plaintiff's action was brought on behalf of the residents of Santa Clara County, San Francisco City and County, Alameda County, Los Angeles County, Monterey County, City of Oakland, City of San Diego, San Mateo County, Solano County, and Ventura County. In this opinion, we will refer to these two cities, seven counties, and one city and county as the 10 jurisdictions.

California jurisdictions represented by plaintiff.  ConAgra, NL, and SWC (collectively defendants) challenge the court's judgment on many grounds.  They contend, among other things, that the court's judgment is not supported by substantial evidence of knowledge, promotion, causation, or abatability.  Defendants also challenge the judgment on separation of powers and due process grounds, claim that they were erroneously denied a jury trial, and assert that the trial court made other prejudicial procedural and evidentiary errors.[2]  We conclude that the trial court's judgment must be reversed because substantial evidence does not support causation as to residences built after 1950.  We also direct the trial court to hold further proceedings on remand regarding the appointment of a suitable receiver.  We reject the remainder of defendants' contentions.

## I.  Plaintiff's Evidence at Trial

"[L]ead is a toxin and causes irreversible brain damage."  Childhood lead poisoning is "the number one environmental health problem for children" in California.  "Childhood lead poisoning at the level at which it is occurring is definitely an epidemic in California." "The most common source of lead exposure to children in California is lead-based paint and how it contributes to soil and dust contamination in and around housing."[3]  Experts have reached a consensus "that lead-based paint is a predominant source of childhood lead exposure [in] pre-1978 housing."[4]  Children in pre-1946 housing are subject to "three times

_____

[2]     This is but a partial list of their contentions.  SWC and ConAgra also each assert an individual contention.

[3]     "Lead-based paint" is not the only source of childhood lead exposure.  Children in the 10 jurisdictions have also been exposed to lead from occupational sources (such as lead dust brought home by construction workers), leaded gasoline, imported goods (such as pottery, Mexican candy, and toys), home remedies (such as "Greta" and "Azarcon"), cosmetics, jewelry, spices, and chapulines (grasshoppers).

[4]     " 'Lead-based paint' means paint or other surface coatings that contain an amount of lead equal to, or in excess of:  [¶]  (a) one milligram per square centimeter (1.0 mg/cm2); or

2

the percentage of elevations in blood lead level" as those in post-1978 housing. Lead in homes accounts for at least 70 percent of all childhood lead poisonings. Lead paint is a major contributor to blood lead levels because the lead content of paint is high, while most other lead sources have only trace amounts. And the most common type of lead paint contains white lead carbonate, which is highly absorbable. Between 1929 and 1974, more than 75 percent of the white lead carbonate produced in this country was used in lead paint. Through the 1940s, lead paint contained as much as 50 percent lead.

"Children are exceptionally vulnerable" to lead because "they explore their environment with typical hand-to-mouth contact behavior." Lead paint chips "taste sweet," which may explain why children ingest them. Young children are at especially high risk from residential lead paint because they spend the vast majority of their time in their homes. Infants and young children also absorb much more lead than older children and adults. Because children are smaller, lead intake has a proportionally larger impact on their bodies, and children absorb lead more easily. Children are also more vulnerable to the toxic effects of lead because their biological systems are still developing.

The "brain effects [of lead exposure] in children are irreversible," so the "only option is to prevent the exposure in the first place." There is "no safe exposure level" for lead "[b]ecause no measurable level of lead in blood is known to be without deleterious effects, and because once engendered the effects appear to be irreversible." Blood lead levels less than 5 micrograms per deciliter (mcg/dL)[5] can cause children to suffer impaired intellect and behavioral problems.[6] "[E]ven among children with the lowest levels of lead exposure," studies suggest that "there is ongoing harm down to the lowest measurable

---

[¶]  (b) half of one percent (0.5%) by weight." (Cal. Code Regs., tit. 17, § 35033.)  This is what we mean when we use "lead paint" in this opinion.

[5]     A microgram (mcg) is a millionth of a gram.  A deciliter (dL) is a tenth of a liter.

[6]      Bone lead levels are a better indicator than blood lead levels of the impact of lead on intellectual abilities.  Blood lead levels may underestimate the impact of lead exposure.

3

levels." "[B]lood lead levels below 5 micrograms per deciliter are associated with decreased academic achievement, diminished IQ scores, or intellectual abilities, cognitive abilities, attention-related behavior problems and antisocial behaviors . . . ." Lead exposure as a child continues to impact the body when the child becomes an adult. It "has reproductive effects, it has impacts on things like birth weight, and even fertility, delays fertility," and it can be associated with cardiovascular disease.

Even intact lead paint poses a potential risk of future lead poisoning to children because lead paint surfaces will inevitably deteriorate. "[A]ll paint eventually deteriorates. On certain surfaces it deteriorates more rapidly than others[;] mainly those surfaces are high-use surfaces, such as windows and doors." Paint deteriorates when it is exposed to ultraviolet light, water, fungus (such as mildew), friction, or abrasion. More than one-third of pre-1978 homes nationwide with intact lead paint have lead dust.[7] In contrast, only 6 percent of homes without lead paint have lead dust. Lead in soil adjacent to homes generally comes from lead paint, not leaded gas emissions, because post-1978 housing has no soil lead.[8]

Most of the housing in the 10 jurisdictions was built before 1980, with the percentages ranging from 51 to 83 percent and is therefore presumed to contain lead paint.[9]

---

[7] " 'Lead-contaminated dust' means dust that contains an amount of lead equal to, or in excess of: [¶] (a) forty micrograms per square foot (40mg/ft$^2$) for interior floor surfaces; or [¶] (b) two hundred and fifty micrograms per square foot (250mg/ft$^2$) for interior horizontal surfaces; or [¶] (c) four hundred micrograms per square foot (400mg/ft$^2$) for exterior floor and exterior horizontal surfaces." (Cal. Code Regs., tit. 17, § 35035.)

[8] " 'Lead-contaminated soil' means bare soil that contains an amount of lead equal to, or in excess of, four hundred parts per million (400 ppm) in children's play areas and one thousand parts per million (1000 ppm) in all other areas." (Cal. Code Regs., tit. 17, § 35036.)

[9] " 'Presumed lead-based paint' means paint or surface coating affixed to a component in or on a structure constructed prior to January 1, 1978." (Cal. Code Regs., tit. 17, § 35043.)

4

Pre-1940 homes are three times as likely to have lead-based paint hazards,[10] with 86 percent having lead-based paint hazards and 67 percent having "significant" lead-based paint hazards such as "deteriorated lead-based paint."[11] "[H]omes with lead-based paint are 10 times more likely than homes without lead-based paint to have dust lead levels on floors and on window sills above the federal limits." And "homes with lead-based paint are more likely to have soil lead levels on the exterior of the home above the EPA [(federal Environmental Protection Agency)] criteria limits." Even when lead paint is "intact," soil levels can exceed EPA limits. Lead paint creates soil lead "by the friction and impact surfaces, opening and closing windows and doors on a home with lead-based paint," from the deterioration of exterior lead paint, and from "sanding and scraping" when repainting. When there is lead in the soil, it is often tracked into the home, creating household lead dust.

Since the 19th century, the medical profession has recognized that lead paint is toxic and a poison. An 1878 article by an English doctor recognized that the use of lead paint on the interiors of homes could have poisonous effects on the people who lived in the home. An 1895 article by a San Francisco doctor recounted how a child had been poisoned by lead paint that she had scratched off her crib. A 1904 article by a doctor in Queensland, Australia described multiple cases of children being poisoned by lead dust from lead paint on walls and railings of a house. He believed that the lead dust had been ingested by the children after it got on their fingers and thereby into their mouths. His investigation found

---

[10] "'Lead hazard' means deteriorated lead-based paint, lead contaminated dust, lead contaminated soil, disturbing lead-based paint or presumed lead-based paint without containment, or any other nuisance which may result in persistent and quantifiable lead exposure." (Cal. Code Regs., tit. 17, § 35037.)

[11] "'Deteriorated lead-based paint' means lead-based paint or presumed lead-based paint that is cracking, chalking, flaking, chipping, peeling, non-intact, failed, or otherwise separating from a component." (Cal. Code Regs., tit. 17, § 35022.)

lead dust on interior walls where the paint was still in "good condition."[12]  An authoritative 1907 textbook edited by a noted American doctor, which was widely used in medical education, discussed the 1904 article and observed that children had been poisoned by lead paint on woodwork in their homes that had produced lead dust and gotten onto their hands.[13] These articles "recognized the dust pathway from paint on a wall, to dust on the floor, to the hands of children, into their mouth[s], as a way of ingestion."

Many medical articles by doctors in the early 20th century described lead poisoning of children from lead paint.  A 1917 article by an American doctor discussed the 1904 Australian article and also described the cases of multiple children who had gnawed lead paint off furniture and died.  A 1926 article discussed the case of a child who had died from lead poisoning after she "gnawed" lead paint off her bed.  A 1933 article pointed out that "children get exposed to lead-based paint in the homes by their common tendency to put things in their mouth[s]."  It also stated that most cases involved infants and small children and that children were more susceptible to lead poisoning than adults.  Another 1933 article noted:  "It must be obvious that for every child who becomes paralysed by lead there must be literally hundreds who have been affected by the poison in some more or less minor degree."  "[T]he extent of the lead paint menace has been minimized, and in consequence, literally thousands of children have been allowed to run the risks of lead absorption."

---

[12] In 1922, Queensland, Australia banned lead paint from areas to which young children had access.

[13] Plaintiff presented an expert who testified that in 1909 public health officials and doctors were suggesting that there be legislation banning lead paint due to the risk of exposure for children.  This expert cited his own 2005 article in which he asserted that researchers had stated in 1909 that "[p]aint containing lead should never be employed where children, especially young children, are accustomed to play," and "[a] number of European countries banned lead-based paint soon thereafter."  He also relied on a seven-page "annotated bibliography" that he had prepared, which listed, but did not include, numerous articles that he had reviewed.

Published medical articles in this era recognized that even small amounts of lead could cause children to suffer harm. A 1931 British Medical Journal article discussed the "insidious" effects of "infinitesimal doses of lead" over a long period of time. A 1935 American medical journal article suggested that there were "insidious" "cumulative effects of infinitesimal doses of lead" that could be "obscure." A 1938 British medical article stated that "the harmful effects of continued small doses of lead begin from the moment the lead is absorbed" and can lead to a long series of "subtle" harms. It opined that "there is no threshold below which still smaller doses can be regarded as being without some adverse effect." A 1943 American medical journal article discussed the impact of early childhood subacute lead poisoning on a child's intelligence and subsequent academic achievement; it called for a ban on interior residential use of lead paint.

Knowledge about the toxic properties of lead paint was not limited to the medical profession. In May 1910, the United States House of Representatives' Committee on Interstate and Foreign Commerce held a hearing on a bill aimed at preventing lead poisoning. The bill would have required products containing white lead to "be labeled conspicuously and securely with a skull and crossbones and the words: 'White lead: poison.'" The sponsor of the bill noted that France had already "entirely prohibited the use of white lead because of its injurious character" and that "all countries of Europe" had already enacted legislation like his proposal. He spoke of "the injurious effect of these atoms of white lead that are filling the air now; they come loose from doors, from window sills, from everywhere, we inhale them and consequently disease is caused which physicians do not understand and can not say what it really is, but it is, in many cases, simply a case of lead poisoning." Another proponent of the bill observed that "the most eminent scientists and doctors of Great Britain" had "found that the small particles that result from chalking, especially from internal painting and external painting as well, when taken by inhalation into the lungs, are absorbed and become a poison to the system." This congressional

7

hearing was attended by an attorney for "practically all of the paint manufacturers of this country" who stated their opposition to the proposal. The bill failed.

A few years later, in 1914, Henry Gardner, who was the assistant director of the Institute of Industrial Research and also the director of the Paint Manufacturers Association's Educational Bureau, published a speech that he had given to the International Association of Master House Painters and Decorators of the United States and Canada at that association's annual convention in February 1914. In this speech, Gardner acknowledged that "the presence of [white lead] dust in the atmosphere of a room is very dangerous to the health of the inmates" and that "[l]ead poisoning may occur through inhalation of [lead] dust . . . ."

Despite this evidence of the toxic properties of white lead, the main use for white lead in the 20th century was as a pigment for paint.[14] NL, SWC, and ConAgra's predecessor, Fuller, were among the handful of companies that manufactured white lead carbonate pigments during the 20th century, and all three of them used white lead carbonate pigment to make paint. NL, SWC, and Fuller were all leaders in the lead paint industry, and they knew at that time that lead dust was poisonous. They were also aware that lead paint "powders and chalks" "soon after it is applied" and routinely produces lead dust after a couple of years.

In 1922, NL, SWC, and Fuller were making white lead carbonate pigment, using it in their paints, and promoting white lead pigment in paint for use on and in residential homes. Sales of white lead peaked in 1922. There was a decrease in the use of lead paint in the 1920s and early 1930s. By 1944, during World War II, the use of lead paint for residential interiors had declined to a low level.

---

[14] Plaintiff's experts defined "lead-based paint" as either paint containing lead pigment or paint that was "either considered 100 percent or 70 percent pure white lead . . . or alternatively mixed paint with . . . 'high-lead content.'"

NL manufactured white lead carbonate pigment from 1891 to 1978, and it had manufacturing facilities in San Francisco and Los Angeles that manufactured white lead carbonate pigments in California between 1900 and 1972. It sold those pigments to California paint manufacturers, used them in its own paint products sold in California, and advertised and promoted paint products containing those pigments for residential use within the 10 jurisdictions during that same period. NL "kept up with the medical literature" about lead poisoning. NL's 1912 annual report acknowledged that lead dust was a "danger to the health" of workers exposed to it in the making of white lead. By the mid to late 1920s, NL knew that children who chewed on things painted with lead paint could get lead poisoning and die from it. Nevertheless, NL's lead paints were marketed for residential use and sold in and advertised in the 10 jurisdictions between 1900 and 1972. NL produced a handbook for consumers in 1950 that instructed them to use lead paint on the interiors of their homes.

ConAgra's predecessor, Fuller, manufactured white lead carbonate pigment from 1894 until at least 1958. Fuller manufactured white lead carbonate pigment at its San Francisco factory until 1898, when it moved its factory to South San Francisco. At this factory, Fuller refined white lead carbonate and was a "major producer" of lead paint. Fuller also had a plant in Los Angeles. Fuller's lead paints were sold at its own stores and by independent dealers in all 10 jurisdictions between 1894 and 1961.[15] Fuller knew that lead dust was poisonous. In 1919, an article about Fuller's South San Francisco plant noted that lead dust is poisonous.

SWC began manufacturing paints containing white lead carbonate pigments in 1880. SWC's internal publication, The Chameleon, published an article in 1900 that acknowledged the many dangers of lead paint. It stated: "A familiar characteristic of white lead is its tendency to crumble from the surface, popularly known as chalking"; "It is also familiarly known that white lead is a deadly cumulative poison"; and "This noxious quality

---

[15]     Fuller also produced and sold non-lead paints.

becomes serious in a paint that disintegrates and is blown about by the wind." In 1910, SWC bought a lead mine, which it utilized to manufacture white lead carbonate pigment from 1910 to 1947 for use in its own paints. SWC stopped manufacturing white lead carbonate in 1947, but it continued to make lead paint until 1958.[16] SWC had plants in Emeryville and later in Los Angeles that manufactured paint containing white lead carbonate. SWC continued to sell lead paint until 1972. SWC removed all lead from its residential paints by the end of 1972.

Two trade associations, the Lead Industries Association (LIA) and the National Paint, Varnish, and Lacquer Association (NPVLA) promoted the use of lead paint. Fuller, NL, and SWC were members of both the LIA and the NPVLA. The LIA, which was created in 1928, promoted the use of white lead pigments in residential paint by sponsoring two advertising campaigns, the Forest Products Better Paint campaign and the White Lead Promotion campaign, in the first half of the 20th century. The LIA knew that white lead was being attacked from "a health standpoint," and these campaigns were designed to increase the consumption of lead.

The LIA provided its members with information about lead hazards and lead poisoning that was available in medical and scientific literature at the time. NL was present at a 1930 LIA board of directors meeting at which a 1930 article about lead poisoning of babies and children from chewing lead paint off of cribs was discussed. The article, which ran in the U.S. Daily, a publication "Presenting the Official News" of the government, stated that lead poisoning from "chewing paint from toys, cradles, and woodwork" was "a more frequent occurrence" than previously thought and noted that even a small amount of lead could kill a child. The article also noted that "[c]hildren are very susceptible to lead" and that the "most common sources of lead poisoning in children are paint on various objects within reach of a child and lead pipes . . . ."

---

[16] Some of SWC's paints did not contain white lead pigment.

In 1934, the LIA launched its Forest Products campaign, which promoted lead paint for interior residential use. At a 1935 LIA annual meeting, it was acknowledged that childhood lead poisoning disproportionately affected poor and minority children and that there were thousands of cases annually. Yet the LIA fought against the imposition of regulations on lead. A 1937 LIA conference on lead poisoning was attended by representatives from NL and SWC, and Fuller received a transcript of the conference. Both industrial lead poisoning and childhood lead poisoning were discussed at the 1937 conference. There was discussion of research that showed it was nearly impossible to get rid of lead once it got into a child's body. Attendees at the conference were asked by the head of the LIA not to discuss what they learned at the conference in order to avoid unfavorable publicity connecting lead paint to lead poisoning. The LIA's Forest Products campaign continued through 1941.

The NPVLA, unlike the LIA, represented paint manufacturers regardless of whether they used lead pigments.[17] The NPVLA ran advertising campaigns promoting paint throughout the first half of the 20th century. One was called Save the Surface in 1920 and 1921. The other was called Clean Up Paint Up and was ongoing in 1949. All three companies were involved in both advertising campaigns. Neither of the NPVLA's campaigns distinguished between lead paint and non-lead paint, but these campaigns included advertisements promoting all three companies' lead paint products.

Lead paint was banned in the United States in 1978. (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 302 (*Santa Clara I*).) In 1991, the Centers for Disease Control (the CDC) set the "level of concern" for lead at a blood lead level (BLL) of 10 mcg/dL.[18] In 2012, the CDC replaced this standard with a "reference

---

[17]    Fuller was a member of the NPVLA from 1933 to 1962. NL was an NPVLA member from 1933 to 1977. SWC was a member of the NPVLA from 1933 to 1981.

[18]    The impact of blood lead levels below 10 mcg/dL was not well understood until 2005.

11

value" of 5 mcg/dL, which represents the top 2.5 percent of BLLs in children under the age of five. "[T]he reference value simply denotes the worst or the highest exposed children in a population." At that point, national data reflected that 5.3 percent of children living in pre-1950 housing had BLLs exceeding that value, while only 0.4 percent of children living in post-1978 housing had BLLs exceeding that value.

In 1995, the California Legislature enacted the Childhood Lead Poisoning Prevention Act of 1991. (Health & Saf. Code, §§ 105275, 124125; Stats. 1995, ch. 415, § 8.) This act created the Childhood Lead Poisoning Prevention Program (CLPPP). (Health & Saf. Code, § 124125.) The Childhood Lead Poisoning Prevention Branch (CLPPB), a division of California's Department of Public Health, was accorded the role of coordinating the state's approach to childhood lead exposure and childhood lead poisoning. The CLPPB devotes its resources to outreach, education, case management programs to track those who have been lead poisoned or exposed to lead, and programs to address lead hazards. The CLPPB also contracts with and supervises 43 county CLPPPs.

The CLPPB focuses on children who are one or two years old. Health care providers are required to order that a child be screened for lead poisoning at age one and at age two if "the child receives services from a publicly funded program for low-income children." (Cal. Code Regs., tit. 17, § 37100.) Medical laboratories are required to report all BLLs to the CLPPB. (Health & Saf. Code, § 124130; Stats. 2002, ch. 931, § 11.) The CLPPB considers it a "case" of lead poisoning if a child's BLL exceeds 19.5 mcg/dL or persistently exceeds 14.5 mcg/dL. In such cases, a public health nurse and an environmental health specialist visit the child's home to try to determine potential sources of the lead poisoning.

National average BLLs have declined precipitously since the 1970s, falling by about 90 percent. In 1980, it was estimated that 88.3 percent of children had BLLs in excess of 10 mcg/dL. By 2008, it was estimated that less than one percent of children had BLLs over 10

12

mcg/dL.[19]  Nevertheless, in 2010, around 22,000 children under the age of six in California had BLLs over 4.5 mcg/dL.  And at the time of trial in 2013, California had more than 2,000 children with BLLs over 10 mcg/dL and more than 15,000 additional children with BLLs over 5 mcg/dL.  Children in California with BLLs over 9.5 mcg/dL represented 0.35 percent of California's children.[20]

Children in the 10 jurisdictions are continuing to be exposed to lead from the lead paint in their homes and to suffer deleterious effects from that lead.  Although only a small percentage of the children in these jurisdictions are screened for lead, thousands of children are found to have BLLs of concern each year.

Lead poisoning from lead paint is "the number one environmental children's health issue in Alameda County."  The primary cause of lead poisoning in Alameda County is lead paint.  About 75 percent of Alameda County's homes are pre-1980, which amounts to 430,000 units.  Nearly 174,000 of those units are pre-1950.  Alameda County is able to screen only 46 percent of the children under the age of six who are poor and live in pre-1978 homes.  Alameda County's CLPPP opens a case only when there is a lead-poisoned child with a BLL of 20 mcg/dL or two BLLs of 15 mcg/dL.  In 2012, 14 children met that standard in Alameda County.  That triggers an investigation of the home and education of the parents about sources of exposure.  There is no funding for remediation.  Alameda County's CLPPP also tries to do outreach and education to families with children who have BLLs of 5 mcg/dL or higher,[21] but there is no funding for dealing with these children.  In 2010, there were 14 children in that category.

---

[19]  The prevalence of elevated BLLs in children under the age of six in California appeared to have declined 60 percent from 2003 to 2010.

[20]  Because the laboratories doing the tests lack the ability to report precise results, BLLs of 4.5 are rounded up to 5 and BLLs of 9.5 are rounded up to 10.

[21]  The limits of detection do not permit such precise measurement, so the CLPPP actually provides these services when the BLL is over 4.5 mcg/dL.

Lead poisoning is the top pediatric environmental health problem in Los Angeles County. The most common source of lead poisoning in Los Angeles County is lead paint chips and lead paint dust. Lead paint is a "severe environmental health concern" in Los Angeles County. In Los Angeles County, 77 percent of the housing was built before 1978, which is more than 2.6 million housing units. More than 900,000 of those housing units are pre-1950. Los Angeles County's investigators have often found lead paint dust in homes with intact lead paint. In 2010, Los Angeles County had about 6,500 children under the age of six with BLLs of greater than 4.5 mcg/dl. Los Angeles County's CLPPP generally does not do "primary prevention" but only screening and "secondary prevention." Los Angeles County's CLPPP handles about 75 to 100 cases of lead poisoning each year. In at least 75 percent of those cases, lead paint is a potential source of the lead poisoning. At least 70 percent of those cases involve pre-1978 housing.

Lead paint is a serious environmental health concern in Monterey County. In Monterey County, 66 percent of the housing was built before 1980, which accounts for between 89,000 and 90,000 units. Between 18,000 and 19,000 of those units were built before 1950. Each year, Monterey County's CLPPP receives between 13 and 15 new cases where there has been a report of a BLL of 20 mcg/dL or two BLLs of 14.5 mcg/dL or greater. The children are generally between the ages of one and three. For those cases, it conducts a full assessment of the home. Each month Monterey County receives 10 to 20 reports of a child with a BLL of 4.5 mcg/dL or higher. A substantial number of cases of lead poisoning in Monterey County have been attributed to imported foods.

Lead-based paint hazards in Oakland homes are "coming close to crisis mode." In Oakland, 80 to 90 percent of the housing is pre-1978, which accounts for about 174,000 units. Each year, Oakland's Lead Safe Housing Program receives 16 to 20 referrals from Alameda County's CLPPP to assess homes where lead-poisoned children live.

In the City of San Diego, 60.5 percent of the housing was built before 1980. There are about 300,000 pre-1978 housing units of which more than 62,000 are pre-1950. The

City of San Diego has a Lead Safety Healthy Homes Program that offers education, outreach, risk assessments, and lead inspections. More than half of the 2,700 lead inspections completed in the City of San Diego between 2005 and 2013 identified lead hazards.

In San Francisco, 94 percent of the homes were built before 1978, which is more than 317,000 housing units, and 68 percent were built before 1950, which is more than 235,000 housing units. About 22,000 housing units in San Francisco that are occupied by low and moderate income families are believed to have lead-based paint hazards. San Francisco's CLPPP contacts parents when a child tests at 2 mcg/dL or higher. Only very infrequently is the source of the child's lead exposure anything other than lead paint. In 2010, when San Francisco tested 10,300 children under the age of six, 959 children tested between 4.5 and 9.5 mcg/dL, and 35 tested higher. Since 2010, San Francisco has been "seeing increasing numbers" of lead exposed children. Each year, San Francisco issues about 200 notices to correct lead paint and soil lead hazards.

The number one source of lead poisoning in San Mateo County is lead paint. Lead paint in pre-1978 housing is a public health problem in San Mateo County. This includes intact lead paint because it will inevitably deteriorate. In San Mateo County, 80 to 90 percent of the housing is pre-1978, which is more than 200,000 housing units. More than 56,000 of those units are pre-1950.

"[L]ead paint is the number one environmental cause of poisoning of children in Santa Clara County" and is a threat to public health there. In Santa Clara County, two-thirds of the housing stock is pre-1978, which is more than 426,000 housing units. More than 61,000 of those are pre-1950. Although in 2010 Santa Clara County could only afford to test less than 20 percent of the more than 150,000 children under the age of six who lived in the county, 339 of them had BLLs between 4.5 mcg/dL and 9.5 mcg/dL, and 71 had BLLs over 9.5 mcg/dL. Most of the children with elevated BLLs lived in pre-1978 housing. "[O]nce those children are determined to be lead poisoned, it is too late."

Lead poisoning of children is a "very significant problem" in Solano County, and it "causes substantial harm even at the lowest levels of exposure" such as 5 mcg/dL. "The harm is very substantial, the harm is permanent. Children's IQs are affected . . . they have impairment of memory, difficulty with problem solving, inattentiveness . . . ." Only about 20 percent of the 32,000 children under age six in Solano County are tested for lead. This is due to lack of access to medical care for poor children. In 2010, at least 100 children in Solano County had BLLs over 4.5 mcg/dL. Between 2001 and 2012, the sole source of lead exposure was lead paint for 55 percent of the children in Solano County with a BLL of 20 mcg/dL or higher or two BLLs of 15 mcg/dL. In many of the other cases, lead paint was a contributing source. Between 75,000 and 80,000 homes in Solano County were built before 1978, which is about 51 percent of all of the homes. More than 18,000 of those units are pre-1950. Solano County has no resources for code enforcement of lead paint hazards in homes or for remediation.

Ventura County has almost 174,000 pre-1978 housing units. Almost 20,000 of those are pre-1950. In 2010, Ventura County had 34 children with BLLs higher than 10 mcg/dL and 271 children with BLLs over 5 mcg/dL. Ventura County's CLPPP does not do any environmental investigation as to children with BLLs between 5 and 15 mcg/dL. For those children, Ventura's CLPPP provides only educational material.

The CLPPPs lack the ability to engage in primary prevention, which seeks to prevent lead exposure in the first place. Instead, the CLPPPs largely target children who have already been exposed to lead. Abatement would be primary prevention. Although it is not feasible to remove all lead from every home in the 10 jurisdictions, primary prevention could be substantially furthered by lead inspections, risk assessments, education, and remediation of identified lead hazards in homes in the 10 jurisdictions.

## II. Defense Evidence At Trial

BLLs in children under the age of six nationally have been dropping since the 1970s, going from a geometric mean of 15 mcg/dL in the late 1970s to 1 mcg/dL in 2009/2010. The percentage of children under the age of six with BLLs exceeding 10 mcg/dL has dropped over that period from more than 80 percent to less than one-half of one percent. A similar drop has occurred for children under the age of six with BLLs over 5 mcg/dL. The same is true in the western region, which includes California, where the geometric mean for BLLs is about 25 to 30 percent lower than in other regions. In most of the 10 jurisdictions, BLLs and the percentage of elevated BLLs also dropped from 2007 to 2012.

A defense expert testified that the lower BLLs reflected decreasing exposure of children to lead. It was his opinion that leaded gasoline was largely responsible for both soil lead and dust lead and that there was "very little impact of exposure to lead from paint on community-wide blood lead levels."

Another defense expert testified that the current understanding of childhood lead poisoning was unknown before 1970. In his view, the amount of lead considered toxic and awareness of "the pathway by which lead gets into the child's body" had both "changed radically over the years." He asserted that in the first decade of the 20th century lead poisoning was considered an "industrial disease of adults." No tests were available to measure a BLL. It was not until the 1930s that a BLL test became available. This defense expert testified that, prior to 1920, there were no cases in the United States of a child ingesting lead paint from a household surface. By 1940, interior use of lead paint was dwindling. In 1951, Baltimore banned lead paint for interior use. In 1953, there was a general call for lead paint not to be used for interiors.

This defense expert testified that in 1971, the medical community's understanding was that lead poisoning did not cause significant symptoms until the BLL exceeded 60 mcg/dL. In 1970, the United States Surgeon General determined that a BLL of 40 mcg/dL should be considered "evidence suggestive of undue absorption of lead . . . ." It was not

17

recognized until 1974 that children could consume lead originating from lead paint from household dust, rather than only from flakes and chips. In 1985, the CDC set an "intervention level" for BLLs at 25 mcg/dL. In 1991, the CDC set the "level of concern" for BLLs at 10 mcg/dL.

A defense epidemiologist testified that it was not clear even in 2003 whether BLLs below 10 mcg/dL produced cognitive deficits. This expert testified that a subsequent study authored by one of plaintiff's experts showing such deficits was flawed. This expert had not studied childhood lead exposure, but he testified that the evidence was inconclusive whether there were cognitive effects of BLLs below 10 mcg/dL.

SWC presented a statistician who testified that SWC had contributed only 6,732 tons of lead to California over the period from 1894 to 2009 out of a total of 217,784 tons of lead consumed in California during that period, which was just ".1 percent" of the total lead. On cross-examination, he conceded that his estimate was limited to lead manufactured by SWC between 1910 and 1947, which was the only period when SWC manufactured lead. SWC continued to make lead paint after 1947. His estimate was also based primarily on national data about lead consumption to which he had applied a ratio based solely on population to determine what he thought was California's consumption.

Another defense expert testified that lead paint does not inevitably deteriorate. He asserted that if lead paint is "maintained properly and re-coated as needed on a regular maintenance cycle," it will not deteriorate. His premise was that repainting would be needed every three to five years. On cross-examination, he admitted that lead paint would deteriorate over time, particularly on friction surfaces like windows. He also admitted that repainting would require surface preparation, which would often mean sanding or scraping, in order to provide a surface to which the new paint would adhere.

The defense's abatement expert testified that the replacement of windows and doors that have been painted with lead paint is "a very intrusive and disruptive process" that involves "guys in moon suits, [and] respirators." That process can disturb other hazardous

waste, such as asbestos, and lead to the discovery of mold issues. The remediation of floors and soil would also be invasive, labor intensive, and time consuming. He also suggested that the abatement plan's cost estimates for remediation were unrealistically low. He believed that remediation would often take a week or more and could increase the risk of lead exposure for the residents of the home. He also testified that replacing windows does not lower BLLs and that remediation can result in higher BLLs.

### III. Procedural Background

In March 2011, plaintiff filed a fourth amended complaint (FAC) for public nuisance.[22] It named as defendants ConAgra, NL, SWC, Atlantic Richfield Company (ARCO), E.I. Du Pont de Nemours and Company (DuPont), and 50 Doe defendants.[23] The FAC alleged that the presence of lead in homes was a public nuisance and that defendants were "liable in public nuisance" because they had created or assisted in the creation of this public nuisance.[24] Plaintiff sought abatement, injunctive relief, costs, and attorney's fees. The parties stipulated that the FAC concerned only residential buildings and no public buildings.

The court struck defendants' jury demands, and the case was tried to the court in July and August 2013. In March 2014, the court issued an amended statement of decision and an amended judgment. The court's amended statement of decision, which was over 100 pages

[22] We need not discuss at length the long and complicated procedural history of this case, which was originally filed in 2000. This case has already produced one published decision by this court (*Santa Clara I*, *supra*, 137 Cal.App.4th 292) and another by the California Supreme Court (*County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35 (*Santa Clara II*)). We will discuss these decisions only where they are relevant to the issues before us in this appeal.

[23] The trial court found that ARCO and DuPont were not liable, and they are not parties to this appeal.

[24] Defendants' demurrer to the FAC was overruled. The court also denied summary judgment motions by NL and SWC.

long, made numerous findings. The court expressly found that, "[s]ince antiquity, it has been well known that lead is highly toxic and causes severe health consequences when ingested" and that "[e]ven relatively low levels of lead exposure have severe health consequences." It found that lead paint is prevalent in the 10 jurisdictions, "inevitably deteriorates," and is the primary source of lead exposure for young children living in pre-1978 housing in the 10 jurisdictions. As a result, children in these jurisdictions are continuing to be exposed to lead from lead paint even though residential lead paint was banned in 1978. The court expressly found that ConAgra, NL, and SWC each had "actual knowledge of the hazards of lead paint," "including childhood lead poisoning," when they promoted lead paint for interior residential use. The court's judgment required defendants to pay $1.15 billion into an abatement fund that would pay for lead inspections, education about lead hazards, and remediation of particular lead hazards inside residences in the 10 jurisdictions. Defendants timely filed notices of appeal.[25]

## IV. Discussion

### A. Substantial Evidence Issues

A public nuisance cause of action is established by proof that a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right. (*Santa Clara I*, *supra*, 137 Cal.App.4th at pp. 305-306.)

Defendants contend that plaintiff failed to produce substantial evidence in support of its public nuisance cause of action. They assert that substantial evidence does not support the trial court's findings that (1) they had actual knowledge of the public health hazard posed by interior use of lead paint at the time they promoted and distributed it; (2) they promoted lead paint for interior use; (3) their conduct caused the public nuisance to occur;

---

[25] Plaintiff also appealed, but it later dismissed its appeal.

and (4) the nuisance is abatable, lead paint poses an imminent danger, and abatement will lower BLLs.

## 1. Standard of Review

Defendants contend that their claims that substantial evidence does not support the trial court's judgment raise questions of law that we must review de novo. They cite *Smith v. Selma Community Hosp.* (2008) 164 Cal.App.4th 1478 (*Smith*) as support for this contention. *Smith* is inapposite. In *Smith*, the Court of Appeal was reviewing a governing board's decision reviewing a judicial review committee's decision. The board, which was exercising substantial evidence review, concluded that the committee's decision was not supported by substantial evidence. Since the Court of Appeal was reviewing the board's decision that substantial evidence did not support the committee's decision, the Court of Appeal necessarily exercised independent review. (*Smith*, at pp. 1515-1516.) As we are not reviewing another reviewing body's decision as to whether a third body's decision was supported by substantial evidence, we do not exercise independent review. Instead, we exercise ordinary deferential substantial evidence review.

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) " '[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' " (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) Our role is limited to determining whether the evidence before the trier of fact supports its findings. (*Reddy v. Gonzalez* (1992) 8 Cal.App.4th 118, 123.)

Defendants claim that we may not presume implied findings in plaintiff's favor because there were "key ambiguities" in the trial court's statement of decision that they brought to the court's attention but the court did not resolve.

21

"When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.) "To bring defects in a statement of decision to the trial court's attention within the meaning of section 634, objections to a statement of decision must be 'specific.' [Citation.] The alleged omission or ambiguity must be identified with sufficient particularity to allow the trial court to correct the defect. [Citation.] 'By filing specific objections to the court's statement of decision a party pinpoints alleged deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous.'" (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498.) "[A] trial court is not required to respond point by point to issues posed in a request for a statement of decision. '"The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case." [Citations.]'" (*Id.* at p. 500.)

After trial, each defendant submitted a proposed statement of decision, and plaintiff submitted proposed findings of fact and law and a proposed order. In December 2013, the court issued a proposed statement of decision. Plaintiff and defendants filed objections to the proposed statement of decision. The court subsequently filed an amended statement of decision and an amended judgment.[26]

Defendants' appellate briefs identify six "key ambiguities" that they assert they brought to the court's attention but the court failed to address in its statement of decision.

---

[26] In January 2014, the court issued a statement of decision. Plaintiff submitted a proposed judgment, and defendants objected to the proposed judgment. The court entered judgment followed by an amended judgment. Defendants moved to vacate the judgment and for a new trial. The court denied the motions for new trial and to vacate the judgment. Plaintiff moved to modify the statement of decision and the judgment, and the court filed an amended statement of decision and a second amended judgment.

22

The alleged "ambiguities" they identify are: (1) "Whether the court found any part of defendants' recitation of the historical knowledge of lead hazards to be incorrect;" (2) "What level of lead exposure the court referred to as being 'lead poisoning'"; (3) "What facts about lead's hazards the court found that defendants 'actually knew'"; (4) "Which of defendants' promotions for interior paint the court found to be a basis for liability"; (5) "On what basis the court included housing built after 1950"; and (6) "what public rights."

"[I]t is settled that the trial court need not, in a statement to decision, 'address all the legal and factual issues raised by the parties.' [Citation.] It 'is required only to set out ultimate findings rather than evidentiary ones.' [Citation.] '"[U]ltimate fact[]"' is a slippery term, but in general it refers to a core fact, such as an element of a claim or defense, without which the claim or defense must fail. [Citation.] It is distinguished conceptually from 'evidentiary facts' and 'conclusions of law.'" (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559.)

Only one of defendants' six alleged "ambiguities" arguably pertains to a "core fact" rather than an evidentiary fact. SWC's objections to the court's proposed statement of decision asked the court to "define 'harmful'" with respect to defendants' knowledge of lead's harmful nature. SWC argued that this was important because the state of knowledge at the time defendants promoted lead paint did not include knowledge of the risks of low-level exposure to deteriorating lead paint. ConAgra adopted SWC's objections and also asked the court to "specify what hazard it finds that Fuller knew when it promoted lead paint for residential interior use, and when Fuller knew exposure to lead at even minute levels was harmful." ConAgra requested that the court specify "what 'harm' each defendant 'knew.'" NL objected to the court's proposed knowledge findings and asked that the court "specifically identify the knowledge that NL had at that time." We address the court's treatment of the "harms" and "hazards" issue in the course of our analysis of defendants' challenge to the court's knowledge findings. In all other respects, we reject

23

defendants' claim that the court failed to resolve an ambiguity as to a "core fact" because we conclude that the alleged ambiguities concerned evidentiary facts.

Before we embark on our substantial evidence review, we note that we cannot rely solely on the expert testimony produced by plaintiff. Plaintiff's expert witnesses testified to conclusions that would appear on their face to establish both the actual knowledge and promotion elements of plaintiff's case. One of plaintiff's experts testified: "These Defendants manufactured white lead carbonate; these Defendants knew of the hazards of lead during the time that they were manufacturing white lead carbonate; these Defendants advertised, promoted, and sold their lead and/or lead [based] products while they had knowledge of the hazards of lead; these Defendants advertised, promoted, and sold their lead and/or lead containing products for use in and around homes within each of the 10 jurisdictions; suitable substitutes were available for white lead; these Defendants, through their trade association, downplayed the hazards of lead; and these Defendants, through their trade associations, fought the imposition of regulations." And plaintiff's experts testified to even more specific conclusions: "Sherwin-Williams had actual knowledge about the hazards of lead as early as 1900."

If we could accept plaintiff's expert witnesses' testimony *at face value*, this testimony would itself support the trial court's findings. However, we may not do so. "'The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; . . . it does not lie in his mere expression of conclusion.'"[27] (*People v. Bassett* (1968) 69 Cal.2d 122, 141.) "Where an expert bases his

_____

[27] The material upon which the expert relies may provide substantial evidence to support the expert's conclusion. However, there are limitations on an expert's testimony about that material. "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 686.) We will consider defendants' hearsay challenges in section IV(J)(1) of this opinion.

24

conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon [by] other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value. [Citations.] In those circumstances the expert's opinion cannot rise to the dignity of substantial evidence. [Citation.] When a trial court has accepted an expert's ultimate conclusion without critical consideration of his reasoning and it appears the conclusion was based upon improper or unwarranted matters, then the judgment must be reversed for lack of substantial evidence." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135-1136.) "If [the expert's] opinion is not based upon facts otherwise proved, or assumes facts contrary to the only proof, it cannot rise to the dignity of substantial evidence." (*Estate of Powers* (1947) 81 Cal.App.2d 480, 485-486.)

Consequently, a conclusion expressed by an expert cannot provide by itself substantial evidence to support a finding unless the basis for the expert's conclusion is itself supported by substantial evidence. Our substantial evidence review must include a critical examination of the material upon which the experts based their conclusions in order to determine whether that material provides substantial support for those conclusions.

## 2. Actual Knowledge

Defendants claim that the trial court did not find actual knowledge, but only constructive knowledge, and that its knowledge findings are not supported by substantial evidence.

Constructive knowledge would not be sufficient to support plaintiff's public nuisance cause of action. The standard set by this court in *Santa Clara I* is *actual* knowledge, not constructive knowledge. "[L]iability is premised on defendants' *promotion of lead paint for interior use **with knowledge of the hazard*** that such use would create. This conduct is distinct from and far more egregious than simply producing a defective product or failing to warn of a defective product . . . . [¶] A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the

25

creation of a hazardous condition.  Here, the alleged basis for defendants' liability for the public nuisance created by lead paint is their affirmative promotion of lead paint for interior use, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards."  (*Santa Clara I*, *supra*, 137 Cal.App.4th 292, 309-310, boldface & italics added.)  By tethering the public nuisance cause of action to affirmative promotion for a use defendants *knew to be hazardous*, this court necessarily set forth an *actual* knowledge standard.  If the standard had been only constructive knowledge, the affirmative promotion of a product for a particular use that was hazardous would not have been "far more egregious" than simply failing to warn of a defective product.

We reject defendants' claim that the trial court did not find "actual knowledge."  The trial court's statement of decision expressly found that all three defendants had "actual knowledge of the hazards of lead paint—including childhood lead poisoning" when they produced, marketed, sold, and promoted lead paint for residential use.  It found:  "ConAgra had actual knowledge of the hazards of lead paint—including childhood lead poisoning— for the duration of its production, marketing, and sale of lead pigments and paint for home use"; "NL had actual knowledge of the hazards of lead paint, including childhood lead poisoning"; "SW[C] had actual knowledge of the hazards of lead paint—including childhood lead poisoning—for the duration of its production, marketing, and sale of lead pigments and lead paint for home use."

While the standard we established in *Santa Clara I* is actual knowledge, our substantial evidence review remains deferential, and we must accept any reasonable inferences that the trial court drew from the evidence before it.  The fact that the trial court was required to find actual knowledge does not mean that the court could not rely exclusively on circumstantial evidence to support such a finding.  The only limit on the trial court's reliance on inferences from circumstantial evidence to establish actual knowledge is that those inferences may not be speculative or conjectural.  " ' "Actual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not

26

based on speculation or conjecture. Only where the circumstances are such that the defendant *'must have known'* and not 'should have known' will an inference of actual knowledge be permitted." [Citation.]'" (*Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1082.) This distinction between what a defendant must have known and what a defendant should have known is crucial. Proof of actual knowledge focuses on what information a defendant must have been aware of, while proof of constructive knowledge rests on a defendant's duty to discover information.

We reject defendants' claim that the court left undefined the nature of the "hazard" or "harm" that defendants had knowledge of when they promoted lead paint for interior residential use. The court expressly found that defendants "learned about the harms of lead exposure through association-sponsored conferences." It expressly found that defendants knew in the 1930s that "the dangers of lead paint to children were not limited to their toys, equipment, and furniture." The court expressly found that defendants knew both that "high level exposure to lead—and, in particular, lead paint—was fatal" and that "lower level lead exposure harmed children." The court also found that, by the 1920s, defendants knew that "lead paint used on the interiors of homes would deteriorate, and that lead dust resulting from this deterioration would poison children and cause serious injury."

The trial court's express findings made clear that the "harms" and "hazards" of which defendants had actual knowledge included that (1) "lower level lead exposure harmed children," (2) "lead paint used on the interiors of homes would deteriorate," and (3) "lead dust resulting from this deterioration would poison children and cause serious injury." Because the trial court made the express findings that defendants sought in their objections to the court's proposed statement of decision, we are not precluded from drawing inferences in support of the trial court's decision. In any case, the court's express findings fully suffice to support its decision.

Here, the trial court properly focused on evidence of information that defendants *must have been aware of* under the circumstances. This evidence was sufficient to support a

27

reasonable inference that each defendant *must have known* by the early 20th century that interior residential lead paint posed a serious risk of harm to children.

First, evidence before the trial court established that, by 1914, it was well known in the paint manufacturing industry that deteriorated lead paint on residential interiors, particularly doors and windowsills, released "small particles" of lead into the air, which were "very dangerous" to and could be ingested by humans and "poison" them.

In May 1910, the United States House of Representatives' Committee on Interstate and Foreign Commerce held a hearing on a bill aimed at preventing lead poisoning. The bill would have required products containing white lead to "be labeled conspicuously and securely with a skull and crossbones and the words: 'White lead: poison.'" Congressman Richard Bartholdt, who was the sponsor of the proposal, explained to the committee that "the painters of the United States," who had originally opposed the proposal, had "practically all come around now" to supporting regulation of white lead. Bartholdt pointed out that France had already "entirely prohibited the use of white lead because of its injurious character" and that "all countries of Europe" had already enacted legislation like his proposal.

Bartholdt explained: "We know very little of the injurious effect of these atoms of white lead that are filling the air now; they come loose from doors, from window sills, from everywhere, we inhale them and consequently disease is caused which physicians do not understand and can not say what it really is, but it is, in many cases, simply a case of lead poisoning." One of the proponents of the bill told the committee that "the most eminent scientists and doctors of Great Britain" had "found that the small particles that result from chalking, especially from internal painting and external painting as well, when taken by inhalation into the lungs, are absorbed and become a poison to the system." He also stated that an "eminent scientist" in London had said that occupying a room that had been painted with white lead was "dangerous."

Eugene Philbin attended the hearing as "counsel for, I think, practically all of the paint manufacturers of this country—the leading ones," to state their opposition to the proposal. Philbin said that he represented not only the "Paint Manufacturers' Association" but also the "National Paint, Oil, and Varnish Association." Philbin objected to the "poison provision" on the ground that it was "entirely unnecessary" and would "create a fear on the part of the consumer." The bill failed.

A few years later, in 1914, Gardner, the director of the Paint Manufacturers Association's Educational Bureau, published a speech that he had given to the International Association of Master House Painters and Decorators of the United States and Canada at that association's annual convention in February 1914. In this speech, Gardner acknowledged that "the presence of [white lead] dust in the atmosphere of a room is very dangerous to the health of the inmates." He observed that "[l]ead poisoning may occur through inhalation of [lead] dust . . . ." Gardner suggested that "white lead flatted with turpentine" was to blame for the disintegration of white lead paint into white lead dust.[28] However, Gardner expressed the belief that "the use of flatted white lead has been largely abandoned for wall and ceiling decoration, and its place has been taken by the more sanitary leadless Flat Wall Paints."

Notwithstanding Gardner's belief, interior residential use of lead paint continued throughout the first half of the 20th century despite widespread knowledge in the paint industry of the toxic properties of white lead. NL, SWC, and Fuller were all leaders in the lead paint industry. SWC proclaimed itself in 1901 to be "the largest manufacturer of Prepared Paint in the world." In 1934, SWC called itself the "World's Largest Paint Producer" and identified itself as "one of the country's largest producers of White Lead."

---

[28] In 1914, it had long been a common practice to mix lead paint with turpentine. That practice did not end. Fuller's 1931 White Lead Paint brochure instructed users to mix the lead paint with turpentine. NL's 1950 Handbook on Painting recommended mixing lead paint with turpentine when painting interior woodwork.

29

NL took pride in its position as a leader in the white lead industry since 1891. In 1912, NL made more than 20 different brands of Dutch Boy White Lead for painting, the brand that it had adopted in 1907. By the late 19th century, Fuller was the leading seller of white lead on the West Coast and was "one of the strongest concerns dealing in paints, oils and glass in the United States."

NL, SWC, and Fuller, as leaders in the lead paint industry were well aware in the early part of the 20th century that lead dust was poisonous. They were also aware that lead paint "powders and chalks" "soon after it is applied" and routinely produces lead dust after a couple of years. Both the May 1910 congressional hearing and the published 1914 Paint Manufacturing Association speech plainly discussed the dangers posed by interior residential use of lead paint. Because defendants were leaders in the paint industry at that time, they must have been aware of hazards related to their products that were well known in the paint industry. It is neither speculative nor conjectural to draw a reasonable inference that leaders in the paint industry were aware of a serious hazard caused by their product when this hazard was generally known in their industry. Indeed, it would be unreasonable to infer that, notwithstanding general knowledge of the hazard of their products within the industry, defendants somehow managed to avoid learning of this hazard.

Second, the reasonable inference arising from the 1910 and 1914 evidence of what was generally known in the paint industry was further supported by evidence that Fuller, NL, and SWC were each the recipient of confirmatory information about this hazard from the LIA in the 1930s. Each of the defendants was a member of the LIA in the 1930s when the LIA promulgated information to its members about the "frequent occurrence" of children being poisoned by lead paint from "toys, cradles, and woodwork," which included the fact that even a small amount of lead could kill a child. The LIA information given to its members (including all three defendants) referenced a national newspaper article that had stated that "[c]hildren are very susceptible to lead" and that the "most common sources of lead poisoning in children are paint on various objects within reach of a child and lead

pipes . . . ." Defendants, as the recipients of this information from the LIA, must have been aware at that time, in the early 1930s, of the hazard to children created by the interior residential use of lead paint. The fact that this information confirmed the prior information of which they also must have been aware served to solidify the foundation for the trial court's actual knowledge findings.

All of this evidence provided substantial support for the trial court's actual knowledge findings as to the three defendants under our deferential standard of review. "The fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence. . . . We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference . . . ." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)

Here, the evidence, while circumstantial, was sufficient to support reasonable inferences that defendants *must have known* in the early 20th century that interior residential lead paint posed a serious risk of harm to children. Since these reasonable inferences support the trier of fact's express findings that NL, SWC, and Fuller harbored the requisite actual knowledge, our deferential standard of review precludes us from drawing contrary inferences, and we must uphold the trial court's actual knowledge findings.

ConAgra claims that there was no evidence that its predecessor, Fuller, knew in the early 20th century that the use of lead paint in residential interiors would pose a public health hazard. It maintains that Fuller either did not know that children were consuming lead paint or knew of only "isolated cases" of such behavior that did not amount to a public health hazard. ConAgra also contends that Fuller could not have been aware of the risk of lower BLLs, since no test for BLLs existed at the time, and could not have known of the specific pathways by which children consume lead dust, which were not proved until much later.

By 1914, as a major producer of lead paint since the previous century, Fuller was well aware of the public health hazard posed to children by interior residential lead paint.

31

The 1910 congressional hearing and the 1914 published speech provide very strong circumstantial evidence of Fuller's actual knowledge. Fuller could not have failed to learn from the hearing and the article that deteriorated interior residential lead paint posed a "very dangerous" risk to the "health" of the inhabitants of those residences. Of course, this knowledge was reinforced by information that the LIA distributed to its members, including Fuller, in the 1930s discussing how it was a "frequent occurrence" that children were poisoned by lead paint from "toys, cradles, and woodwork" and noting that even a small amount of lead could kill a child.[29]

In light of these facts, there is no merit to ConAgra's claims that Fuller did not know children were consuming lead paint, that Fuller believed that such events were infrequent, and that Fuller could not have known that a small amount of lead could harm a child. Since Fuller was aware that deteriorating interior residential lead paint exposed the occupants of the residence to "very dangerous" lead dust, knowledge of the specific pathway by which children consume lead dust was not essential for Fuller to be aware that lead paint on residential interiors posed a risk of serious harm to children.

ConAgra also claims that the evidence was insufficient to show Fuller's knowledge because the trial court erroneously permitted plaintiff's experts to opine about Fuller's

---

[29] ConAgra contends that Fuller could not acquire knowledge through the LIA because the LIA was not Fuller's agent. It was Fuller's *own participation* in the LIA that led it to acquire the requisite knowledge, not by means of any agency relationship between Fuller and the LIA.

ConAgra argues that the trial court could not reasonably rely on Fuller's knowledge through the LIA because the court found that ARCO did not have knowledge through the LIA. The trial court's finding as to ARCO did not expressly relate to the LIA. The court found only that ARCO and its predecessors did not have knowledge of "adverse health effects from exposure to residential lead paint during the relevant time period." Indeed, the court's rejection of liability for ARCO was based primarily on a lack of evidence connecting ARCO's predecessors to the 10 jurisdictions. ConAgra makes no attempt to demonstrate that the evidence of Fuller's participation in the LIA was identical to that of ARCO's predecessors.

knowledge. Since the material upon which the experts' opinions were based provides substantial support for those opinions, the court did not err in admitting and relying on those opinions. We assess ConAgra's claim that some of the documents relied on by the experts were inadmissible hearsay in section IV(J)(1) of this opinion.

ConAgra asserts that Fuller was aware of the dangers of lead dust solely in the occupational context. As we have already explained, the evidence supports the trial court's finding that Fuller was aware of the risks posed by lead paint on residential interiors. We reject ConAgra's challenge to the sufficiency of the evidence to support the trial court's express finding that Fuller was aware of the public health hazard to children posed by lead paint in residential interiors.

NL claims that the evidence was insufficient to support the trial court's actual knowledge finding because plaintiff was required to prove that NL had "knowledge in the early 1900s that children could get dangerous levels of blood lead from intact lead paint *anywhere* in *any* home . . . via invisible dust." NL's claim is misleading. Our review of the trial court's actual knowledge finding requires us to examine the record to determine whether there is substantial evidence that NL knew in the early 1900s that interior residential lead paint posed a significant risk of harm to children. We need not find evidence that NL understood *precisely how* children could be harmed by interior residential lead paint so long as there is substantial evidence that NL knew that interior residential lead paint posed a significant risk of harm to children.

Our examination of the record reveals that it contains substantial evidence that NL had the requisite actual knowledge by 1914. The 1910 congressional hearing and the 1914 published speech were sufficient to make a leader in the lead paint industry aware of the risk of serious harm that interior residential lead paint posed to children. NL claims that there was not substantial evidence that it was aware in the early 20th century of the risks to children of "low-level" lead exposure. Since the information of which NL was aware suggested that even adults were at serious risk from interior residential lead paint, NL could

not have failed to understand that the risk to children would be at least as great. NL, like Fuller, subsequently gained further knowledge, from its participation in the LIA, that children who ingested even very small amounts of lead could suffer serious harm. The LIA informed its members in the 1930s that even a small amount of lead could kill a child. And, at a 1937 LIA conference, a doctor informed LIA members that "[t]o get rid of the lead in children is almost impossible."

We find substantial evidence in the record to support the trial court's finding that NL had actual knowledge of the risk of harm to children from interior residential lead paint.

SWC claims that the trial court's finding that it had actual knowledge of the risk of harm to children from interior residential use of lead paint was based on "hindsight" because SWC could not have known "of today's alleged risk to children from ultra-low BLLs that can come from ingesting lead in household dust." SWC's premise is flawed. The trial court's actual knowledge finding may be upheld if there is substantial evidence that SWC was aware at the relevant time that interior residential lead paint posed a significant risk of harm to children. It was not necessary for there to be proof that SWC was aware of the precise pathway by which children were exposed to lead and or that those harms could occur even at low BLL levels, particularly since there was no BLL test in existence at the relevant time.

The evidence presented at trial established that SWC knew no later than 1900 that lead paint was prone to deterioration and that it posed a serious risk of harm to those exposed to it. SWC began making lead paint in 1880. By 1900, it knew that, because lead was a "deadly cumulative poison," and lead paint tended to deteriorate, lead paint could be seriously dangerous.

SWC claims that its knowledge in 1900 of risks from deteriorating lead paint was limited to exterior use of lead paint, but the trial court could have reasonably concluded that SWC knew that the deterioration of interior residential lead paint would pose an even more serious risk that would be heightened with respect to young children who were necessarily

34

confined to the interiors of their homes. We conclude that substantial evidence supports the trial court's finding that SWC had actual knowledge of the serious risk of harm to children from interior residential lead paint.

### 3. Creating or Assisting in Creating a Public Nuisance: Promotion

Defendants challenge the trial court's findings that they affirmatively promoted lead paint for interior residential use.

"'[T]he critical question is whether the defendant *created or assisted in the creation of the nuisance.*'" (*Santa Clara I*, *supra*, 137 Cal.App.4th at pp. 305-306.) "A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition. Here, the alleged basis for defendants' liability for the public nuisance created by lead paint is their *affirmative promotion of lead paint for interior use*, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards." (*Santa Clara I*, at pp. 309-310, italics added.)

Defendants claim that the court could not base its promotion findings on their advertising without violating the First Amendment.[30] They also contend that reliance on the

---

[30] In a reply brief, defendants claim for the first time that we must apply a heightened standard of substantial evidence review to the court's promotion finding because "First Amendment rights are at stake." Appellate courts ordinarily do not consider new issues raised for the first time in an appellant's reply brief because such a tactic deprives the respondent of the opportunity to respond to the contention. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765 (*Reichardt*).) It is only upon a showing of good cause for failing to raise the issue earlier that an appellate court will address an issue that is initially raised in the reply brief. (*Ibid.*) We decline to address this issue as defendants have made no showing of good cause, and plaintiff has had no opportunity to address this issue.

Furthermore, the only case they cite in support of this claim is one in which the Court of Appeal acknowledged that a heightened standard of review is appropriate where the issue is whether a communication is unlawful. (*San Francisco Unified School Dist. ex. rel. Contreras v. First Student, Inc.* (2013) 213 Cal.App.4th 1212, 1228.) In that case, the trial court had issued an injunction barring certain communications. (*Id.* at p. 1228.) Here, the only plausible First Amendment issue is defendants' contention that their "promotion" of

promotional advertising activities of the LIA and the NPVLA would violate their First Amendment right to free association.[31] In addition, the three defendants individually challenge the sufficiency of the evidence to support the court's findings that each of them affirmatively promoted lead paint for interior residential use.

Defendants' reliance on the First Amendment is misplaced. While "the creation and dissemination of information are speech within the meaning of the First Amendment" (*Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, 570), "[t]he Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." (*Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York* (1980) 447 U.S. 557, 562-563 (*Central Hudson*).) "[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, [citations], or commercial speech related to illegal activity, [citation]."[32] (*Central Hudson*, at pp. 563-564.)

"[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." (*Ohralik v. Ohio State Bar*

---

lead paint for interior residential use was protected by the First Amendment. The trial court's order did not bar any communications. In any case, since we conclude as a matter of law that their advertisements were not protected by the First Amendment, application of a heightened standard of review would not assist defendants.

[31] Defendants objected in the trial court on First Amendment grounds to evidence that they had used commercial speech to promote lead paint for interior residential use. They also objected on First Amendment freedom of association grounds to evidence based on their membership in the LIA and the NPVLA. The court overruled both objections.

[32] "If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. . . . Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive." (*Central Hudson*, *supra*, 447 U.S. at p. 564.)

*Ass'n* (1978) 436 U.S. 447, 456.)  The California Supreme Court has already acknowledged that holding defendants liable in this case for the public nuisance created by their promotion of lead paint for interior residential use will not "prevent defendants from exercising any First Amendment right or any other liberty interest.  Although liability may be based in part on prior commercial speech, the *remedy* will not involve enjoining current or future speech."  (*Santa Clara II*, *supra*, 50 Cal.4th at p. 55; see also *People v. Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 195 [imposing civil "penalties for the negligent dissemination of untruthful or misleading advertising does not offend the First Amendment."].)

Defendants' lead paint promotional advertising and participation in trade-association-sponsored lead paint promotional advertising were not entitled to any First Amendment protections.  Promotion of lead paint for interior residential use necessarily implied that lead paint was safe for such use.  If defendants promoted lead paint for interior residential use while knowing that such use would create a public health hazard, then their promotions were misleading and not entitled to any First Amendment protection.  If, on the other hand, defendants did not promote lead paint for interior residential use, or did not know at the time they did so that such use would create a public health hazard, those promotions would not establish that defendants created or assisted in the creation of a public nuisance.  As any wrongful promotions would be misleading and not entitled to First Amendment protection, we find no First Amendment bar to the trial court's reliance on defendants' promotions.

Defendants also make individual challenges to the sufficiency of the evidence to support the trial court's findings that each of them affirmatively promoted lead paint for interior residential use while knowing of the public health hazard that such use would create.  Our review of these contentions requires us to examine, among other things, the hundreds of advertisements upon which plaintiff relied to show that defendants had promoted lead paint for interior residential use.  We must note at the outset that, for a

37

number of reasons, a large number of these advertisements did *not* promote *interior* residential use of *lead* paint.

Some of these advertisements expressly promoted only *exterior* use of lead paint. Others promoted a particular brand without specifying any particular paint. Numerous advertisements promoted lead paint as "house paint" without expressly promoting it for interior use.

Another group of these advertisements promoted interior use of a particular paint without identifying that paint as a lead paint, and without other evidence that the particular paint promoted for interior use in these advertisements was a lead paint. Stipulations between plaintiff and NL and between plaintiff and SWC established that certain paints promoted by NL and SWC were lead paints, but there was no such stipulation with regard to Fuller or as to paint companies acquired by NL or SWC. And many of the advertisements were not specific enough to identify the promoted paint as one of those identified in the stipulations.

Many of the advertisements were not placed by NL, SWC, or Fuller, but instead by a paint store or a hardware retailer. While there was evidence that SWC financed half of the cost of its authorized dealers' local advertisements and that NL "consistently supported dealers' local advertising," plaintiff's expert acknowledged that there was no such evidence as to Fuller. As there was no evidence that Fuller had any involvement in the placement of advertisements by hardware and paint stores, advertisements by those stores cannot be attributed to Fuller and cannot show that Fuller promoted lead paint for interior residential use.[33]

---

[33] For instance, a 1916 Santa Clara County "Farmers Union" advertisement promoted for interior use a lead paint made by a company acquired by Fuller. A 1934 advertisement placed by a Monterey hardware store promoted Fuller's lead paint "for use on interior and exterior surfaces." A 1940 Solano County hardware store advertisement promoted Fuller's lead paint for "interior surfaces." A 1942 Monterey County paint store advertisement

Plaintiff also relied on the LIA's two promotional campaigns. The member companies that participated in these campaigns funded them. Fuller was a member of the LIA from 1928 to 1958. SWC was a member of the LIA from 1928 to 1947. NL was an LIA member from 1928 to 1978. NL and Fuller participated in both of the LIA's campaigns; SWC participated in only the Forest Products campaign and contributed funds to that campaign only from 1937 to 1941.

Because the LIA's promotional campaigns affected multiple defendants, we detail those campaigns at the outset. The Forest Products campaign, which ran from 1934 to 1941, was aimed at having manufacturers of lumber, window frames, and doors endorse lead paint. The purpose of the Forest Products campaign, which was active in California, was to promote the use of lead paint on lumber and in residences. In 1934, the LIA persuaded lumber manufacturers associations on the West Coast to recommend the use of lead paint on lumber by "enclos[ing] 'Painting Instructions' folders with all bundles of siding" in 1935.[34] In 1938, the LIA persuaded the Western Pine Association to paint its model home at the San Francisco World's Fair "inside and out with white lead and publicize this specification." Also in 1938, the LIA persuaded "sash [(window frame)] and door manufacturers" to put labels on 20,000,000 sashes and doors "featuring the use of white lead and high-grade prepared paint." In 1939, the LIA board was apprised that, due to the Forest Products campaign, " '[a]ll of the principal producers of soft and hard lumber in the United States such as redwood, cypresses, cedar, pine and others, now specify white lead or high grade prepared paint which contain white lead.' "

---

promoted Fuller's lead paint for interior use. A 1949 Vallejo paint store advertisement promoted Fuller's lead paint as an "all-purpose house paint."

[34] Plaintiff's expert testified that these painting instructions included "methods for how to use paint on sidings *and on floors and on objects in homes . . . .*" (Italics added.) The painting instructions were not in evidence, and the expert relied solely on an LIA document that referred only to "siding." The expert also asserted that these instructions pertained to "siding interiors," but he did not explain why the word "siding" would have been used in the 1930s in reference to interior paneling.

The LIA's White Lead Promotion campaign, which ran in two phases, phase one from 1939 to 1944 and phase two from 1950 through 1952, was intended to increase the market for white lead.[35] This campaign produced hundreds of advertisements promoting white lead. LIA advertisements in 1939 and 1940 expressly promoted lead paint for interior residential use. A 1939 LIA advertisement in the Hardware Retailer reproduced a letter to the LIA from the Douglas Fir Plywood Association touting lead paint for interior walls and ceilings in addition to "exterior siding." In 1940, LIA advertisements in "National Painters Magazine" and "American Painter and Decorator" promoted interior residential use of lead paint and proclaimed such things as "white lead lends itself ideally to any paint styling desired by owner or architect, inside or out." 1940 LIA advertisements in American Paint and Oil Dealer, American Painter and Decorator, National Painters Magazine, The Painter and Decorator, American Builder, Hardware Retailer, and Hardware Age all promoted lead paint for interior residential use.

By 1941, the LIA's campaigns had created a great increase in the sale of lead paint compared to non-lead paint. During the war, lead paint sales declined, and they continued to decline after the war. The LIA briefly revived the White Lead Promotion campaign in the early 1950s, but it subsequently stopped specifically promoting white lead paint. Although the LIA's campaigns did not reverse the long-term trend of less use of lead pigments, these campaigns did prolong the use of lead pigments that otherwise probably would have ceased to be used.[36] More white lead was used during the Depression (the late 1920s and 1930s) than had been used previously, and the LIA attributed this increase to its campaigns.

---

[35] Other LIA advertisements in 1939 and 1940 did not expressly promote lead paint for interior use and mentioned only exterior use.

[36] It was unclear whether white lead sales would have declined more quickly if there had been no White Lead Promotion campaign.

With this background in mind, we proceed to review defendants' individual contentions.

### a. ConAgra

ConAgra contends that there is not substantial evidence that Fuller promoted lead paint for residential interiors with the requisite knowledge because (1) Fuller's post-1929 advertisements did not tell consumers to use lead paint on residential interiors, (2) Fuller's post-1935 advertisements did not mention lead or were only for exterior paint, (3) Fuller did not sell any lead paint for interiors after 1948, and (4) Fuller did not participate in the LIA's promotions.

Evidence at trial established that Fuller sold lead paint in the 10 jurisdictions from 1894 to 1961. Between 1894 and 1948, Fuller marketed two lead products: Pure Prepared Paint and Pioneer White Lead in Oil.[37] Fuller also marketed paints and other coatings that did not contain lead. Fuller's lead paints were sold at its own stores and by independent dealers in all 10 jurisdictions between 1894 and 1961. Plaintiff's experts testified that Fuller promoted the use of white lead by distributing brochures for consumers and painters that instructed them to use Fuller's lead paints for residential interiors and exteriors. They also asserted that Fuller's advertisements in the 10 jurisdictions instructed consumers to use Fuller's white lead paints on their residences.

A large number of the advertisements for Fuller products in the record are not for Fuller's lead paint but for other Fuller paints or coatings.[38] Another group of these advertisements simply generally advertised Fuller paints with no specification of which ones or without specifying for what purposes, or with specifications of the purposes for each

---

[37] Fuller also owned the Phoenix and Nason paint companies and marketed Phoenix's lead paint.

[38] The record contains hundreds of advertisements for Fuller products. Fuller advertised its "Nitrokote," "Fullerglo," "Enamel," and other specific paints, and there was no evidence that these paints contained lead.

41

paint that did not suggest that Fuller's lead paint be used for interiors. Plaintiff's expert testified: "In my expert opinion, they all are advertising Fuller Paints which contain lead. And they are actually ads that are informing consumers to use Fuller products without any acknowledgment they are containing lead. Some of them have lead in it, some don't." Since plaintiff's expert acknowledged that Fuller made both lead paint and non-lead paint, the mere fact that Fuller advertised its products does not establish that it promoted its lead paint for interior residential use. We disregard plaintiff's expert's testimony on this point because it lacks any rational basis in the evidence.

Many advertisements in the record were for Fuller's lead paint but did not expressly suggest that it be used for interiors. Some of these advertisements described Fuller's lead paint as "house paint." However, another group of Fuller advertisements explicitly promoted Fuller's lead paints for "all" residential purposes. For example, a 1927 Monterey Fuller advertisement promoted Fuller's lead paint "for all general purposes." Fuller advertisements in 1937 in the San Francisco Chronicle and the Los Angeles Times described Fuller's lead paint as "all purpose, 'house' paint." While these advertisements suggested that Fuller's lead paint could be used for any purpose, including interior residential use, the most important evidence of Fuller's promotion of its lead paint for interior residential use was Fuller's 1931 brochure for its lead paint. This brochure's "Directions for Use" instructed consumers to use this lead paint for residential interiors. Since Fuller's advertisements frequently suggested that consumers obtain brochures from a Fuller dealer, the brochure's "Directions for Use" amounted to instructions to all of those who purchased Fuller's lead paint to use it for residential interiors. Fuller also participated in both of the LIA's promotional campaigns in the 1930s and 1940s, which promoted lead paint for interior residential use.

This evidence rebuts ConAgra's contentions. Fuller did promote its lead paint after 1929 and after 1935, both by instructing consumers to use its lead paint for interior residential use and by participating in the LIA's campaigns promoting lead paint for interior

residential use.  It is immaterial whether Fuller's advertisements mentioned the word "lead" so long as the paint promoted in the advertisement was a lead paint, as it was.  Fuller's claim that it ceased to produce and sell lead paint in 1948 is immaterial even if true.  It was not necessary to show that Fuller continued to assist in the creation of the public nuisance throughout the entire period if its conduct constituted a substantial factor in causing the public nuisance (an issue we address in section IV(A)(4) of this opinion).  Fuller's claim that it did not participate in the LIA's promotions was rebutted by substantial evidence at trial.

We conclude that there is substantial evidence that Fuller itself promoted its lead paint for interior residential use at least beginning in 1931 and that it continued to do so as part of the LIA's promotional campaigns in the 1930s and 1940s.  Since the evidence supports the trial court's finding that Fuller knew of the danger that such use would create for children at that time, there is substantial evidence that Fuller promoted lead paint for interior residential use with the requisite knowledge.

### b.  NL

NL contends that its advertisements were not misleading because they merely described how well lead paint would protect and beautify interior walls and woodwork.  As we have already explained, promotion of lead paint for interior residential use was inherently misleading because it implicitly asserted that it was safe for such use when it was not.  NL also asserts that the court's promotion finding cannot be upheld because there was no evidence that NL promoted lead paint for interior residential use after 1950.  As we have noted above, the period during which a defendant assisted in the creation of a public nuisance is relevant only as to causation; it does not rebut a showing of affirmative promotion with the requisite knowledge.

Substantial evidence supports the trial court's finding that NL affirmatively promoted lead paint for interior residential use with the requisite knowledge.  NL stipulated that it manufactured, sold, and promoted lead paint for residential use in the 10 jurisdictions from

43

1900 to 1972 and that its "White Lead-in-Oil," "Dutch Boy House Paint 104," "Dutch Boy House Paint 111," and "Dutch Boy House Paint 116" contained white lead. No evidence was produced at trial that any other NL paint products contained white lead.[39]

Plaintiff's expert testified that NL promoted its Dutch Boy lead paint for interior residential use. NL produced "little illustrated books [in which] children were provided with both a story and a coloring pallet of paint that basically depicted the ways in which Dutch Boy white lead paint protected children from all sorts of onslaughts." He testified that NL "[s]pecifically promoted the use" of lead paint in "play rooms, . . . homes and on to surfaces and even on their furniture." Plaintiff's expert also noted that NL's advertisements did not necessarily disclose whether NL's lead paint contained lead and did not always distinguish between the use of lead paint on interiors and its use on exteriors. As we will explain, the material upon which plaintiff's expert based his testimony provides substantial support for his testimony.

NL's advertisements from the early 20th century demonstrate that NL repeatedly promoted its lead paint for interior residential use. A 1915 NL advertisement in the San Francisco Chronicle did so. A 1924 NL advertisement in National Geographic Magazine did so. A 1929 NL advertisement in the Los Angeles Times did so. 1929 NL advertisements in the San Francisco Chronicle and the Oakland Tribune promoted lead

---

[39] Many of the advertisements in the record were for Bass-Hueter products. NL purchased Bass-Hueter Paint Company in 1916, and Bass-Hueter merged with NL in 1930. No evidence was produced at trial that any specific Bass-Hueter paints contained white lead. Although the record contains 1931 advertisements for Bass-Hueter paints that promoted interior residential use, there is no evidence that those paints were lead paints. A 1933 Santa Clara County hardware store advertisement promoted Bass-Heuter Pure Lead and Oil Paint, but it did not suggest that it be used for residential interiors. Although Bass-Heuter advertisements in 1922 in Solano County and in 1925 in Santa Clara County described Bass-Heuter paints as having "permanent pigments, a base consisting of a combination of pure carbonate of lead and oxide of zinc, ground in refined linseed oil," there is no indication that these advertisements were admitted or could properly be admitted for their truth. Accordingly, the Bass-Hueter advertisements do not establish that NL promoted lead paint for interior residential use.

paint for "your stucco house *or for any other surface*." (Italics added.) A 1938 San Diego advertisement by a paint store promoted Dutch Boy, NL's brand, as "All Purpose Lead." A 1950 San Diego advertisement by a paint store promoted NL's lead products for interior residential use. And NL participated in both of the LIA's promotional campaigns in the 1930s and 1940s promoting lead paint for interior residential use.

NL's 1929 "paint book" for children showed a "Dutch Boy Painter" who tells the children, "This famous Dutch Boy Lead of mine [¶] Can make this playroom fairly shine [¶] Let's start our painting right away [¶] You'll find the work is only play." The book showed children stirring and painting with clearly labeled containers of Dutch Boy White Lead paint and then playing in their newly painted playroom. At the end of the book, it said: "For durable economical paint—inside or outside [¶] Paint with lead [¶] Dutch Boy White-Lead." Every page of the "paint book" instructed children to give their parents the "coupon" in the middle of the book.[40] NL's paint book contained "paper chips of paint" for children to use to color the pictures in the book. NL used this paint book as a promotion "for many years." This paint book obviously promoted lead paint for interior residential use.

NL's 1949 salesman's manual instructed NL's salesmen that NL's lead paints could "handle *any* painting job, exterior or interior" on any building. The manual told the salesmen that NL's "Lead Mixing Oil" was appropriate for "interior surfaces."

NL's 1950 "Handbook on Painting" encouraged the use of white lead paint on interior surfaces: "On interiors white lead is desired for its unique richness and solid beauty of finish. Also, the durability of white lead paint enables it to stand up under frequent washing—a big money saver in such places as hospitals and hotels." "The customary flat paint for interior work is made by mixing white lead with either Lead Mixing Oil or flatting

---

[40] In NL's 1949 salesman's manual, NL noted that the "paint book" was one of its "most successful promotions" of its paint.

oil." "Dutch Boy Lead Mixing Oil, when mixed with white lead in the proper proportions, makes flat paint that can be used on exterior as well as interior surfaces." "Furthermore, white lead and Lead Mixing Oil has the sturdy wear and beauty of finish characteristic of all white lead paint, whether exposed to weather or used inside. [¶] White lead and Lead Mixing Oil can be used for all coats on plaster and wallboard." NL's instructions for use in this handbook explicitly advocated the use of lead paint on interiors.

Substantial evidence supports the trial court's finding that NL affirmatively promoted lead paint for interior residential use with the requisite knowledge. NL extensively promoted its lead paint for interior residential use from 1915 through 1950. Because NL knew of the danger to children from lead paint on residential interiors no later than 1914, substantial evidence supports the trial court's finding that NL's subsequent promotions of lead paint for such use were done with the requisite knowledge.

### c. SWC

SWC contends that plaintiff did not present evidence of any advertisement by SWC promoting lead paint for interior residential use.

SWC stipulated that it began manufacturing lead paint in 1880 and began manufacturing white lead carbonate pigment in 1910. SWC manufactured Old Dutch Process (ODP) white lead in oil from 1910 to 1947. SWC manufactured "Inside Floor Paint," some colors of which contained white lead, between 1910 and 1913. SWC's other white lead paints were some of its SWP "house paint" colors until 1950, some of its "Family Paint" colors in the 1940s,[41] its "Porch and Deck" paint, and its "Concrete &

---

[41]  SWC and plaintiff stipulated that there was "no evidence" that SWC's "Family Paint," a paint that was intended for and promoted for interior residential use, "ever contained white lead sulfate" or "ever contained white lead carbonate pigment prior to 1941." Interestingly, SWC's 1926 training manual for its representatives stated that Family Paint, which it stated "will give good service on inside work," contained "White Lead Sulfate" pigment. SWC and plaintiff also stipulated that they had discovered no post-1936 advertisements for SWC's Family Paint.

Stucco" paint.[42] SWC also sold Monarch House Paint, ACME Quality House Paint, and Lowe Brothers High Standard House Paint, which were all lead paints. In a 1934 promotional booklet, SWC proclaimed that it was the "world's largest paint producer" and "one of the country's largest producers of White Lead."

SWC promoted and sold its white lead products for residential use in the 10 jurisdictions. The primary message conveyed in advertisements for SWC's paints, Monarch paints, and ACME's paints was that there was a specific coating for each purpose and that it was important to get the right coating for each type of use. For example, a 1903 SWC advertisement read: "No matter what you want to paint, . . . you'll get best results and save money if you use [¶] THE SHERWIN-WILLIAMS PAINTS [¶] A special paint for each purpose." A large group of SWC advertisements simply generically advertised SWC's brand, without specifying any particular paints. Many SWC advertisements were for SWC's non-lead "Kemtone" paint.

Advertisements for SWC's SWP House Paint often specified that it was for exterior use. Others simply referred to SWP as "house paint" without mentioning interior use. Still others identified SWP as being for "wood surfaces" or for all "woodwork" surfaces. However, there were also advertisements promoting SWP for interior residential use. 1904 SWC advertisements in the Los Angeles Times and the San Diego Union promoted SWP

---

In view of the parties' stipulations, we are required to disregard evidence that SWC's Family Paint was promoted for interior residential use prior to 1941. 1901 and 1904 advertisements in the Los Angeles Times promoted SWC Family Paint for interior use. A 1923 SWC advertisement in the San Francisco Examiner promoted SWC's Family Paint as "an all-round paint for inside use." A 1926 advertisement in the Oakland Tribune promoted SWC Family Paint as a "household paint."

[42] For instance, SWC's SWP Mildew Resisting White paint contained lead prior to 1954. Some of the colors in SWC's SWP Colors contained lead until 1950. In 1938, SWC also sold a lead paint called Zilo.

for "inside" use.[43] In addition, SWC participated in the LIA's Forest Products campaign from 1937 to 1941, which promoted lead paint for interior residential use and particularly for use on doors and window frames.

SWC had the requisite knowledge in 1900 of the public health hazard posed by lead paint, but it nevertheless continued to promote lead paint for interior residential use thereafter. This evidence supports the trial court's finding that SWC engaged in the requisite wrongful promotion.

### 4. Causation

Defendants contend that plaintiff did not produce substantial evidence that *their* promotions of lead paint for interior residential use were a substantial factor in *causing* the nuisance that the trial court required them to abate. First, they contend that there was no evidence that their promotions actually had an impact on the use of lead paint on residential interiors. Second, they contend that their wrongful promotions were too remote from the current presence of any public health hazard created by interior residential lead paint, which, they claim, is largely due to owner neglect, renovations, intervening actors (architects, painters, etc.), and repainting that has taken place in the interim. Third, they argue that, because they did not promote lead paint for interior residential use after 1950, they could not be held responsible for use of lead paint on residential interiors of homes built after 1950. The trial court's judgment required defendants to remediate interior lead paint in all homes built before 1980, even though most of those homes were built after 1950. Fourth, they maintain that there was no evidence that their promotions of lead paint

---

[43] Although many of the advertisements for SWC paints were placed by hardware stores or other retailers, SWC paid half of the cost of advertising by its authorized dealers, so these advertisements may properly be attributed to SWC. A 1924 lumber store advertisement in Monterey for Monarch lead paint suggested that it could be used for interiors. However, the stipulation between SWC and plaintiff was that this paint contained lead between 1925 and 1930, which does not include 1924 when this advertisement was placed.

for interior residential use had a causal connection to the water leaks and soil lead that the court ordered them to remediate.  Fifth, defendants claim that plaintiff was required to show that their individual lead paints are currently present in a large number of homes in the 10 jurisdictions.  Sixth, they argue that due process requires that their liability for remediation be proportionate to their individual contributions.

Causation is an element of a cause of action for public nuisance.  (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 542.)  "A connecting element to the prohibited harm must be shown." (*In re Firearm Cases* (2005) 126 Cal.App.4th 959, 988 (*Firearm Cases*).)  The parties agree that the causation element of a public nuisance cause of action is satisfied if the conduct of a defendant is a substantial factor in bringing about the result.  (*Citizens for Odor Nuisance Abatement v. City of San Diego* (2017) 8 Cal.App.5th 350, 359 [applying substantial factor standard in a public nuisance action].)  " 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation.]  Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' [citation], but a very minor force that does cause harm is a substantial factor [citation]." (*Bockrath v. Aldrich Chemical Co., Inc.* (1999) 21 Cal.4th 71, 79.)

### a.  Impact and Remoteness

In this case, there was plenty of evidence that defendants' affirmative promotions of lead paint for interior residential use played at least a "minor" role in creating the nuisance that now exists.

First, all three defendants participated in the LIA's Forest Products campaign.  The Forest Products campaign began in 1934.  In 1935, the LIA reported that its Forest Products campaign had resulted in some manufacturers of leadless paints "changing their formulas to include lead."  In 1939, the LIA reported to its members that, as a result of the Forest Products campaign, (1) "[a]ll the principal producers of soft and hard lumber in the United States . . . specify white lead or high grade prepared paint which contains white lead"

49

through the "distributi[on of] painting instruction leaflets (2,000,000 copies)"; (2) "[s]ome paint companies have increased the lead content of their paint"; and (3) "sash and door manufacturers" would be producing "20,000,000 labels to be affixed to nearly all the sash and doors in the United States, featuring the use of white lead and high-grade prepared paint." In 1941, the LIA reported that the benefits of the Forest Products campaign were continuing. "Lumber associations continued distributing, at their own expense, thousands of painting leaflets recommending white lead or the highest grade prepared paints to be used on their products" and that the "National Door Manufacturing Association" was "the latest to use painting leaflets" to promote the use of white lead. The lumber manufacturers were continuing to include "painting instruction leaflets" with their lumber products. Since lead paint on doors and windows is one of the most hazardous uses for children due to the dust created by their friction surfaces, this campaign played a significant role in creating the nuisance that now exists.

Second, both NL and Fuller gave consumers of their lead paints explicit instructions to use those paints on residential interiors. Fuller's 1931 brochure for its lead paint contained "Directions for Use" instructing consumers to use this lead paint for residential interiors. Since Fuller's advertisements frequently suggested that consumers obtain brochures from a Fuller dealer, the brochure's "Directions for Use" constituted instructions to all those who purchased Fuller's lead paint to use it for residential interiors. NL produced its 1929 paint book, which promoted lead paint for interior residential use, and NL published its 1950 "Handbook on Painting," which explicitly recommended that consumers use white lead paint on interior surfaces.

In sum, by persuading window and door manufacturers to attach written recommendations to all windows and doors that lead paint should be used on those windows and doors, *all three defendants* certainly played a significant role in causing lead paint to be used on at least some of those windows and doors. Further, NL and Fuller, by explicitly instructing consumers to use their lead paints on residential interiors, played an even more

50

direct role in causing lead paint to be used in such a manner. Again, the trial court could reasonably infer that at least some of those who were the targets of these recommendations heeded them. That is all that the substantial factor test requires.

We cannot credit defendants' claim that there was no evidence that their promotions were even "a very minor force"—"a substantial factor"—in causing the presence of lead paint on residential interiors in the 10 jurisdictions. The LIA's extensive advertising campaigns, in which all three defendants participated, affirmatively promoted to painters, architects, retailers, and consumers the use of lead paint on residential interiors, and each defendant also individually promoted to consumers lead paint for use on residential interiors in the 10 jurisdictions. The LIA judged its promotional campaigns to be a success, and the fact that lead paint remains in place on residential interiors in many homes throughout the 10 jurisdictions decades after all of these promotions ceased reflects that this belief was accurate. We find reasonable the inference that each individual defendant's promotion of lead paint for interior residential use, both through the LIA promotional campaigns and their individual promotions, were at least "a very minor force" in leading to the current presence of interior residential lead paint in a substantial number of homes in the 10 jurisdictions.

Defendants also contend that their wrongful promotions were too remote from the current hazard to be its "legal cause." They claim that, due to the lapse of time, this hazard is more closely attributable to owner neglect, renovations, painters, architects, and repainting. "A tort is a legal cause of injury only when it is a substantial factor in producing the injury." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) " " " 'Legal cause' exists if the actor's conduct is a 'substantial factor' in bringing about the harm and there is no rule of law relieving the actor from liability. [Citations.]" ' [Citations.] ' "The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, he will nevertheless be absolved because of the manner in which the injury occurred." ' " (*Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 665-666.)

51

" 'Proximate cause involves *two* elements.' [Citation.] 'One is *cause in fact*. An act is a cause in fact if it is a necessary antecedent of an event.' [Citation.] . . . [¶] By contrast, the second element focuses on public policy considerations. Because the purported causes of an event may be traced back to the dawn of humanity, the law has imposed additional 'limitations on liability other than simple causality.' [Citation.] 'These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy.' [Citation.] Thus, 'proximate cause' "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." ' " (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1045.) "[T]here is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the [factfinder], though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus." (*People v. Roberts* (1992) 2 Cal.4th 271, 320, fn. 11.)

Defendants argue that they should be absolved of responsibility for the current hazard because their wrongful conduct was "too remote" and "attenuated" from the current hazard.[44] This was a question of fact for the trial court. A rational factfinder could have concluded that defendants' wrongful promotions of lead paint for interior residential use were not unduly remote from the presence of interior residential lead paint placed on those residences during the period of defendants' wrongful promotions and within a reasonable period thereafter. The connection between the long-ago promotions and the current

---

[44] The cases that defendants rely on provide no support for their argument. For instance, the portion of *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764 (*Cabral*) that they cite concerned a duty determination, not a causation determination. (*Cabral*, at p. 779.) The firearm manufacturers in *Firearm Cases*, *supra*, 126 Cal.App.4th 959, unlike defendants, did not affirmatively promote their products for a dangerous use. (*Firearm Cases*, at pp. 988-989.) *City of Chicago v. American Cyanamid Co.* (Ill. App. Ct. 2005) 355 Ill.App.3d 209 was decided under Illinois law.

presence of lead paint was not particularly attenuated. Those who were influenced by the promotions to use lead paint on residential interiors in the 10 jurisdictions were the single conduit between defendants' actions and the current hazard. Under these circumstances, the trial court could have reasonably concluded that defendants' promotions, which were a substantial factor in creating the current hazard, were not too remote to be considered a legal cause of the current hazard even if the actions of others in response to those promotions and the passive neglect of owners also played a causal role. The court could therefore have concluded that defendants' promotions were the "legal cause" of the current nuisance.

### b. Post-1950 Homes

We find merit in defendants' claim that the record lacks substantial evidence to support the court's finding that their wrongful promotions were causally connected to post-1950 homes containing interior lead paint built before 1980.

Plaintiff claims that defendants' wrongful promotions "sustained, increased, and prolonged the use of lead paint in homes *throughout the 20th century*." (Italics added.) It asserts that this can be "inferred" from the "sheer breadth of Defendants' promotional activities" and the fact that there is currently lead paint in homes in the 10 jurisdictions. Plaintiff also claims that NL continued to promote lead paint for interior residential use beyond 1950.

First of all, plaintiff did not produce any evidence of an affirmative promotion by NL, SWC, or Fuller of lead paint for interior residential use after 1950. The advertisements that plaintiff identifies as post-1950 NL promotions did not promote *lead* paint for interior residential use. Those advertisements promoted NL's "Dutch Boy" *brand* of paints and identified interior residential use as one of the uses for NL's "Dutch Boy" brand of paints without suggesting that any *lead* paint be used for interiors. NL stipulated at trial that its "White Lead-in-Oil" and three of its "Dutch Boy" paints contained white lead, and plaintiff presented no evidence that any other NL paint product contained lead. Since NL

indisputably made many Dutch Boy paints, NL's promotion of its *brand* for many uses, including interior residential use, did not amount to an affirmative promotion of *lead* paint for interior residential use. Indeed, plaintiff's argument seems to be based on the idea that the mere fact that these advertisements identified National *Lead* Company as the maker of Dutch Boy paints transformed advertisements for non-lead paints for interior use into promotions of lead paint for interior use. We reject this unfounded argument.

NL contends that the evidence could not support a finding that it caused the use of lead paint on residential interiors after 1955 because, according to NL, all lead paint bore a label marking it as not for interior residential use beginning in 1955. The only citation to the record that NL provides is to testimony by a defense expert about a standard created by the American Standards Association in 1955. The expert testified that the LIA had participated in the creation of that standard. He referenced a defense exhibit, a barely legible copy of which appears in the record, that apparently contains the 1955 standard. This standard states: "These specifications cover the requirements for coatings (such as paints, enamels, lacquers, etc. applied in liquid form) which are deemed suitable from a health standpoint to be used to paint children's toys or furniture or interior surfaces so that the danger of poisoning will be minimized if, by chance, some of this coating should be chewed off and swallowed by a child." "A liquid coating material to be deemed suitable, from a health standpoint, for use on articles such as furniture, toys, etc, or for interior use in dwelling units where it might be chewed by children" should not contain more than 1 percent lead. The standard states that coatings complying with it "may be marked: 'Conforms to American Standard Z66.1-1955, for use on surfaces that might be chewed by children." Notably, this standard does not impose any labeling requirement of any kind on lead paint.

Although one might draw an inference that the LIA's participation in the creation of this standard encouraged the compliance of its members, the trial court was not required to draw that inference. Indeed, the standard itself stated: "The existence of an American

54

Standard does not in any respect preclude any party who has approved of the standard from manufacturing, selling, or using products . . . not conforming to the standard." Moreover, this standard did not even suggest a label for lead paint. It pertained to a label for **non-**lead paints. Nor is there any affirmative evidence in the record that even this standard was enforced by anyone or that any defendant complied with it beginning in 1955.

Nevertheless, plaintiff's assertion that the current presence of lead paint on residential interiors itself establishes that defendants' pre-1951 promotions caused it to be placed there is speculative and attempts to eliminate the causation element entirely. While we can accept the inference that defendants' pre-1951 promotions increased the use of lead paint on residential interiors during the period of those promotions, we reject plaintiff's claim that it is a reasonable inference that the impact of those promotions may be assumed to have continued for the next 30 years. We can find no evidence in the record that supports an inference that the promotions of defendants prior to 1951 continued to cause the use of lead paint on residential interiors decades later.[45] We therefore conclude that we cannot uphold the trial court's judgment requiring defendants to remediate all houses built before 1981 because there is no evidence to support causation as to the homes built after 1950.[46]

### c. Water Leaks and Soil Lead

Defendants also challenge on causation grounds the court's inclusion of soil lead and water leaks in its remediation plan.

---

[45] ConAgra contends that the court erred in treating homes built before 1981 as an "indivisible group." We do not believe that the court treated these homes as an indivisible group. The court's remediation plan explicitly assigned homes built before 1950 to the highest priority, while homes built from 1950 to 1981 were assigned a lower priority. Since the age of a home is generally discoverable, homes may be readily distinguished from one another based on the date they were built. Indeed, by limiting the remediation plan to homes built before 1981, the court's remediation plan already treated homes differently based on their age.

[46] On remand, the trial court will need to recalculate the amount of the abatement fund accordingly.

This was a disputed issue at trial. Plaintiff's experts testified: "[L]ead paint gets into the soil from several routes. One is by the friction and impact surfaces, opening and closing windows and doors on a home with lead-based paint. It also results from the weathering of paint exterior on the home, rain and sun hits the paint, it deteriorates over time. And also previous paint jobs, generally where they are sanding and scraping have contributed to soil lead contamination around the home." Lead concentrations are highest close to the home "[b]ecause we know that the exterior is subject to weathering, because windows on the exterior often have high lead concentrations and they are subject to friction and impact, and because the previous painting jobs could have caused sanding and scraping on the exterior of a home which often then resides as contamination of the soil close to the home."[47] "[L]ead-based paint in housing now is the major source of contamination of both soil and house dust."[48] Thus, plaintiff's evidence established that a prime contributor to soil lead was lead paint on the friction surfaces of windows and doors, which are interior, rather than exterior surfaces. In keeping with this evidence, the judgment requires remediation of soil lead only where the home itself contains interior lead paint. Under these circumstances, the evidence supports the court's implied finding that soil lead in those homes has been caused by interior residential use of lead paint.

The court's decision to include remediation of water leaks in the judgment is not a causation issue. Plaintiff did not contend that the water leaks should be remediated because they were caused by defendants' promotions. The reason why remediation of water leaks is

---

[47] One of plaintiff's experts responded to the question "What are sources of lead in dust in [*sic*] soil, other than -- your view is that the sources for dust and soil lead are lead-based paint; right?" by saying "Sure. Where leaded paints are available. I mean in the housing unit." This response does not necessarily attribute soil lead to interior lead paint as the question referred to both soil lead and household dust lead.

[48] He also testified that "lead in housing" consisted of "lead paint, lead dust in housing, and lead in soil." Plaintiff's expert testified that soil lead and dust lead inside houses are linked because "the soil is often tracked into the home on people's shoes."

properly part of the remediation plan is that the court did not order remediation of all interior lead paint. As water leaks could cause intact interior lead paint to deteriorate and present a dangerous hazard to children, the remediation of water leaks was an appropriate lesser alternative to removal of all interior lead paint. Since defendants' wrongful promotions caused the presence of interior lead paint, the court did not err in requiring remediation designed to prevent that interior lead paint from harming children in those homes.

### d. Identification of Individual Paint

Defendants contend that their promotions cannot be found to have caused the presence of interior lead paint in homes in the 10 jurisdictions without proof that paint made by each of them is currently present in those homes. This contention misconstrues the basis for defendants' liability. Defendants are liable for *promoting* lead paint for interior residential use. To the extent that this promotion caused lead paint to be used on residential interiors, the identity of the manufacturer of that lead paint is irrelevant. Indeed, the LIA's promotions did not refer to any manufacturer of lead paint, but were generic. What matters is whether defendants' promotions were a substantial factor in leading to the use of lead paint on residential interiors. Substantial evidence supports the court's causation finding on that basis.

### e. Proportioned Liability

Defendants' final challenge to the court's causation finding is based on their claim that they could not be held liable except in proportion to their individual contributions to the creation of the public nuisance. They claim that due process precluded the imposition of a remedy that was "grossly disproportionate to a defendant's conduct."

None of the cases they cite concerns causation in a public nuisance case. Proportionality is not a causation issue. Defendants may be held liable for a public nuisance that they assisted in creating if their wrongful promotions were a substantial factor in the creation of that public nuisance. As we have already concluded, the evidence supports the

57

trial court's finding at least as to homes built before 1951. Proportionate liability is something that defendants may be able to determine by means of litigation between themselves, but the fact that the remediation plan does not apportion liability among defendants does not infect the court's causation finding.

Citing the Restatement, defendants argue that "a defendant can be liable only for its own contribution to a nuisance." However, the Restatement comment upon which they rely does not support their contention. It says: "[T]he burden rests *upon the defendant* to produce sufficient evidence to permit the apportionment to be made. [¶] When the apportionment is made, each person contributing to the nuisance is subject to liability only for his own contribution. He is not liable for that of others; but the fact that the others are contributing is not a defense to his own liability." (Rest.2d Torts, § 840E, com. B, italics added.) The trial court could have reasonably concluded that defendants did not prove that the harm was capable of apportionment. The Restatement confirms that where the harm is not capable of apportionment, each contributor is liable for the entire harm. (Rest.2d Torts, § 840E, com. c.) In this case, it is clear that the trial court properly concluded that the harm was incapable of apportionment and therefore held all three defendants jointly and severally liable for the entire harm.

### 5. Abatability, Imminent Danger, and Reduction of BLLs

Defendants contend that plaintiff failed to prove that defendants have the ability to abate lead in private homes or that abatement can be achieved "at a reasonable cost by reasonable means."

This court rejected defendants' "ability to abate" contention in *Santa Clara I*. "'[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical

58

question is whether the defendant *created or assisted in the creation of the nuisance.*' " (*Santa Clara I*, *supra*, 137 Cal.App.4th at p. 306.)  We decline to reconsider this issue.[49]

Defendants' "reasonable cost" contention is premised on *Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087 (*Mangini II*).  The issue in *Mangini II* concerned the statute of limitations.  (*Mangini II*, at p. 1090.)  Because the plaintiffs had not filed their private nuisance action within the three-year limitations period for a "permanent" nuisance, the action was barred unless the nuisance was a "continuing" one.  (*Ibid.*)  " '[T]he crucial test of the permanency of a trespass or nuisance is whether the trespass or nuisance can be discontinued or abated.' " (*Mangini II*, at p. 1097.)  The California Supreme Court held that the plaintiffs had failed to prove that the nuisance was abatable.  However, the court expressly denied that its holding would be applicable where the statute of limitations was not at issue:  "We express no opinion on the question whether a plaintiff who has filed a *timely* nuisance action is required to prove that abatement can be accomplished at a 'reasonable cost' in order to be entitled to an injunction requiring the wrongdoing party to remedy the damage to the property." (*Mangini II*, at p. 1090*.*)  Defendants choose to ignore this statement, but it establishes that *Mangini II* provides no support for their claim.[50]

Defendants' reliance on *County of San Diego v. Carlstrom* (1961) 196 Cal.App.2d 485 (*Carlstrom*) is also misplaced.  *Carlstrom* was a case in which the defendants claimed that the abatement injunction should have offered them abatement options other than removal of the structures that the court had found to be a public nuisance.  (*Carlstrom*, at

---

[49]     The Rhode Island and New Jersey cases upon which defendants rely are not helpful as these cases did not apply California law.  (*State v. Lead Industries Ass'n, Inc.* (R.I. 2008) 951 A.2d 428; *In re Lead Paint Litigation* ([June 15,] 2007) 191 N.J. 405.)  We discuss these out-of-state cases in section V of this opinion.

[50]     *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160 (*Beck*), like *Mangini II*, discussed abatability solely in the context of whether a private nuisance cause of action was barred by the statute of limitations.  (*Beck*, at pp. 1216, 1219-1223.)

p. 493.) The Court of Appeal found that the trial court had not abused its discretion in requiring removal. (*Ibid.*) We can find nothing in *Carlstrom* to support defendants' abatability or reasonable cost contentions.

Defendants assert that plaintiff failed to establish that lead paint poses an imminent danger of harm and that the abatement plan will reduce children's BLLs. Plaintiff responds that it presented substantial evidence that lead paint poses an imminent risk of harm and that abatement, and particularly door and window replacement, will reduce the number of children who are poisoned by lead paint.

Defendants rely on *Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932 (*Helix*) to support their claim that plaintiff failed to prove that lead paint poses an imminent danger of harm. The plaintiff in *Helix* attempted to allege inverse condemnation and nuisance causes of action based on its claim that its land was at greater risk of harm due to the City's actions and inactions regarding flood control. (*Helix*, at pp. 940, 950.) However, the plaintiff failed to allege that the City's actions "present[] a future hazard" to its land. (*Helix*, at p. 950.) The plaintiff did not allege that any damage had occurred, and the court found that it was mere speculation that damage might occur in the future. (*Ibid*.) The court rejected the plaintiff's nuisance cause of action on the ground that it had failed to allege that a "prospective nuisance" was "either probable or imminent." (*Helix*, at p. 951.)

*Helix* does not support defendants' challenge to the trial court's abatement order. In this case, unlike in *Helix*, there was substantial evidence that interior residential lead paint had been causing and will continue to cause harm to children in the 10 jurisdictions.[51] "Almost all human activity involves some risk, and in circumstances in which Civil Code section 3479 is the only applicable statute, considerable judicial discretion has been allowed in determining whether an alleged danger is sufficiently serious to justify abatement." (*City*

---

[51] They also cite *Beck*, but in *Beck*, unlike this case, there was "no evidence" of potential harm from the alleged public nuisance. (*Beck*, *supra*, 44 Cal.App.4th at p. 1214.)

*of Bakersfield v. Miller* (1966) 64 Cal.2d 93, 99 (*Miller*).) Every year, numerous children in the 10 jurisdictions are found to be suffering from lead poisoning due to their exposure to lead paint. "[T]he lead will not disappear on its own." So long as interior residential lead paint continues to exist in the 10 jurisdictions, this nuisance will continue to be an ongoing and imminent risk to the health of the children in the 10 jurisdictions. The trial court did not abuse its discretion in determining that the danger posed by interior residential lead paint in the 10 jurisdictions poses a sufficiently serious and imminent risk of harm to merit abatement.

Defendants also contend that abatement is unwarranted because plaintiff failed to show that abatement will reduce the BLLs of children in the 10 jurisdictions. Plaintiff presented expert testimony that abatement is effective at reducing BLLs in children. Defendants concede that plaintiff presented such evidence, but they maintain that this expert opinion testimony was "inadmissible guesswork."[52] The trial court admitted this evidence, and defendants make no effort to demonstrate that the court abused its broad discretion in doing so. Their citation to *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*) is not helpful to their contention. *Sargon* held that the trial court has discretion as a "gatekeeper" to determine "whether the matter relied on [by an expert] can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon*, at pp. 771-772.) Defendants fail to establish that the trial court abused its discretion in finding that plaintiff's expert's opinion regarding BLL

---

[52]  Defendants repeatedly insist that the court ordered abatement of "intact" lead paint. This insistence is misleading. With the exception of doors and windows, intact lead paint on large surfaces such as walls would not be removed. Instead, paint stabilization techniques would be applied to ensure that it remained intact. Lead-contaminated soil would be covered or removed depending on its concentration. Windows and doors that had been painted with lead paint would be replaced, as no other remediation would be effective. Thus, the court did not order abatement of all "intact" lead paint in the 10 jurisdictions. The abatement plan targeted only the highest risks, while avoiding the creation of additional risks of contamination that might follow from the removal of all intact lead paint.

reductions had a reasonable basis.  Since the evidence was properly admitted, the trial court was entitled to credit it.  The substance of defendants' argument is that the trial court should not have credited this testimony, but an appellate court must defer to a trial court's credibility determinations.  We reject this contention.

## B.  Public Right

Defendants contend that plaintiff failed to establish that interior residential lead paint interferes with any "public right."[53]

"'*Anything* which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance.'  (Civ. Code, § 3479, italics added.)  'A *public* nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.'  (Civ. Code, § 3480[, italics added].) . . .  [¶] '*[P]ublic* nuisances are offenses against, or interferences with, the exercise of *rights common to the public.*'  (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103 [60 Cal.Rptr.2d 277, 929 P.2d 596], [first italics added, second italics are] original italics.)  'Of course, not every interference with collective social interests constitutes a public nuisance. To qualify, and thus be enjoinable [or abatable], the interference must be both *substantial* and *unreasonable.*'  ([*Id.* at p. 1105].)  It is substantial if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted.  ([*Ibid*].)" (*Santa Clara I*, *supra*, 137 Cal.App.4th at p. 305.)

---

[53] They also claim that, "if this were a factual question, not a legal one," we would be precluded from inferring a trial court finding on it because the trial court failed to identify any "public right" in its statement of decision even though it was pointed out to the court in objections.  However, they concede that this is a legal issue, and we agree.

Defendants concede that a "public right is one relating to common resources," but they contend that interior residential lead paint does not interfere with any "public right" because it causes only private harms in private residences. They claim that the trial court erroneously based its public nuisance finding on an "aggregation of private harms." Defendants contend that a public nuisance can exist only if it "harm[s] people in their *exercise of a public right*." (Italics added.)

Interior residential lead paint that is in a dangerous condition does not merely pose a risk of private harm in private residences. The community has a collective social interest in the safety of children in residential housing. Interior residential lead paint interferes with the community's "public right" to housing that does not poison children. This interference seriously threatens to cause grave harm to the physical health of the community's children. Defendants cite no California authority for their claim that no public right is threatened by interior residential lead paint, and we reject their reliance on Rhode Island and Illinois cases applying those states' laws, which they seem to concede are not as broad as California's.

Defendants argue that "[t]he 'public' has no right to be present inside a private home, and thus, any possible lead exposure inside a private home cannot occur in the exercise of any public right." Most members of the "public" reside in residential housing, and we do not accept defendants' claim that, unlike streets, residential housing is not a shared community resource. Residential housing, like water, electricity, natural gas, and sewer services, is an essential community resource. Indeed, without residential housing, it would be nearly impossible for the "public" to obtain access to water, electricity, gas, and sewer services. Pervasive lead exposure in residential housing threatens the public right to essential community resources. We reject defendants' contention that interior residential lead paint cannot interfere with a public right.

## C. Regulatory Standards, Nuisance Per Se, and Separation of Powers

Defendants claim that interior residential lead paint cannot be a public nuisance because it does not violate any regulatory standards, and "[t]he court must follow state regulations declaring intact LBP [lead-based paint] not a hazard, even on friction surfaces. (H&S Code §17920.10.)"

"Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." (Civ. Code, § 3482.) Health and Safety Code section 17920.10 does not "declar[e]" that "intact" lead paint is "not a hazard." This statute provides that buildings that contain "lead hazards," as it defines them "for the purposes of this part" (primarily deteriorated lead paint), are in violation of the Health and Safety Code.[54] (Health & Saf.

---

[54] Health and Safety Code section 17920.10 provides: "(a) Any building or portion thereof including any dwelling unit, guestroom, or suite of rooms, or portion thereof, or the premises on which it is located, is deemed to be in violation of this part as to any portion that contains lead hazards. For purposes of this part, 'lead hazards' means deteriorated lead-based paint, lead-contaminated dust, lead-contaminated soil, or disturbing lead-based paint without containment, if one or more of these hazards are present in one or more locations in amounts that are equal to or exceed the amounts of lead established for these terms in Chapter 8 (commencing with Section 35001) of Division 1 of Title 17 of the California Code of Regulations or by this section and that are likely to endanger the health of the public or the occupants thereof as a result of their proximity to the public or the occupants thereof. [¶] (b) In the absence of new regulations adopted by the State Department of Health Services in accordance with the rulemaking provisions of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code) further interpreting or clarifying the terms 'deteriorated lead-based paint,' 'lead-based paint,' 'lead-contaminated dust,' 'containment,' or 'lead-contaminated soil,' regulations in Chapter 8 (commencing with Section 35001) of Division 1 of Title 17 of the California Code of Regulations adopted by the State Department of Health Services pursuant to Sections 105250 and 124150 shall interpret or clarify these terms. If the State Department of Health Services adopts new regulations defining these terms, the new regulations shall supersede the prior regulations for the purposes of this part. [¶] (c) In the absence of new regulations adopted by the State Department of Health Services in accordance with the rulemaking provisions of the Administrative Procedure Act defining the term 'disturbing lead-based paint without containment' or modifying the term 'deteriorated lead-based paint,' for purposes of this part 'disturbing lead-based paint without containment' and 'deteriorated lead-based paint' shall

Code, § 17920.10, subd. (a).)  Nowhere in this statute does the Legislature declare that any other type of lead paint in buildings is *not a hazard*, is *lawful*, or is *authorized by statute*. All that this statute does is identify certain defined "lead hazards" as violations of the Health and Safety Code.  The mere fact that not all interior residential lead paint violates the Health and Safety Code does not mean that it cannot be abated as a public nuisance.  "'A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury.'" (*Hassell v. City and County of San Francisco* (1938) 11 Cal.2d 168, 171.)

Nor does the absence of a regulation or statute declaring interior residential lead paint to be unlawful bar a court from declaring it to be a public nuisance.  "The fact that a building was constructed in accordance with all existing statutes does not immunize it from subsequent abatement as a public nuisance. . . .  It would be an unreasonable limitation on the powers of the city to require that this [presently existing] danger be tolerated ad

be considered lead hazards as described in subdivision (a) only if the aggregate affected area is equal to or in excess of one of the following:  [¶]  (1)  Two square feet in any one interior room or space.  [¶]  (2)  Twenty square feet on exterior surfaces.  [¶]  (3)  Ten percent of the surface area on the interior or exterior type of component with a small surface area.  Examples include window sills, baseboards, and trim.  [¶]  (d)  Notwithstanding subdivision (c), 'disturbing lead-based paint without containment' and 'deteriorated lead-based paint' shall be considered lead hazards, for purposes of this part, if it is determined that an area smaller than those specified in subdivision (c) is associated with a person with a blood lead level equal to or greater than 10 micrograms per deciliter.  [¶]  (e)  If the State Department of Health Services adopts regulations defining or redefining the terms 'deteriorated lead-based paint,' 'lead-contaminated dust,' 'lead-contaminated soil,' 'disturbing lead-based paint without containment,' 'containment,' or 'lead-based paint,' the effective date of the new regulations shall be deferred for a minimum of three months after their approval by the Office of Administrative Law and the regulations shall take effect on the next July 1 or January 1 following that three-month period.  Until the new definitions apply, the prior definition shall apply."

infinitum merely because the [building] did not violate the statutes in effect when it was constructed 36 years ago." (*Miller*, *supra*, 64 Cal.2d at pp. 101-102.)

Defendants contend: "[T]he trial court declared lead paint to be a nuisance by category. This inverts the role of the two branches of government, because only the Legislature has the power to choose between declaring a nuisance per se and finding a nuisance in specific circumstances." The trial court did no such thing. "Generally a nuisance is defined as '[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . .' (Civ. Code, § 3479.) This requires consideration and balancing of a variety of factors. [Citations.] However, where the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made and in this sense its mere existence is said to be a nuisance per se. [Citation.] But, to rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law." (*Beck*, *supra*, 44 Cal.App.4th at pp. 1206-1207.)

The trial court did not declare the "very existence" of lead paint or even interior residential lead paint to be a public nuisance. The court crafted a very limited order requiring abatement of only deteriorated interior lead paint, lead paint on friction surfaces, and lead-contaminated soil at residences in the 10 jurisdictions. It did not find that lead paint itself is a nuisance per se but only that the specific targets of its order produce or contain lead that has been shown to threaten the safety of children in their homes. It is only under these limited circumstances that lead paint poses an *immediate* threat to the health of children and must be abated as a public nuisance. The court's order was well within the general authority of Civil Code section 3479, so its order was not a declaration of a nuisance per se.

Defendants argue that the trial court's order violated separation of powers principles because the Legislature chose in 2001 not to declare the presence of lead paint in a

66

residence to be a nuisance. They assert that the Legislature rejected a 2001 bill that would have declared the presence of lead paint in a residence to be a public nuisance and instead enacted a statute that "permits owners to maintain intact LBP in residences." Defendants misrepresent the nature of the Legislature's 2001 actions. The unpassed bill, Assembly Bill No. 422 (2001-2002 Reg. Sess.) would have enacted a statute providing that "[a]ny condition on real property that a local health department has determined poses a lead hazard risk to public children is a public nuisance for purposes of Section 3479 of the Civil Code." (Assem. Bill No. 422 (2001-2002 Reg. Sess.) as introduced and amended Feb. 20, 2001.) This bill was not limited to residences, did not address "intact" lead paint, and did not propose to declare anything to be a public nuisance absent a determination by a local agency. The enacted bill, Senate Bill No. 460, was directed toward lead hazard abatement. It enacted Health and Safety Code section 17920.10, providing that a "dwelling" would be "deemed untenantable" if it "contains lead hazards" as defined (primarily deteriorated lead paint). Senate Bill No. 460 also enacted Health and Safety Code section 17980, which mandated that an "enforcement agency" that "determined" a building contained "lead hazards" "shall commence proceedings to abate the violation by repair, rehabilitation, vacation, or demolition of the building." (Health & Saf. Code, § 17980, subd. (b)(1).) And it provided for criminal charges against a person who did not comply with such an abatement order. (Health & Saf. Code, § 105256.)

First of all, "[u]npassed bills, as evidences of legislative intent, have little value." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396.) Furthermore, the Legislature's 2001 actions cannot reasonably be viewed as rejecting the possibility that conditions created by lead paint in the interiors of residences that posed an imminent danger to children could constitute public nuisances. By authorizing abatement actions for lead hazards and criminal charges against those who did not comply with abatement orders, the Legislature took a strong stance against lead hazards *in dwellings* by enacting Senate Bill No. 460. Assembly Bill No. 422, unlike Senate Bill No. 460 and the

67

trial court's order, was not limited to dwellings and gave local health departments the power to declare "real property" to be a public nuisance. The Legislature's rejection of Assembly Bill No. 422 was therefore not a rejection of the potential for a court to conclude that certain conditions created by lead paint in the interiors of residences and posing an imminent danger to children were public nuisances.

Defendants also submit an extended argument that the trial court's order has adverse policy implications. We are not persuaded that these arguments could support a reversal of the trial court's abatement order. It may well be that a multi-pronged approach to this problem will be necessary, with the court's abatement order serving as merely one of several methods necessary to resolve this problem. What the evidence in this case demonstrates is that defendants are wrong in claiming that California's statutory scheme creating the CLPPB and local CLPPPs fully addresses childhood lead exposure.

The CLPPB's $28 million annual budget is largely funded by a special fee called the Childhood Lead Poisoning Prevention fee, and also by Medi-Cal, the EPA, the CDC, and a special fund for lead-related construction. The Childhood Lead Poisoning Prevention fee, which provides about $20 million a year, is funded by the industries that put lead into the environment. About 14 percent of those fees are paid by makers and former makers of "architectural coatings."[55] The vast majority of the fees are paid by motor vehicle fuel distributors.[56] Even with the CLPPB, local CLPPPs, and state statutes addressing lead

---

[55] "'Architectural coating' means any product which is used as, or usable as, a coating applied to the interior or exterior surfaces of stationary structures and their appurtenances, to portable buildings, to pavements, or to curbs, such as house and trim paints, varnishes, stains, lacquers, industrial maintenance coatings, primers, undercoaters, and traffic coatings." (Cal. Code Regs., tit. 17, § 33002.)

[56] Motor vehicle fuel contained lead from the 1920s until it began to be phased out in the 1970s and 1980s. It was not eliminated until the 1990s. The percentages were not based on distribution of lead into the environment by the products but on the amount of lead used in the products.

hazards, many children in the 10 jurisdictions continue to suffer serious harm from lead paint in their homes.

The evidence presented at trial demonstrated that the trial court's abatement order will reduce the risk of further harm to children in the 10 jurisdictions from lead paint. The Legislature has not precluded courts from utilizing public nuisance law to prevent further harm, and we are aware of no public policy reason to preclude courts from taking such actions. Lead poisoning has been estimated to cost society $50 billion a year. For every dollar that is spent on preventing lead exposure, there is a savings to society of between $17 and $220. We reject defendants' claims that the court's abatement order usurps the Legislature's powers.


### D.  Joint and Several Liability

Defendants contend that the trial court erred in imposing joint and several liability. They claim that this resulted in a "disproportionate, unfair burden" being placed on each of them when many people were involved in the creation of the nuisance.

The trial court expressly found that "[d]efendants offered no evidence that an abatement remedy can be apportioned" and that the remedy was indivisible. While liability often may be capable of apportionment in a public nuisance case, "[t]here are other cases in which the harm resulting from a nuisance is not capable of apportionment to the several contributors upon any reasonable or rational basis." (Rest.2d. Torts, § 840E, com. c.) Each defendant bore the burden of producing evidence upon which an apportionment could be made. (Rest.2d Torts, § 840E, com. b.) "Unless sufficient evidence permits the factfinder to determine that damages are divisible, they are indivisible." (Rest.3d Torts: Apportionment of Liability, § 26, com. g.) When a court determines that apportionment cannot be accomplished, each defendant who contributed is liable for the entire harm. (Rest.2d Torts, § 840E, com. c.)

"Where several persons act in concert and damages result from their joint tort, each person is held for the entire damages unless segregation as to causation can be established. Even though persons are not acting in concert, if the result produced by their acts are [*sic*] indivisible, each person is held liable for the whole. . . . The reason for imposing liability on each for the entire consequence is that there exists no basis for dividing damages and the law is loath to permit an innocent plaintiff to suffer as against a wrongdoing defendant. This liability is imposed where each cause is sufficient in itself as well as where each cause is required to produce the result. [¶] . . . [T]he same reason[s] of policy and justice shift the burden to each of defendants to absolve himself if he can—relieving the wronged person of the duty of apportioning the injury to a particular defendant, apply here where we are concerned with whether plaintiff is required to supply evidence for the apportionment of damages. If defendants are independent tort feasors and thus each liable for the damage caused by him alone, and, at least, where the matter of apportionment is incapable of proof, the innocent wronged party should not be deprived of his right to redress. The wrongdoers should be left to work out between themselves an apportionment." (*Finnegan v. Royal Realty Co.* (1950) 35 Cal.2d 409, 433-434.)

"[T]he mere fact that it may be possible to assign some percentage figure to the relative culpability of one negligent defendant as compared to another does not in any way suggest that each defendant's negligence is not a proximate cause of the entire indivisible injury." (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 588-589 [citing *Finnegan*].) "Principles of equitable indemnity would enable these defendants to sort out their respective liabilities. It does not affect the right of a plaintiff to recover the entire judgment from any one of them." (*Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776, 796-797.)

The trial court determined that defendants had failed to establish that the public nuisance was divisible, and we review this factual finding for substantial evidence. Only SWC argues that it presented evidence supporting an apportionment. SWC asserts that it

70

was responsible for only a tiny percentage of "the total lead used in California from 1894 to 2009," that it paid its share of the CLPP fee, and that "thousands of persons contributed" to the presence of lead paint inside residences. The trial court could reasonably conclude that SWC's evidence did not support an apportionment of liability for the public nuisance created by the promotion of lead paint for interior residential use by defendants. The evidence presented at trial did not establish that an entity's share of the total amount of lead used in California bore any relationship to that entity's liability for the amount of lead paint present in residences in the 10 jurisdictions. The evidence presented at trial indicated that nonresidential uses of lead have been the historically predominant ones. The Legislature's establishment of the CLPP fee was not intended to limit liability for promotion of lead paint for interior residential use, as that fee was not premised on such conduct but merely on total lead contribution. Finally, SWC did not establish that the "thousands of persons" who were also involved in the use of lead paint inside residences (painters, architects, homeowners, etc.) promoted the use of lead paint inside residences with knowledge of the danger such use would produce. Thus, those persons were not joint tortfeasors with defendants. Since defendants failed to show that the public nuisance was divisible, we uphold the trial court's imposition of joint and several liability for the nuisance created by defendants' conduct.

### E. Collective Liability and Due Process

Defendants argue that the court erred in "categorically declar[ing] all properties with interior LBP to be a nuisance sight unseen." Defendants maintain that the court's finding of a "collective nuisance" deprived them of due process because they did not have the opportunity to inspect each individual property and defend against their liability on a residence-by-residence basis. They insist that plaintiff was required to identify the location of each individual property in order to establish a public nuisance. Defendants claim that the court's order cannot be upheld because there was no evidence that any individual defendant's lead was present in any specific location. They assert that access to individual

71

properties would have permitted each of them to "rule out the presence of its WLC [white lead carbonate], to develop evidence of the primary lead sources, to prove the owner's fault, or to show that its WLC, if present, posed no imminent threat of harm to any child." They contend that due process forbids requiring any one defendant to abate a nuisance created by "others' products."

The trial court did not "declare" all interior lead paint to be a public nuisance. Instead, the court's abatement order was limited to conditions created by interior residential lead paint that placed children at imminent risk of harm. Due to the nature of the conduct that defendants engaged in, knowingly promoting lead paint for interior residential use throughout a vast area that is home to millions of people, every one of the precise locations at which these conditions currently exist has not yet been fully catalogued. Plaintiff established the existence of a public nuisance by proving that these conditions are pervasive in the 10 jurisdictions, but the enormous cost of discovering each and every one of the specific locations where remediation is necessary must be borne by the wrongdoers, in this case defendants. It cannot be that the highly insidious character of the public nuisance created by defendants renders it beyond the reach of a public nuisance abatement action.

Defendants were not deprived of due process because they were not provided with access to individual properties. None of the defendants claimed that it could differentiate "its" lead paint from other lead paint at an individual location. And even if a defendant could have proved that its paint was present in only a portion of the individual properties, the identity of the manufacturer of lead paint at a specific location was of limited relevance. Defendants were held liable for *promoting* lead paint for interior residential use. Their promotional activities were not limited to advertisements for their own lead paints. They also generically promoted lead paint for interior residential use. Furthermore, nothing precludes a defendant from testing the lead paint at specific locations during the remediation process and seeking to hold a fellow defendant liable for a greater share of the

72

responsibility. The same is true of evidence that the hazardous condition is "the owner's fault" or that it is not hazardous.

None of the cases defendants rely upon has any import on this issue. Defendants rely on class certification cases stating that a defendant has a right to assert individual defenses to each class member's entitlement to recover. (*Wal-Mart Stores, Inc. v. Dukes* (2011) 564 U.S. 338, 366; *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 29; *In re Fibreboard Corp.* (5th Cir. 1990) 893 F.2d 706 [asbestos class action].) This is not a class action, and no individuals seek to recover anything from defendants. *Stanley v. Illinois* (1972) 405 U.S. 645 is also not on point, as it concerned due process rights in an action to terminate a father's parental rights. *McClatchy v. Superior Court of County of Sacramento* (1897) 119 Cal. 413 does not support defendants' argument as it concerned a newspaper editor's due process right to offer a defense in a contempt proceeding.

Since defendants have failed to establish that the court's public nuisance findings and abatement order deprived them of due process by imposing "collective liability," we reject their contention.

## F. Disproportionality and Due Process

Defendants argue that the court's abatement order violates due process because it "grossly exceeds" their individual responsibility for the nuisance.

The trial court found that defendants promoted lead paint for interior residential use in the 10 jurisdictions and that their conduct was a substantial factor in creating the existing public nuisance that requires remediation. Since their conduct caused the existing public nuisance that they are being ordered to abate, the burden of that remediation is not disproportional to their individual responsibilities for assisting in its creation. Defendants' reliance on punitive damages and penalty cases is misplaced. Here, defendants are not being penalized or required to pay damages of any kind. They are being required simply to

73

clean up the hazardous conditions that they assisted in creating. Requiring them to do so is not disproportional to their wrongdoing.

Defendants also complain that the trial court imposed "retroactive liability" "in hindsight." Not so. The only conduct for which defendants are being held responsible is their promotion of lead paint for interior residential use knowing of the public health hazard that such use would create. There is no "hindsight" or "retroactive liability" involved in requiring those who knowingly engage in hazardous conduct to remediate the consequences of their conduct.

### G. Denial of Jury Trial

Defendants claim that the trial court erred in denying them a jury trial. They maintain that the California Constitution guaranteed them a right to a jury trial in this public nuisance action by the government even though this was an equitable action seeking only abatement because, they argue, the common law in 1850 recognized a right to a jury trial in public nuisance actions except for an action based on a nuisance per se.

Plaintiff, NL, and ConAgra filed jury demands. However, plaintiff subsequently filed a motion to strike the jury demands and to have a court trial. Plaintiff asserted that there was no right to jury trial on a public nuisance cause of action seeking abatement or on a cause of action for equitable contribution or declaratory relief. Defendants opposed plaintiff's motion to strike the jury demands. The court granted plaintiff's motion and struck the jury demands, and the case was tried to the court.

"Trial by jury is an inviolate right and shall be secured to all . . . ." (Cal. Const., art. I, § 16.) Generally, "if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial." (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 9.) However, "[i]t is settled that the state constitutional right to a jury trial 'is the right as it existed at common law in 1850, when the Constitution was first adopted,' "and what that right is, is a purely

74

historical question, a fact which is to be ascertained like any other social, political or legal fact." [Citations.]'" (*Franchise Tax Bd. v. Superior Court* (2011) 51 Cal.4th 1006, 1010.)

"Our state Constitution essentially *preserves* the right to a jury in those actions in which there was a right to a jury trial at common law at the time the Constitution was first adopted. [Citation.] Thus, the scope of the constitutional right to jury trial depends on the provisions for jury trial at common law. The historical analysis of the common law right to jury often relies on the traditional distinction between courts at law, in which a jury sat, and courts of equity, in which there was no jury." (*Crouchman v. Superior Court* (1988) 45 Cal.3d 1167, 1175.)

"In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the gist of the action. A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law. [¶] . . . The constitutional right of trial by jury is not to be narrowly construed. It is not limited strictly to those cases in which it existed before the adoption of the Constitution but is extended to cases of like nature as may afterwards arise. It embraces cases of the same class thereafter arising." (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 299-300 (*One 1941*).)

The question before us is whether in 1850 the common law recognized a right to a jury trial in public nuisance actions by the government that sought only abatement or in "cases of like nature." At the outset, we must consider exactly what cases are of "like nature" to the one before us. Many of the cases relied on by the parties are private nuisance, rather than public nuisance, cases. Others sought damages, rather than or in addition to equitable relief. Still others sought an injunction, but the nature of the injunction was not remedial, but preventative, or was an interlocutory injunction pending trial, rather than permanent relief after a full trial.

75

"Unlike public nuisance, which is an interference with the rights of the community at large, private nuisance is a civil wrong based on disturbance of rights in land. [Citation.] A nuisance may be both public and private, but to proceed on a private nuisance theory the plaintiff must prove an injury specifically referable to the use and enjoyment of his or her land. The injury, however, need not be different in kind from that suffered by the general public." (*Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036, 1041.) While damages may be available in both public and private nuisance actions, damages are not an available remedy in the type of public nuisance action that was brought by plaintiff in this case, a representative public nuisance action. "[A]lthough California's general nuisance statute expressly permits the recovery of damages in a public nuisance action brought by a specially injured party, it does not grant a damage remedy in actions brought on behalf of the People to abate a public nuisance." (*People ex rel. Van de Kamp v. American Art Enterprises, Inc.* (1983) 33 Cal.3d 328, 333, fn. 11.) Code of Civil Procedure section 731 permits such an action to "abate a public nuisance," but it does not allow the government to seek damages.

Because public and private nuisance actions are distinct, and public nuisance actions brought as representative actions are different from those brought by the government on its own behalf, our examination of this issue must focus on whether the common law in 1850 granted a right to a jury trial in a representative public nuisance action by the government seeking only abatement.

Defendants rely heavily on an 1849 treatise written by United States Supreme Court Justice Joseph Story. The Fifth Edition of this treatise explained that a "public nuisance" was traditionally punished by way of an indictment. It went on to say: "But an information also lies in Equity to redress the grievance by way of injunction. . . . If the soil does not belong to the crown, but it is merely a common nuisance to all the public, an information in Equity lies. But the question of nuisance or not must, in cases of doubt, be tried by a jury;

and the injunction will be granted or not, as that fact is decided." (Story's Commentaries on Equity Jurisprudence as administered in England (5th ed. 1849) chpt. XXIII, § 923, p. 251.)

Justice Story's treatise provides some support for defendants' claim that they were entitled to a jury trial in this case. However, a treatise is not itself sufficient to establish this factual question. We must examine the cases cited by Justice Story as support for this passage to determine whether they reflect that a right to a jury trial was recognized in 1850 for a representative public nuisance action by the government seeking only abatement.

One of the cases cited by Justice Story was *The Attorney General v. Cleaver* (1811) 34 Eng.Rep. 297 [18 Ves. Jun. 212] (*Cleaver*). *Cleaver* was an action by the Attorney-General "at the relation of individuals" seeking a temporary and permanent restraining order against a manufacturer whose factory was causing injury to nearby residents.[57] (*Ibid.*) The issue before the court was whether to grant a request for a pretrial injunction. (*Ibid.*) The court declined to issue an injunction in advance of a trial on whether the factory constituted a nuisance. The court stated: "[I]f the soil belongs to the Crown, there is one species of remedy for that: the Crown may abate the obstruction; as it is upon the King's soil. *Where it is not upon the King's soil, but merely a public nuisance to all the King's subjects*, though the suit may be in the same form, the law is laid down in treatises [citation] that upon the ground of public nuisance, and not as an obstruction upon the King's soil, *it is a question of fact, which must be tried by a Jury; and, though the suit may be entertained, the Court would be bound to try the fact by the intervention of a Jury*." (*Cleaver*, at p. 299, italics added.) While *Cleaver* appears to support the proposition that, as of 1811, a jury trial may have been required in a representative public nuisance action seeking only an injunction, it

---

[57] Although the Attorney-General brought the action, the manufacturer asserted that "[t]his is not a public prosecution by the Attorney General, but at the relation of several inhabitants of the neighbourhood; and there is a wide distinction between the two sorts of Information." (*Cleaver*, *supra*, 34 Eng.Rep at p. 298.)

is notable that *Cleaver* did not involve a remedial abatement order but a prohibitory injunction.

A subsequent case, *Earl of Ripon v. Hobart* (1834) 40 Eng.Rep. 65 [also reported at 47 Eng.Rep. 119] (*Earl of Ripon*), pointed out the important distinction between a prohibitory or preventative injunction and other types of injunctive relief. *Earl of Ripon* concerned an action brought by the government seeking an injunction to preclude the use of steam engines (instead of windmills) to drain lowlands. (*Earl of Ripon*, at pp. 65-67.) The plaintiffs claimed steam engines would send water more continuously and more quickly into the river than would windmills, thereby putting pressure on and damaging the river's banks. (*Earl of Ripon*, at p. 65.) The Chancellor refused to grant an injunction. The Chancellor described "the rule respecting the relief by injunction, as applied *to such cases to be,*" which it described as cases of "eventual or contingent nuisance." (*Earl of Ripon*, at p. 69, italics added.) "If the thing sought to be prohibited is in itself a nuisance, the Court will interfere to stay irreparable mischief, without waiting for the result of a trial; and will, according to the circumstances, direct an issue, or allow an action, and, if need be, expedite the proceedings, the injunction being in the meantime continued. But where the thing sought to be restrained is not unavoidably and in itself noxious, but only something which may according to circumstances, prove so, then the Court will refuse to interfere until the matter has been tried at law, generally by an action, though, in particular cases, an issue may be directed for the satisfaction of the Court, where an action could not be framed so as to meet the question. [¶] The distinction between *the two kinds of erection or operation* is obvious, and the soundness of that discretion seems undeniable, which would be very slow to interfere *where the thing to be stopped, while it is highly beneficial to one party, may very possibly be prejudicial to none*. The great fitness of pausing much before we interrupt men in those modes of enjoying or improving their property which are *prima facie* harmless, or even praiseworthy, is equally manifest; and it is always to be borne in mind that the jurisdiction of this Court over nuisance by injunction at all is of recent growth, has not till

78

very lately been much exercised, and has at various times found great reluctance on the part of the learned Judges to use it, even in cases where the thing or the act complained of was admitted to be directly and immediately hurtful to the Complainant." (*Ibid.*)

The explanation given by the Chancellor in *Earl of Ripon* illuminates the limited nature of the rules governing the power of equity courts to grant injunctions that were evolving at that time, and that had not been explicated in *Cleaver*. The Chancellor's reluctance to grant injunctive relief without a jury trial in *Earl of Ripon* was due to the fact that the nuisance was "contingent," that is, prospective, and therefore an injunction would bar potentially beneficial activity. (*Earl of Ripon*, *supra*, 40 Eng.Rep. at p. 69.) That type of injunction differs dramatically from a remedial abatement order. When the government seeks a remedial abatement order, the nuisance is not contingent, and the remedy does not bar some prospective activity. Abatement is restricted to undoing already accomplished harmful conditions. The rule described by the Chancellor in *Earl of Ripon* did not require a jury trial in cases seeking a remedial abatement order.

The remaining cases cited by Justice Story all fall within the rule described in *Earl of Ripon*; they concerned prohibitory injunctions against activities that might prove beneficial and might not prove to cause the feared harm. *Attorney-General v. Cohoes Co.* (N.Y. Ch. 1836) 1836 WL 2625 [6 Paige Ch. 133; 3 N.Y. Ch.Ann. 928] was solely concerned with a pretrial motion to dissolve an injunction; the court denied the motion. The injunction had been obtained to prevent a mill company from breaching a canal and withdrawing water pending trial on whether the breach would create a public nuisance. (*Cohoes*, at pp. 134-135.) *Attorney General v. Forbes* (1836) 40 Eng.Rep. 587 [2 My. & Cr. 123] (*Forbes*) was a pretrial request for an injunction to prevent the potential creation of a public nuisance.[58]

---

[58] *Forbes* was a dispute between Bucks County and Berks County about the repair of a bridge that ran across the river between the two counties. The center of the bridge was the line between the two counties. Although the two counties had originally agreed to share the cost of repairs to the bridge, when it came time for additional repairs to the bridge, they could not reach an agreement on the mode of repair. (*Forbes*, *supra*, 40 Eng.Rep. at

Notably, in neither *Cohoes* nor *Forbes* was a jury trial required before the court granted an injunction.

 *Crowder v. Tinkler* (1816) 34 Eng.Rep. 645 [19 Ves. Jun. 618] (*Crowder*) was an action by private plaintiffs seeking a pretrial injunction to stop the defendants from building a new building and using it to store gunpowder close to the plaintiffs' paper mills and homes. (*Crowder*, at pp. 645-646, 647-648 [19 Ves. Jun., at pp. 618-619, 625].) *Crowder* is distinguishable both because it was not a representative public nuisance action and because it sought a prohibitory injunction.

 *Mohawk Bridge Co. v. Utica & S.R. Co.* (N.Y. Ch. 1837) 6 Paige Ch. 554 [1837 WL 2675] (*Mohawk Bridge*) was an action by a bridge company seeking an injunction to prevent the erection by a railway company of a railway bridge over a river. (*Mohawk Bridge*, at p. 561.) The government was not the plaintiff. The New York court reasoned: "If the thing sought to be prohibited is in itself a nuisance, the court will interfere to stay irreparable mischief, where the complainant's right is not doubtful, without waiting for the result of a trial. But where the thing sought to be restrained is not in itself noxious, but only

---

pp. 587-588 [2 My. & Cr., at pp. 123-124].) Berks County wanted to rebuild the entire bridge out of iron. Bucks County wanted to repair the wooden bridge. (*Forbes*, at pp. 588-589 [2 My. & Cr., at p. 125].) The oak joists that supported the center of the bridge ran from one county's last pier to the other county's last pier and had been funded equally by both counties when the bridge was previously repaired. (*Forbes*, at pp. 587-588 [2 My. & Cr., at pp. 123-124].) Bucks proposed a plan of repair that would have replaced the oak joists that supported the center with new oak joists, but Berks would not agree to that plan. Bucks was forced to alter its plan and instead repaired its half of the bridge in such a fashion that the old oak joists were left undisturbed and new joists were run only from the center of the bridge to the last pier in Bucks County. (*Forbes*, at pp. 588-589 [2 My. & Cr., at pp. 125-126].) The new joists depended on the old joists for support. (*Ibid.*) Berks then notified Bucks that it intended to cut the old oak joists at the center, thereby depriving the center of the bridge of any support. (*Forbes*, at pp. 589-590 [2 My. & Cr., at pp. 126-127].) Bucks sought a preventative injunction on the ground that the cutting of the old oak joists would create a public nuisance because the center of the bridge would be unsupported. (*Forbes*, at p. 589 [2 My. & Cr., at p. 127].) The court granted a pretrial injunction. (*Forbes*, at p. 590 [2 My. & Cr., at pp. 129-130].)

something which may according to circumstances prove to be so, the court will refuse to interfere until the matter has been tried at law by an action; though in particular cases the court may direct an issue, for its own satisfaction, where an action could not be brought in such a form as to meet the question. And in applying these principles, if the magnitude of the injury to be dreaded is great, and the risk so imminent that no prudent person would think of incurring it, the court will not refuse its aid for the protection of the complainant's rights, by injunction, on the ground that there is a bare possibility that the anticipated injury from the noxious erection may not happen." (*Mohawk*, at p. 563.) As in *Crowder*, the action in *Mohawk* was not brought by the government and sought a prohibitory injunction.

*Baines v. Baker* (1752) 27 Eng.Rep. 105 [AMB. 158] (*Baines*) was a nuisance action brought by a private party seeking an injunction to prevent the building of a hospital near the plaintiff's property to house patients suffering from smallpox. It was not an action brought by the government, and, like the other cases, it was an action seeking a prohibitory injunction, not a remedial injunction.

The remaining English cases cited by defendants are distinguishable on similar grounds. *The Attorney General v. The United Kingdom Electric Telegraph Company* (1861) 54 Eng.Rep. 899 [30 Beav. 287] (*Electric Telegraph*) was not an action for a remedial abatement order. In *Electric Telegraph*, the Baron and the Attorney General sought an "interlocutory injunction" to bar a telegraph company from putting telegraph wires in trenches across public highways and on land owned by the Baron. They claimed that the wires created a public nuisance. (*Electric Telegraph*, at p. 901.) The court found that, as to the Attorney General's action, it was "very doubtful" whether there was a public nuisance and no clear showing of any injury to the public. (*Ibid.*) Under these circumstances, the court refused to grant an injunction until the Attorney General "establish[es] the fact that the act done is a nuisance at law . . . ." (*Ibid.*) The court stated: "This case depends upon a legal right, which must be established to the satisfaction of the Court before the equity can be administered; without it, it would be impossible to say that

81

either the acts of the company or the works amounted to a nuisance. The one side insists that the works cause an obstruction, and, on the other side, persons are found to say they do not; but no tribunal is so fit to try this question of fact as a jury, who will have the assistance of a Judge to direct them as to the law."[59] (*Electric Telegraph*, at p. 902.) While the *Electric Telegraph* opinion suggested that a jury trial would be *appropriate* to determine whether the wires were a public nuisance, the court did not actually speak of a "right" to a jury trial and did not consider whether a jury trial would be required in a public nuisance action seeking only a remedial abatement order. Instead, the court simply found that the evidence before it did not justify a finding that the wires were a public nuisance and determined that this issue would be best tried by a jury in that particular case. Since the

---

[59] Defendants cite an alternate version of this opinion in a different reporter. In the alternate version, the language is significantly different. At the beginning of the alternate version, the court says: "The main question with which I have to deal now is, whether the acts complained of do or do not amount to a nuisance. If they did, I should have no hesitation in granting an injunction; but I confess I am not at present prepared to do more than send the case to be tried before a jury, in an action at law." The court then proceeds to address the claims of the Baron and of the Attorney General separately.

Defendants quote the following language: "In ordinary cases, where the issue of a suit in equity depends upon a legal right, that right must be ascertained at law before any relief can be granted by this court." This language appears in the portion of the alternate version addressing the Baron's claim, not the Attorney General's claim, and the court took great pains to distinguish between the two claims. Hence, it is not material to the issue before us.

In the portion of the alternate version addressing the Attorney General's claim, the court says: "With regard to the fact of these posts and wires being nuisances, I am by no means clear, that upon the evidence before me I can determine whether they are or are not such; at all events, I think I cannot say that they are. In truth, the question, what is a nuisance, is one peculiarly fitted for investigation by a jury." (*The Attorney-General v. The United Kingdom Electric Telegraph Company* (1861) The Law Times, vol. V, N.S. at pp. 338-339.) Even if we were to accept that the alternate version is entitled to credence, it does not support defendants' claim. The court was unwilling to issue a preventative injunction because it deemed the evidence before it to be inadequate, and it simply did not rule out that it might do so after a trial before a jury. This ruling does not establish that there was a right to a jury trial at that time in a public nuisance action seeking only a remedial abatement order.

action before us did not seek a preventative injunction, and the trial court found the evidence sufficient to support a remedial injunction, *Electric Telegraph* is inapposite.

*Walter v. Selfe* (1851) 64 Eng.Rep. 849 (*Walter*) was a private nuisance action between private parties seeking an injunction. (*Walter*, at p. 851.) The Chancery court stated that the parties had "declin[ed] to go before a jury," and it granted the plaintiffs' request for an injunction. (*Walter*, at p. 853.) Nowhere in the *Walter* opinion is there any indication that a public nuisance action by the government seeking only a remedial injunction would have been required to be tried to a jury. *Imperial Gas Light and Coke Company v. Broadbent* (1859) 11 Eng.Rep. 239 [7 H.L.C. 600] (*Imperial*) was not a public nuisance action but a private nuisance action between private parties in which the plaintiff sought an injunction to stop the defendants from manufacturing gas near his house. The opinion contains broad language: "There is no doubt whatever that before a perpetual injunction can be granted, the party applying for it must establish his right by a proceeding at law." (*Imperial*, at p. 242.) Since *Imperial* was a private nuisance action seeking a prohibitory injunction, its statements about the need for a proceeding "at law" (a jury trial) can only be understood as applying in that context.

The distinction between prohibitory injunctions and abatement orders was recognized in the 1850s in England. In *Attorney-General v. Birmingham Council* (1858) 70 Eng.Rep. 220 [4 K.&J. 528] (*Birmingham*), the plaintiffs sought an abatement order barring the defendants from continuing to pollute a river with sewage. (*Birmingham*, at p. 220.) The defendants argued before the Chancellor that under *Cleaver* and *Earl of Ripon* the Chancellor should not interfere and should leave the plaintiffs to seek a remedy at common law. (*Birmingham*, at p. 223.) The Chancellor rejected this argument and granted an abatement injunction. (*Birmingham*, at p. 228.)

83

The cases defendants cite from the United States are also distinguishable.[60] *Pilcher v. Hart* (1840) 20 Tenn. 524 was a trespass action for damages between private parties.  (*Id.* at p. 530.)  *Davidson v. Isham* (N.J. Ch. 1852) 9 N.J. Eq. 186 was an action between private parties.  *Middleton v. Franklin* (1853) 3 Cal. 238 was an action between private parties. *Gunter v. Geary* (1851) 1 Cal. 462 (*Gunter*) was an action for damages by private plaintiffs against the mayor of San Francisco for destroying the plaintiffs' house, which had been tried to a jury and resulted in a judgment for damages.  (*Gunter*, at pp. 463-464.)  None of these cases contains any indication of whether a jury trial was required at common law in 1850 in a representative public nuisance action by the government seeking only a remedial abatement order.

The remaining California cases cited by defendants are similarly distinguishable. *Farrell v. City of Ontario* (1919) 39 Cal.App. 351 (*Farrell*) was a private nuisance action by a private party against a municipality seeking both damages and an injunction.  (*Farrell*, at pp. 352-353.)  The case was tried to a jury, which returned a damages verdict for the plaintiff.  (*Id.* at p. 353.)  The trial court nevertheless entered judgment for the defendants.

---

[60]    *Appeal of McClain* (1890) 130 Pa. 546 (*McClain*), which defendants cite in a string cite but do not discuss, was an action by a city seeking the destruction of a dam on the ground that it was a public nuisance.  (*McClain*, at p. 560.)  The Pennsylvania Supreme Court stated:  "We do not question the power of a court of equity to restrain and abate public nuisances.  This is settled by a line of decisions.  But the authorities uniformly limit the jurisdiction to cases where the right has first been established at law, or is conceded.  It was never intended, and I do not know of a case in the books where a chancellor has usurped the functions of a jury, and attempted to decide disputed questions of fact, and pass upon conflicting evidence in such cases."  (*McClain*, at p. 562.)  "We think that, under all the circumstances of this case, the defendants are entitled to a trial by jury before their property shall be condemned as a nuisance, and destroyed."  (*McClain*, at p. 564.)  While *McClain* was a public nuisance action by the government seeking a remedial abatement order, it has little weight as authority because it significantly postdates 1850 (by four decades) and appears to rely heavily on the fact that the requested relief was that private property be "condemned . . . and destroyed."  The case before us does not threaten the destruction of any of defendants' private property, and a case from 1890 does not provide strong evidence of what was a common law right in 1850.

(*Ibid.*)  On appeal, the plaintiffs contended that they were entitled to a jury trial, and therefore the trial court had erred in entering judgment contrary to the jury's verdict.  (*Ibid.*)  The court in *Farrell* relied on *Walter* and *Imperial Gas* in finding that there was a right to a jury trial in this private nuisance action for damages.  (*Farrell*, at pp. 356-357.)  It held: "[U]nder the English common law as it stood in 1850, at the time it was adopted as the rule of decision in this state, 'if a plaintiff applies for an injunction to restrain a violation of a common-law right, if either the existence of the right or the fact of its violation be disputed, he must establish that right at law'; or, in other words, by a jury, if one be demanded.  We conclude, therefore, that the parties here were entitled to a jury trial upon the issues as to damages and that the verdict of the jury thereon was binding." (*Farrell*, at p. 357.)  Still, the *Farrell* court emphasized that "the equitable issues . . . are to be determined by the court *upon findings of fact made by it*." (*Farrell*, at p. 359, italics added.)  Since *Farrell* was a private nuisance action seeking damages, it does not tell us whether a jury trial is required in a representative public nuisance action by the government seeking only a remedial abatement order.

  *Pacific Western Oil Co. v. Bern Oil Co.* (1939) 13 Cal.2d 60 (*Pacific Western*) was an action between private parties seeking a prohibitory injunction and damages.  (*Pacific Western*, at p. 64.)  The trial court awarded damages and a prohibitory injunction.  (*Pacific Western*, at p. 66.)  On appeal, the defendants contended that they had been deprived of their right to a jury trial, and the court, relying on *Farrell*, agreed.  However, the court limited its holding to situations "wherein both legal and equitable remedies are the subject of the action." (*Pacific Western*, at p. 69.)

  *Pacific Western* partly overruled *McCarthy v. Gaston Ridge Mill & Mining Co.* (1904) 144 Cal. 542 (*McCarthy*).  *McCarthy* was a private nuisance action for damages and an injunction.  Although a jury rejected the plaintiff's damages claim, the trial court rejected the jury's verdict and awarded the plaintiff damages but no injunction.  (*McCarthy*, at pp. 543-545.)  On appeal, the defendant contended that the plaintiff's action was one in

which the defendant was entitled to a jury trial. (*McCarthy*, at p. 545.) The California Supreme Court disagreed. "The prevention or abatement of a nuisance is to be accomplished by means of an injunction either prohibitive or mandatory, and an action therefor is within the equitable jurisdiction of the court, and is to be governed by the principles prevailing in that jurisdiction. [Citations.] The constitution does not give to a party the right to have the issues in such action tried by a jury, nor is the action within those in which the legislature has authorized a jury trial." (*McCarthy*, at pp. 545-546.) *Pacific Western* overruled *McCarthy* to the extent that it held that there was no right to a jury trial in a private nuisance action that sought both an injunction *and damages*. (*Pacific Western*, *supra*, 13 Cal.2d at p. 69.)

The California Supreme Court has never held that there is or is not a right to a jury trial in a public nuisance action brought by the government that seeks only a remedial abatement order. It *has* held that there is no right to a jury trial in a private nuisance action seeking only abatement. *Sullivan v. Royer* (1887) 72 Cal. 248 (*Sullivan*) was an action to abate and enjoin a private nuisance. A jury found for the plaintiff, and the defendant appealed, claiming that the jury had been misinstructed. The California Supreme Court held that any jury instruction errors were immaterial because there was no right to a jury trial in an equitable action to abate a nuisance. (*Sullivan*, at pp. 249-250.) The court reached the same holding in *Richardson v. City of Eureka* (1895) 110 Cal. 441, which was also a private nuisance case. (*Id.* at p. 446.)

The California Supreme Court has mentioned in dicta that there is no right to a jury trial in a public nuisance case seeking only abatement. *One 1941* was a forfeiture case brought by the government in which the legal owner of the vehicle claimed that he had been denied his constitutional right to a jury trial. (*One 1941*, *supra*, 37 Cal.2d at pp. 285-286.) The issue was whether an in rem forfeiture action was a common law action entitled to a jury trial in 1850. The California Supreme Court compared an in rem forfeiture action to an action to abate a public nuisance. " 'The right of trial by jury did not exist at common law in

a suit to abate a public nuisance. (*People v. McCaddon,* 48 Cal.App. 790, 792 [192 P. 325].) Hence it is not a constitutional right now. [¶] Automobiles, carriages, wagons, horses, and mules, that are ordinarily used for lawful purposes, cannot be classified with narcotics, gambling paraphernalia, counterfeit coins, diseased cattle, obscene books and pictures, decayed fruit and fish, unwholesome meat, infected clothing, or other contraband, which are ordinarily used for an unlawful purpose, and are public nuisances *per se.* [Fn. omitted.] While property kept in violation of law which is incapable of lawful use and declared to be a nuisance *per se* may be forfeited without a trial by jury under the police power, it does not follow that property ordinarily used for lawful purposes—innocent property—may be forfeited without a trial by jury where an issue of fact is joined as to whether the property was being used for an unlawful purpose or is to be taken from an innocent owner. There is no general constitutional right to a jury trial in actions for the seizure and forfeiture of contraband articles. [Fn. omitted.] But property is not contraband or a public nuisance merely because it was instrumental in the commission of a public offense.'" (*One 1941*, at pp. 298-299.)

In *One 1941*, the California Supreme Court cited *People v. McCaddon* (1920) 48 Cal.App. 790 (*McCaddon*) to support the proposition that there is no right to a jury trial in a public nuisance action seeking only abatement. *McCaddon* was a public nuisance action by the government to abate a public nuisance. (*McCaddon*, at p. 790.) The claim on appeal was that the trial court had erred in denying the defendants a jury trial. (*McCaddon*, at p. 791.) The Court of Appeal devoted no significant analysis to the issue, instead stating: "[T]he rule is too well established to need discussion here. This being an action for an injunction, neither the constitution nor the statute requires the submission of the issues to a jury. It is not error to deny a jury in any case where such right was not granted at common law. [Citations.]" (*McCaddon*, at p. 792.) Not one of the citations in the court's string cite was to a public nuisance case.

Numerous Court of Appeal cases have stated that there is no right to a jury trial in a public nuisance action by the government seeking only abatement. For example, *People v. Frangadakis* (1960) 184 Cal.App.2d 540 (*Frangadakis*) was an action by the government to abate a public nuisance in which the defendants contended on appeal that they had been deprived of their constitutional right to a jury trial. The Court of Appeal, citing *One 1941*, rejected their contention without substantive analysis. (*Frangadakis*, at pp. 543, 545-546.) *People v. Englebrecht* (2001) 88 Cal.App.4th 1236 (*Englebrecht*) did the same. (*Englebrecht*, at p. 1245.)

There is no binding California Supreme Court holding on the issue of whether a jury trial is required in a representative public nuisance action by the government seeking only a remedial abatement order. This issue is "'"a purely historical question, a fact which is to be ascertained like any other social, political or legal fact." [Citations.]'" (*Franchise Tax Bd. v. Superior Court*, *supra*, 51 Cal.4th at p. 1010.) Defendants have failed to show that the trial court erred in finding that there was not a right to a jury trial under the common law in 1850 in a representative public nuisance action brought by the government seeking solely a remedial abatement order. The historical materials upon which defendants rely reflect that representative public nuisance cases brought by the government seeking only remedial abatement orders were not exclusively tried in common law courts but could be resolved in equity courts by the Chancellors. None of the cases from the 19th century involved a cause of action closely analogous to the representative public nuisance cause of action seeking only remedial abatement brought by plaintiff in this action. Given this historical record, we must reject their contention that they were deprived of their right to a jury trial.

## H. Abatement Fund

Defendants contend that the trial court's abatement order was invalid because it was actually an order that they pay damages.

The trial court's statement of decision required "abatement through the establishment of a fund, in the name of the People, dedicated to abating the public nuisance" that would "be administered by the State of California," unless the State was "unwilling or unable" to do so, in which case the 10 jurisdictions would serve as receivers and administrators of the fund. "Payments into the fund shall be deposited into an account established in the name of the People and disbursed by the [CLPPB] on behalf of the People." "The Defendants against whom judgment is entered, jointly and severally, shall pay to the People of the State of California, in a manner consistent with California law, $1,150,000,000 (One Billion One Hundred Fifty Million Dollars) into a specifically designated, dedicated, and restricted abatement fund (the 'Fund') [¶] . . . within 60 days of entry of judgment." The funds will be disbursed to the 10 jurisdictions to pay for remediation in accordance with the abatement plan. "The [remediation] program shall last for four years from the date of total payment by defendants into the Fund. If, at the end of four years, any funds remain, those monies shall be returned to the paying defendants in the ratio by which the program was initially funded. The Superior Court of California, County of Santa Clara, shall have continuing jurisdiction over the Plan and its implementation."

Defendants assert that "[t]he [abatement] Plan is nothing more than a thinly-disguised damages award to Plaintiffs for unattributed past harm to private homes over which Defendants have no control."

"An abatement of a nuisance is accomplished by a court of equity by means of an injunction proper and suitable to the facts of each case." (*Sullivan*, *supra*, 72 Cal. at p. 249.) "'[T]he granting, denial, dissolving, or refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case.' [Citation] Such an order will not be modified or dissolved on appeal except for an abuse of discretion." (*Union Interchange, Inc. v. Savage* (1959) 52 Cal.2d 601, 606.)

89

A public entity may not recover in a representative public nuisance action any funds that it has already expended to remediate a public nuisance. This court acknowledged as much in *Santa Clara I*. (*Santa Clara I*, *supra*, 137 Cal.App.4th at p. 310.) The trial court's abatement order in this case did not attempt to award any already-incurred costs to plaintiff or to any of the 10 jurisdictions. Instead, the court's abatement order directed defendants to deposit funds in an abatement fund, which would be utilized to prospectively fund remediation of the public nuisance. None of these funds were permitted to be utilized to reimburse plaintiff, any of the 10 jurisdictions, or any homeowners for already-incurred costs.

The abatement fund was not a "thinly-disguised" damages award. The distinction between an abatement order and a damages award is stark. An abatement order is an equitable remedy, while damages are a legal remedy. An equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff. An equitable remedy provides no compensation to a plaintiff for prior harm. Damages, on the other hand, are directed at compensating the plaintiff for prior accrued harm that has resulted from the defendant's wrongful conduct. The distinction between these two types of remedies frequently arises in nuisance actions. Generally, continuing nuisances are subject to abatement, and permanent nuisances are subject to actions for damages. (*Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 868-870.) As Code of Civil Procedure section 731 permits a public entity plaintiff to seek abatement of a public nuisance in a representative action, the trial court could properly order abatement as a remedy in this case.

Here, plaintiff sought the equitable remedy of abatement for the nuisance because the hazard created by defendants was continuing to cause harm to children, and that harm could be prevented only by removing the hazard. Plaintiff did not seek to recover for any prior accrued harm nor did it seek compensation of any kind. The deposits that the trial court required defendants to make into the abatement account would be utilized not to

90

recompense anyone for accrued harm but solely to pay for the prospective removal of the hazards defendants had created. Furthermore, any funds that had not been utilized for that sole purpose by the end of the four-year abatement period were to be returned to defendants. While the trial court did require defendants to make deposits into the account to provide the funds necessary to carry out the abatement, the court's estimate of the amount that would be necessary for that purpose was just that: an estimate. The trial court could have chosen to have defendants handle the remediation themselves, but such an order would have been difficult for the court to oversee and for defendants to undertake. The court's reasonable decision to create a remediation fund overseen by a knowledgeable receiver, and ultimately by the court, was not an abuse of discretion under the specific circumstances of this case.

Because the trial court's abatement order did not require defendants to reimburse anyone for already incurred costs, defendants' reliance on *County of San Luis Obispo v. Abalone Alliance* (1986) 178 Cal.App.3d 848 (*Abalone*), which this court cited in *Santa Clara I*, is misplaced. In *Abalone*, the county sought to recover $700,000 in costs that it had incurred as a result of the defendants' "blockade . . . ." (*Abalone*, at p. 859.) The Court of Appeal rejected the county's attempt to characterize these already incurred costs as "costs of abatement" so that they could be recovered in a public nuisance abatement action. (*Abalone*, at pp. 859-860.) As the court pointed out, these already-incurred costs were "damages," and therefore not recoverable by a public entity in a public nuisance abatement action. (*Abalone*, at pp. 859-861.)

The distinction between an abatement fund and damages was recognized by the Third Circuit Court of Appeals in *United States v. Price* (3d Cir. 1982) 688 F.2d 204 (*Price*). *Price* was an appeal from the district court's denial of a preliminary injunction in a case where the defendants were alleged to be responsible for contaminating a city's water supply. While the Third Circuit affirmed the district court's exercise of its discretion to deny preliminary relief, it pointed out that the district court had taken an "unduly restrictive view of its remedial powers . . . ." (*Price*, at p. 211.) "Damages are awarded as a form of

91

substitutional redress. They are intended to compensate a party for an injury suffered or other loss. A request for funds for a diagnostic study of the public health threat posed by the continuing contamination and its abatement is not, in any sense, a traditional form of damages. The funding of a diagnostic study in the present case, though it would require monetary payments, would be preventive rather than compensatory. The study is intended to be the first step in the remedial process of abating an existing but growing toxic hazard which, if left unchecked, will result in even graver future injury, i.e., the contamination of Atlantic City's water supply." (*Price*, at p. 212.)

While the trial court's order in this case may be unusual in requiring defendants to prefund remediation costs, it was well within the court's discretion. The California Supreme Court presciently noted in *Santa Clara II* that "[t]his case will result, at most, in defendants' having to expend resources to abate the lead-paint nuisance they allegedly created, either *by paying into a fund dedicated to that abatement purpose* or by undertaking the abatement themselves." (*Santa Clara II*, *supra*, 50 Cal.4th at pp. 55-56, italics added.) The abatement fund ordered by the trial court was a reasonable method of prefunding the remediation that is required to abate the public nuisance created by defendants. The choice of this method was not an abuse of the court's broad discretion to fashion an appropriate abatement injunction.

Defendants briefly complain that the trial court erred "by ordering defendants to pay into a plan that provides no judicial oversight, and no mechanism for return of unused funds to defendants." We see no such flaws in the court's order. The court expressly provided that it would retain jurisdiction "over the Plan and its implementation." And it explicitly ordered, "If, at the end of four years, any funds remain, those monies shall be returned to the paying defendants in the ratio by which the program was initially funded." Thus, there is no basis for defendant's complaints.

There is also no merit to defendants' claim that the abatement fund will somehow be "placed into the State treasury . . . ." The trial court's order explicitly required defendants to

deposit funds into "a specifically designated, dedicated, and restricted abatement fund." It plainly did not require, contemplate, or permit the deposit of those funds into "the State treasury . . . ."

## I. Laches

ConAgra contends that plaintiff's public nuisance cause of action was barred by laches.[61] Plaintiff asserts that laches was not an available defense to its public nuisance abatement cause of action. The trial court expressly rejected ConAgra's laches contention in its statement of decision, but ConAgra contends that it is raising solely a legal issue upon which we exercise independent review. Although a trial court's decision on a laches issue is ordinarily subject to deferential review, the issue of whether laches is a legally available defense is a legal issue subject to de novo review. (*City and County of San Francisco v. Ballard* (2006) 136 Cal.App.4th 381, 392.)

Civil Code section 3490 expressly provides that "[n]o lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right." (Civ. Code, § 3490.) ConAgra claims that this statute does not apply because interior residential lead paint does not *actually obstruct* any *public right*. As we have already explained, plaintiff established that pervasive interior residential lead paint in the housing stock of the 10 jurisdictions obstructs the *public right* to safe housing. An obstruction is something that impedes or hinders. (Merriam-Webster's Collegiate Dict. (10th ed. 1993) p. 803.) Interior residential lead paint "actual[ly]" impedes or hinders the public right to safe housing because it renders unsafe for young children a large amount of residential housing in the 10 jurisdictions. We

---

[61] Although defendants generally join each other's contentions, ConAgra's laches argument is premised on facts concerning only itself. NL makes no mention of laches in its briefs. SWC makes only the briefest mention of laches in its opening brief. Because NL and SWC have chosen not to argue this issue as to their particular facts, and ConAgra's contention is premised on facts applicable only to itself, we discuss this issue solely as it applies to ConAgra.

93

reject ConAgra's claim that interior residential lead paint does not amount to an actual obstruction of a public right.

ConAgra also claims that Civil Code section 3490 does not apply here because it is not seeking to "legalize" any continuing conduct, such as putting lead paint in residential housing. Nowhere in the text of Civil Code section 3490 do we discern any indication that it is limited to continuing *conduct*. Legalize means to "make legal," and "legal" means "conforming to" the law. (Merriam-Webster's Collegiate Dict. (10th ed. 1993) p. 664.) Public nuisances are criminal. (Pen. Code, § 372.) The public nuisance created by defendants is not "conforming to" the law, and permitting defendants to avoid responsibility for abating this public nuisance would allow this *unlawful* public nuisance to continue to exist. Under these circumstances, Civil Code section 3490 does apply, and any "lapse of time" does not preclude plaintiff's action to abate the unlawful public nuisance created by defendants.

ConAgra further asserts that "public policy" supports the application of laches in this case. " 'Laches is an *equitable* defense based on the principle that those who neglect their rights may be barred from obtaining relief in equity. [Citation.]' " (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1381, italics added.) "It is clear, however, that neither the doctrine of estoppel *nor any other equitable principle* may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public." (*County of San Diego v. California Water & Tel. Co.* (1947) 30 Cal.2d 817, 826, italics added.)

Since laches is an equitable defense, it could not be asserted against the government, even if it were not barred by Civil Code section 3490, because such an application would defeat a public policy aimed at protecting the public. Civil Code section 3479 is an expression of the Legislature's public policy against public nuisances, and it is plainly aimed at protecting the public from the hazards created by public nuisances.

94

Given these conclusions, we need not consider ConAgra's extended and irrelevant argument that the public nuisance it assisted in creating was permanent rather than continuing. The trial court did not err in rejecting ConAgra's laches defense.

## J. Procedural and Evidentiary Issues

Defendants contend that the trial court erred in (1) admitting hearsay documents, permitting experts to testify about hearsay documents, and considering limited purpose hearsay documents for their truth; (2) making a blanket ruling disallowing recross-examination; (3) imposing time limits and rejecting offers of proof and deposition designations; (4) changing the relevant product from white lead to lead paint during trial; (5) not allowing defendants adequate time to analyze the "RASSCLE" database, which was not fully provided to defendants until three weeks before trial; (6) not allowing defendants to inspect specific properties; and (7) not sanctioning plaintiff for spoliation of evidence.[62]

### 1. Hearsay Documents

Defendants claim that the trial court prejudicially erred in (1) admitting hearsay documents into evidence under Evidence Code section 1280 that did not meet that statute's requirements, (2) permitting plaintiff's expert historians to give opinion testimony based on hearsay documents that were not admitted into evidence at trial or were admitted only for a limited purpose, (3) permitting plaintiff's experts to quote those limited purpose documents while testifying, and (4) considering limited purpose hearsay documents for their truth.[63]

---

[62] The trial court advised the parties before trial that an objection by one defendant would be "applicable to" all defendants. The court reiterated this at trial. Hence, we analyze these contentions as to all defendants even if only one of them objected at trial.

[63] Defendants' appellate briefing makes it difficult if not impossible to determine precisely which trial court rulings on defense objections are being challenged on appeal. For instance, ConAgra refers in its brief to some testimony by plaintiff's expert Markowitz. Defendants did not interject any hearsay objections to the testimony of Markowitz to which they refer. At one point, during Markowitz's testimony, ConAgra's trial counsel asked the court whether a Fuller brochure was being admitted for a limited purpose, and the court

95

## a. Evidence Code section 1280

### i. Background

Near the beginning of trial, defendants submitted a "Memorandum Regarding Admissibility of Scientific and Government Publications." (Most capitalization omitted.) This memorandum addressed potential exhibits described as "reports and surveys from federal agencies and committees" and a single article from a medical journal. Defendants asserted that these documents would not qualify for admission under Evidence Code section 1280 because they were "not limited to public employees' records of an act, condition, or event, nor were they written at or near the time of such an act, condition, or event." They also asserted that plaintiff's experts could not testify about the contents of these documents other than to say that they had relied on them.

The trial court did not view this memorandum as an objection to anything: "It is not framed as a motion. It is not framed as an objection to testimony. I wasn't clear what it was supposed to be other than trying to educate me about some legal principles." Defendants explained that they were providing "our explanation for those objections in advance," and they then objected on hearsay and relevance grounds to plaintiff's expert historian Mushak "reading from and potentially offering" "scientific journals and

confirmed that it was. He made no objection. Hence, defendants did not preserve a hearsay objection to this testimony.

Defendants cite a written objection that ConAgra filed, objecting to any testimony by plaintiff's expert historian Rosner that Fuller's promotion of lead paint had "caused" lead paint to be present on residences in the 10 jurisdictions. It claimed that Rosner was not qualified to offer such testimony and lacked any reliable basis for such testimony. These written objections did not interject any hearsay objections or relate to the contentions that defendants make on appeal. Defendants cite a defense objection, not on hearsay grounds, to the admission of an exhibit regarding ConAgra's liability as the successor to Fuller. And they cite ConAgra's objection on "no foundation and Evidence Code sections 802 and 803" grounds to any testimony by plaintiff's expert Markowitz that Fuller had knowledge of the dangers of lead when it was promoting it. Although the court overruled these objections, there is no apparent relationship between that ruling and defendants' evidentiary contentions on appeal.

government reports." The court noted that Mushak was testifying as an expert and therefore could rely on inadmissible hearsay to support his opinion testimony. It also observed that "reports and analysis" that were not admitted for their truth but solely to allow the court to evaluate the expert's testimony could be received into evidence. The court ruled that "expert witnesses testifying in this case as a general matter can rely on reports, information, which might otherwise be designated inadmissible as hearsay."

Defendants clarified that their objection was to *the admission of the documents*, not the expert's reliance on hearsay. The trial court reiterated that any hearsay documents relied on by the experts would not be admitted for their truth but only to evaluate the expert's testimony. The court subsequently ruled: "First of all, if the documents that are being proffered are the product of a public agency, they will be admitted as an exception to the hearsay rule under Evidence Code Section 1280. That's a general proposition I don't think anyone can argue with. Experts who are testifying and who are relying on reports, analysis, and so forth, not prepared by themselves but, say, statistical analysis or something like that, those materials can come into evidence for a limited purpose to assist the Court in evaluating the expert's opinion." No defendant challenged at that time the court's statement that "documents that . . . are the product of a public agency" are admissible under Evidence Code section 1280.

Defendants subsequently objected on hearsay grounds to the admission of a 2012 "monograph" prepared by the National Institutes of Health (NIH) addressing the health effects of low-level lead exposure. This monograph was introduced during the testimony of one of the experts who had helped write it. The court ruled that this document was admissible under Evidence Code section 1280. Defendants also objected on hearsay grounds to the admission of a Mineral Resources Yearbook for the year 1922 that had been prepared and published by the United States Department of the Interior in 1925. This document contained statistics for the production and consumption of lead in the United

States from 1917 to 1922 and a list of the companies that were producing white lead in 1922, which included Fuller, NL, and SWC.

## ii. Analysis

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies:  [¶]  (a) The writing was made by and within the scope of duty of a public employee.  [¶]  (b) The writing was made at or near the time of the act, condition, or event.  [¶]  (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."  (Evid. Code, § 1280.)  "A trial court has broad discretion in determining whether a party has established these foundational requirements.  [Citation.]  Its ruling on admissibility 'implies whatever finding of fact is prerequisite thereto . . . .  [Citation.]'  [Citation.]  A reviewing court may overturn the trial court's exercise of discretion ' "only upon a clear showing of abuse." ' "  (*People v. Martinez* (2000) 22 Cal.4th 106, 120.)

We can see no abuse of discretion in the trial court's finding that the monograph and the mineral yearbook fell within the parameters of Evidence Code section 1280.  Both of these documents demonstrated on their face that they had been prepared by public employees in the scope of their employment.  The monograph described an NIH study that had been recently completed and had been extensively peer reviewed, so the trial court could have reasonably concluded that it was a writing made "at or near" the time of the study and had been prepared using sources and methods that were trustworthy.  The mineral yearbook was prepared by the Department of the Interior to report on mineral production and consumption during what were no doubt the most recent years for which it had information.  The trial court could reasonably conclude that the Department of the Interior used trustworthy sources to compile this information.

Defendants do not argue the Evidence Code section 1280 issue as to any other exhibits except for a summary reference in a footnote to exhibits 8, 17, 19, and 253 as

examples of documents that were admitted into evidence by the trial court over hearsay objections under Evidence Code section 1280. Defendants provide no further detail about these four exhibits, and they do not even provide record citations for the exhibits themselves or the rulings on their admission. Instead, they support their claim that these four exhibits were admitted into evidence over hearsay objections with a citation to the court's general unchallenged ruling that "documents that . . . are the product of a public agency" would be admissible under Evidence Code section 1280.

Despite defendants' inadequate briefing, we briefly consider the propriety of the admission of these four exhibits. Exhibit 8 is a transcript of a 1910 hearing before a Congressional committee. When it was admitted into evidence, the only defense objection was "[c]ontinuing objections," which the court overruled while citing Evidence Code section 1280. Defendants made no express hearsay objection to the admission of this exhibit, and they submit no argument on appeal as to why this official transcript of a legislative hearing was not admissible under Evidence Code section 1280. In any case, we can see no abuse of discretion in the court's determination that this official transcript was admissible under Evidence Code section 1280. Exhibit 17 is a 2013 CDC "Weekly Report," and one of plaintiff's experts testified that the CDC published such reports every week. Exhibit 19 is a 2010 World Health Organization (WHO) booklet on childhood lead poisoning that was prepared in part by one of plaintiff's expert witnesses. When these two exhibits were admitted into evidence, the defense objected "under 1280 because it is not a record of an act, condition, or event." The court overruled the objections. Again, defendants do not detail on appeal why these exhibits did not qualify for admission under Evidence Code section 1280. However, we can discern no abuse of discretion in the trial court's overruling of the objection. Both exhibits appear to be timely official records of conditions.

Exhibit 253 is a resolution of the Santa Clara County Board of Supervisors declaring National Childhood Lead Poisoning Prevention Week in 2012. When this document was

mentioned by a witness at trial, the defense objected on "foundation" grounds and because it was "unsigned." Although the court admitted the document "for all purposes," it also said that it would "take it in for whatever it is worth" as a "resolution of the Board of Supervisors." The only testimony about this document was that it showed that "[t]he Board is basically recognizing that childhood lead poisoning is a significant health issue in Santa Clara County . . . ." This was not a disputed issue. Defendant makes no argument on appeal about how it could have been prejudiced by the admission of this document, and it is inconceivable that this document was considered for the truth of any of its recitals. Any error in admitting it "for all purposes" was not prejudicial.

**b. Expert Testimony Based on Hearsay Documents Not Admitted At Trial**

Defendants contend that the trial court erred in permitting experts to testify "based on hearsay documents that were described at trial but which were, in many instances, never admitted into evidence." With one exception, none of the record citations that defendants provide to support this contention contains any objection to expert testimony about hearsay documents that *were not* admitted into evidence. Instead, the record citations they provide in support of this contention are to testimony based on documents that *were admitted* into evidence.

The one exception is the following exchange: "Q [by plaintiff's trial counsel]. Okay. And, Dr. Markowitz, we have only touched on a handful of documents from either the Lead Industries Association or the National Paint, Varnish, and Lacquer Association here. Are these documents representative of other types of documents that you have seen in your much more extensive research and review of hundreds of thousands of pages of documents? [¶] MR. GLYNN [DuPont's trial counsel]: I think that's improper to now bring in a host of undisclosed and undescribed documents. He can testify as to what he has brought to court, not something -- [¶] THE COURT: I get it. You can shorten the objection. The objection is overruled. It is what it is." Markowitz responded: "Yes. These are representative of many other documents." Defendants provide in support of this

100

argument no other record citation to any instance of an overruled defense objection to an expert testifying about an unadmitted document.[64] As the trial court's alleged error in overruling this objection resulted only in Markowitz's response to this one question, which was not prejudicial, we reject this contention.

### c. Permitting Experts to Read Limited Purpose Hearsay Documents Into Record

Defendants assert that the court prejudicially erred in permitting experts to read into the record hearsay in documents that had been admitted for a limited purpose. The string of record citations that defendants provide to support this assertion, which they make without substantive analysis, primarily demonstrates that the court expressly ruled that the hearsay in these documents was being admitted only for a limited purpose. Defendants' objections were primarily limited to hearsay objections to the documents themselves.[65]

However, defendants did make a relevant objection at one point. The defense objected on hearsay grounds to the admission of 1937 and 1939 LIA and NPVLA documents and a 1930 newspaper article referenced in the LIA documents. The court admitted these documents for the limited purpose of evaluating the expert's opinion

---

[64] We do note one other similar occurrence. "Q [by plaintiff's trial counsel]. Were these opinions informed by other documents that you reviewed in [the] historical record? [¶] A [by plaintiff's expert Rosner]. Yes, certainly. [¶] Q. And are the documents you presented to the Court as the basis of your expert opinion, representations of what you have seen in other documents as well? [¶] A. Yes. [¶] MR. STERN [ARCO's trial counsel]: Objection, your Honor. Without specific discussion of those documents. [¶] THE COURT: Overruled. [¶] THE WITNESS: Yes." The trial court's alleged error in overruling this objection also was not prejudicial.

[65] For instance, the defense objected, apparently on hearsay grounds, to the admission of an 1878 medical journal article, and the court ruled that the evidence would be admitted for the limited purpose of evaluating the expert's opinion. In response to plaintiff's argument for unlimited admission, the court held open the possibility that this article might be admissible to show "notice" if plaintiff produced evidence that a defendant was aware of it. ConAgra objected on hearsay grounds to the admission of a 1919 newspaper article about Fuller's South San Francisco plant. The court ruled that the article was admissible for a limited purpose.

testimony, and it permitted the defense to enter a "continuing objection to purported opinion testimony that is based solely on information gleaned from the four corners of the document being referred to."[66] Plaintiff's experts thereafter referenced specific portions of these documents in their testimony.

"If statements related by experts as bases for their opinions are not admitted for their truth, they are not hearsay." (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 681.) "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the [factfinder] as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth." (*Id.* at p. 682.) "When an expert is not testifying in the form of a proper hypothetical question and no other evidence of the case-specific facts presented has or will be admitted, there is no denying that such facts are being considered by the expert, and offered to the [factfinder], as true." (*Id*. at p. 684.) "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception." (*Ibid*.) "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.)

The trial court did not err in permitting the experts to testify about the specific statements in these documents that supported their opinions. First, the record does not establish that these documents were not within a hearsay exception. As plaintiff established below, these documents were more than 30 years old. "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is contained in a writing more than 30 years old and the statement has been since generally acted upon as true by persons having

---

[66]    There is no indication that the trial court or the parties viewed this "continuing objection" as applying to documents other than the LIA and NPVLA documents and the 1930 newspaper article.

an interest in the matter." (Evid. Code, § 1331.) "Ancient documents would have no effect or potency as evidence unless they served to import verity to the facts written therein. The true rule is that an ancient document is admitted in evidence as proof of the facts recited therein, provided the writer would have been competent to testify as to such facts." (*Kirkpatrick v. Tapo Oil Co.* (1956) 144 Cal.App.2d 404, 411.) Since the authors of the LIA and NPVLA documents and the writer of the newspaper article would likely have been competent to testify to the contents of these writings, and the members of the LIA and the NPVLA would have acted upon the statements in these documents being true, defendants have not established that these documents were inadmissible hearsay.

Second, the experts were not necessarily relying on the truth of the statements in these documents since their relevance was primarily to show what defendants were aware of at the relevant time. Finally, the trial court, which admitted these documents for a limited purpose, was well aware of the nature of the limited admissibility of these documents and, unlike lay jurors, able to distinguish between the use of the contents for their truth and the use of the documents as a basis for an expert's opinion.[67] We find no prejudicial error in the court's rulings with regard to the experts' references to these documents.

### d. Reliance on Hearsay in Limited Purpose Documents

Defendants argue that the trial court prejudicially erred in considering for its truth hearsay in documents that had been admitted only for a limited purpose. Defendants have forfeited this contention because they fail to cite any indication in the record that the trial court relied on a *limited purpose* exhibit for the truth of its assertions. The only exhibits they expressly reference are exhibits 18 and 19, which were admitted for all purposes under Evidence Code section 1280 and therefore were not limited purpose documents.

---

[67] The court stated early on: "[T]hese matters, these reports, analyses, whatever they might be, if they are hearsay are not admitted for the truth of the matter asserted, but they are admitted for the limited purpose to assist me in evaluating the expert's opinion."

103

## 2. Disallowance of Recross

Defendants contend that the trial court prejudicially erred in ruling that there would be no recross-examination during the trial.

### a. Background

After redirect of the first trial witness, one of the defense attorneys asked to recross. The court said: "No. No. One round. Direct, cross, redirect. That's it." After plaintiff's expert Rosner testified on redirect, trial counsel for ARCO and DuPont requested recross. The court denied the request. ConAgra's trial counsel objected to the denial of recross. "If the Court please, I too would like to do a brief recross-examination. May I please have a continuing objection to the denial of rights under 772 as to any witness where I actually participated in the cross-examination at issue." The court allowed him a continuing objection and overruled his objection. SWC's trial counsel joined ConAgra's objection NL's trial counsel did not join.

After redirect of plaintiff's expert industrial hygienist Gottesfeld, who had testified about lead inspections and lead assessments, SWC's trial counsel moved to "strike the redirect testimony in light of the denial of recross." The court denied the motion. It stated: "I think the Court has the discretion to alter the order of this. You might want to take a look at Evidence Code Section 320. There is some case law about that as well. In any event, I think I am within my province to do that."

After plaintiff's witness Courtney testified on redirect, SWC's attorney asked to be permitted to "ask two questions as my redirect," but the court denied the request. SWC had done its direct exam as its cross to save time.

During redirect of plaintiff's expert Markowitz, plaintiff introduced additional exhibits. SWC's trial counsel objected: "[W]ith no chance to cross-examination [*sic*], they chose to proceed by summary. If they botched it, they shouldn't be able to drop this on us after cross. Your Honor, I object. If they are allowed, I would like an opportunity to study them and have this witness subject to recall so I can cross-examine them fairly and deal

104

with them later.  That's my objection."  The court overruled the objection.  After Markowitz's redirect, DuPont's trial counsel asked the court if it would "permit brief recross."  The court said "No."  No other attorney sought recross of Markowitz.

After redirect of plaintiff's final expert witness, SWC's trial counsel said:  "I am assuming that your Honor's standing rule of no recross applies, and we don't have to ask for recross each time?"  The court said:  "That is correct."  SWC's trial counsel then sought to strike the witness's testimony about an article because he would not have the opportunity to ask about it on recross.  His request was denied.

At the close of plaintiff's case, SWC's trial counsel moved "to strike the testimony on redirect for all of the witnesses on the ground we were not permitted recross."  The motion was denied.

### b. Analysis

Defendants claim that the trial court's disallowance of all recross throughout the trial was an arbitrary ruling that cannot be upheld as an exercise of discretion because it allowed plaintiff to present evidence on redirect that defendants had no opportunity to confront.

"A witness examined by one party may be cross-examined upon any matter within the scope of the direct examination by each other party to the action in such order as the court directs."  (Evid. Code, § 773, subd. (a).)  " 'Recross-examination' is an examination of a witness by a cross-examiner subsequent to a redirect examination of the witness."  (Evid. Code, § 763.)  "The examination of a witness shall proceed in the following phases:  direct examination, cross-examination, redirect examination, recross-examination, and continuing thereafter by redirect and recross-examination."  (Evid. Code, § 772, subd. (a).)

Defendants contend that Evidence Code sections 772 and 763 create a right to recross.  Neither statute creates any rights.  Evidence Code section 763 merely defines recross, and Evidence Code section 772 simply identifies the order in which the various phases of witness examination, including recross, may occur.  If defendants' contention were accurate, Evidence Code section 772's mention of re-redirect and re-recross would

105

create a right to those uncommon phases of witness examination. Defendants cite no authority for the proposition that Evidence Code section 772 has ever been construed to create a right to every possible phase of witness examination.

Defendants cite an appellate court decision from Illinois for the proposition that a blanket prohibition on recross is never permissible.[68] In *Grundy County Nat. Bank v. Myre* (1975) 34 Ill.App.3d 287 (*Grundy*), a bank brought an action to collect from a farmer on an accounts receivable that had been assigned to the bank by a farm supply company. (*Ibid*.) The farmer claimed that the account was overstated by $18,500, which was attributable to a note that the farm supply company had assigned to one of its suppliers and the farmer had paid off. The trial court rejected the farmer's claim that the account was overstated and awarded the bank over $30,000. On appeal, the farmer contended that the trial court had prejudicially erred in refusing to allow him recross of one of the bank's witnesses. (*Grundy*, at pp. 287-288.) On direct exam, the witness acknowledged that $18,500 for a carload of a particular type of fertilizer was supposed to be billed to the farmer by the supplier and was the subject of the note. On cross, the witness admitted that he could not tell if that fertilizer had instead been charged to the farmer's account by the supply company and said that the fertilizer was just part of the goods covered by the $18,500 note. On redirect, the witness testified that one of the ledger cards for the farmer's account showed no fertilizer purchases that could have amounted to a carload or to $18,500. The farmer was denied the opportunity for recross. In fact, another ledger card in evidence at the trial showed that more than $20,000 had been charged to the farmer's account for a carload of that particular type of fertilizer. (*Grundy*, at pp. 288-289.) Under these circumstances, the Illinois

---

[68] Defendants' reliance on a federal Confrontation Clause case is misplaced as the Confrontation Clause does not apply in civil cases. (*United States v. Baker* (9th Cir. 1993) 10 F.3d 1374, 1404 [Confrontation Clause permits recross to be barred except where "new matter" was introduced on redirect], overruled on a different point in *United States v Nordby* (9th Cir. 2000) 225 F.3d 1053, 1059.) The remainder of the cases defendants cite are irrelevant because they concerned the right to cross-examination, not the right to recross.

appellate court held that, "[s]ince new matter had been brought out on redirect, and since the refusal to permit recross was clearly prejudicial to defendant's case, the ruling amounted to reversible error." (*Grundy*, at p. 290.)

*Grundy* is readily distinguishable. Here, unlike in *Grundy*, the trial court announced *at the beginning of the trial* that there would be no recross permitted throughout the trial. By making this ruling at the outset, the trial court let trial counsel know that it was their job to avoid the need for recross by objecting to any redirect that exceeded the scope of cross. The scope of direct operates as a limit on cross, and the scope of cross in turn limits redirect. Even without an opportunity for recross, the cross examiner has a full opportunity to address everything that the direct examiner has addressed on direct, and any redirect cannot properly delve into new subject matter. In fact, trial counsel for the defense actively interposed objections to the scope of redirect. Some of those objections were sustained, and others were overruled, but defendants do not contend on appeal that the trial court prejudicially erred in overruling their specific beyond-the-scope objections.

We can see no abuse of discretion in a trial court's decision that a particular court trial should be conducted without recross. In a court trial, the trial court, as the factfinder, can discern whether the material to be presented is of a type that does not merit repetitive examination of witnesses. In this case, with half a dozen litigants, more than a dozen trial attorneys, and predominantly expert witnesses who had been heavily deposed in advance of trial, the trial court could have reasonably concluded that repetitive witness examination would be unduly burdensome and unproductive. Requiring trial counsel to police the scope of redirect so as to avoid the need for recross was a reasonable choice for the trial court to make in this case to avoid an undue consumption of the court's time and resources. The court did not abuse its discretion in prohibiting recross at this trial.

### 3. Time Limits

Defendants challenge the trial court's imposition of time limits and rejection of their posttrial deposition designations and offers of proof.

107

## a. Background

The parties initially estimated that the trial would last two months. Two months before trial, the court told the parties that it would allow each side 30 hours to present its case. Defendants objected to this time limit. The court clarified that this limit applied only to "witness time" and that a party could seek more time if it could provide a "specific justification."[69] The court told the parties that it anticipated that the case would be tried over a one-month period. The parties were ordered "to exchange exhibit lists and the content and expected testimony time of each witness" and to provide to the court "a list of proposed exhibits that are actually intended to be used and witnesses (including a brief summary of testimony and realistic time estimates) . . . ."

On June 24, 2013, three weeks before trial, the court went over the lists of witnesses and time estimates that the parties had provided. Plaintiff's time estimate was within the court's 30-hour allotment. The defense estimated that it would need 64.25 hours to present its case. The court was not satisfied. "The Defendants have to get the number down from the amount of time that they have stated. I am not going to pick a precise number. But to get me above the 30 hours is going to take a lot, a lot, to get over that. And just a list of names is not going to do it."

On July 8, 2013, a week before trial, the court informed the parties that, "within reason," deposition testimony would not be counted against the 30-hour limit because the court could read deposition testimony "a lot quicker, obviously, than having somebody on the witness stand testifying." However, the court would count deposition testimony against the limit "if it gets to be excessive . . . ." The court had reviewed the parties' revised

---

[69] The court said: "[T]he time allocation refers to witness time and does not include opening statements (if any), pretrial and other motions, closing argument, and other procedural matters requiring Court time."

108

witness lists and exhibit lists, and, in the court's view, these lists confirmed that "the 30-hour limit is correct."[70]

On the first day of trial, the court clarified that the time limit applied only to live testimony. The court explained that, based on pretrial litigation, "it [is] obvious to me that without specific limits for trial presentation this trial could easily divulge [*sic*] into a morass of side issues and side arguments." The court increased the time limit to 40 hours per side. It then overruled the defense objections to the time limits.

After plaintiff's expert epidemiologist Lanphear testified, SWC's trial counsel asked to submit an offer of proof of what additional questions he would have asked if he had not been subject to the time limits. The court acceded to his request to "file something" later. During the defense case, while the defense still had eight hours of time remaining, SWC requested additional time. The court rejected that request. Near the end of the defense case, the defense asked the court to allow it an additional hour to present a witness on abatement. The court agreed to "be flexible about that, within limits." The court did not interrupt the lengthy testimony by the defense abatement expert. After his testimony, the defense rested without requesting additional time.

When plaintiff presented its first rebuttal witness, the defense asked for 15 minutes to cross-examine him. The court granted this request. The defense completed its cross without being interrupted. After plaintiff's second rebuttal witness testified, the court offered the defense the opportunity to cross-examine the witness, but the defense declined. The defense freely cross-examined plaintiff's third rebuttal witness without interruption.

The trial actually consumed 24 court days. After trial, defendants delivered to the court 47 binders of proposed deposition designations for 46 witnesses to supplement the trial record. The court rejected 25 of the 47 binders, but it permitted 22 of the binders (for

---

[70] The court also informed the parties that the defense would have 30 minutes for each defendant for opening statement, but plaintiff would be limited to a single 30-minute opening statement for all 10 jurisdictions.

21 witnesses) to be admitted into evidence. The court subsequently rejected defendants' request for reconsideration of this ruling.

### b. Analysis

Defendants complain that the trial court prejudicially erred in imposing "unreasonable time limits" on their examination of witnesses at trial and rejecting their efforts to use deposition designations and offers of proof to present evidence outside of those time limits.

Defendants appear to believe that Evidence Code section 351 precluded the trial court from limiting the amount of time they could use for their evidentiary presentation. This statute provides: "Except as otherwise provided by statute, all relevant evidence is admissible." The fact that relevant evidence is admissible does not mean that a trial court may not restrict a party from making an unduly time-consuming presentation of its evidence.

We review the trial court's imposition of time limits for abuse of discretion. (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 23 (*Crane*).) In *Crane*, the Fifth District Court of Appeal considered the merits of court-imposed time limits for a civil trial. We set forth the Fifth District's analysis at some length because it cogently refutes defendants' contention that time limits are forbidden.[71]

"Some litigants are of the mistaken opinion that when they are assigned to a court for trial they have *camping rights*. This view presumes that the trial judge must defer to the lawyers' time estimates for the conduct of the trial such that, for example, when examining witnesses, unless a valid objection is made by one's opponent, a party is entitled to take whatever time it believes necessary to question each witness. This view is not only contrary

---

[71] Defendants do not acknowledge the existence of *Crane* despite the fact that the *Crane* opinion was published in May 2014, well before any of the briefs were filed in this case (beginning in September 2014), and plaintiff cited *Crane* in its appellate brief.

to law but undermines a trial judge's obligation to be protective of the court's time and resources as well as the time and interests of trial witnesses, jurors and other litigants waiting in line to have their cases assigned to a courtroom. [Fn. omitted.] The Evidence Code expressly empowers trial judges to limit the presentation of evidence, even evidence that is relevant and probative. Evidence Code section 352 authorizes the court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate *undue consumption of time.* Evidence Code section 765, subdivision (a) provides that the court *shall* exercise control over the mode of interrogation of witnesses 'so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of truth.' Both statutes describe powers that the court may exercise on its own initiative. [¶] It is incumbent upon trial judges to manage trials efficiently. Efficiency is not necessarily measured by comparing the actual length of a trial with the parties' original time estimate because parties often overestimate or underestimate a trial's length. Judges need to be proactive from the start in both assessing what a reasonable trial time estimate is and in monitoring the trial's progress so that the case proceeds smoothly without delay. . . . Trial time management is an ongoing responsibility of the trial judge, regardless of the case's complexity, the number of witnesses called or whether specific time limits have been imposed. [¶] . . . [¶]

"For those cases in which the trial judge believes time limits should be set, the court should first elicit estimates from the parties and invite each side to comment on the other's estimate. Once the parties have presented their views, the court should independently evaluate the estimates based on the arguments of the parties, the state of the pleadings, the legal and factual issues presented, the number of witnesses likely to testify, the court's trial schedule and hours, and the court's experience in trying similar cases. [¶] . . . [¶]

"There are advantages to specifying time limits in court hours rather than court days. An hour time limit imposed on one side would include all time that party spends in examining its own witnesses (direct and redirect) as well as time spent in examining the

111

adverse party's witnesses (cross and recross). It would include the time spent in delivering an opening statement and final argument. As contrasted with a time limit expressed in court days, an hour limit, as described, is not diminished by matters beyond the party's control, such as the amount of time an opponent uses to cross-examine said party's witnesses. . . . The parties are entitled to be kept advised on a regular basis and upon request of how much time each side has used and has remaining. [Fn. omitted.]

"... [A]ny time limit order should be reasonable, mindful that each party is entitled to a full and fair opportunity to present its case. Trials are a dynamic process without the benefit of a dress rehearsal, which makes forecasting the length of a trial less than precise. But for those parties and attorneys who are fully prepared for trial and do not waste time with repetitive questioning, cumulative evidence, not having witnesses available, or not having documentary evidence organized and easily accessible, a trial's length is not an issue. Thus, despite the vagaries of trial, when all parties try a case diligently, there is no reason for time limits. In all other cases, time limits will provide incentive to be diligent. [¶] Any limits imposed should be subject to revision (upward or downward) for good cause shown either on a party's or the court's own motion. . . . [¶] Not all cases are suitable for the imposition of time limits. More often it is sufficient if the trial judge manages the trial in such a way that the trial proceeds efficiently without delays, repetition or dead time. However, in those cases in which the trial court imposes time limits, it is also important that those limits be enforced." (*Crane*, *supra*, 226 Cal.App.4th at pp. 19-22.)

The Fifth District's opinion in *Crane* provides an excellent explanation of how and why a civil trial court may use time limits to ensure an efficient trial. In this case, the trial court did precisely as the Fifth District later recommended. First, the trial court "elicit[ed] [time] estimates from the parties." Second, it "independently evaluate[d] the estimates based on the arguments of the parties, the state of the pleadings, the legal and factual issues presented, the number of witnesses likely to testify, the court's trial schedule and hours, and the court's experience in trying [complex] cases." (*Crane*, *supra*, 226 Cal.App.4th at p. 20.)

112

Third, the court specified the time limits in court hours, which "provide[d] [the parties] incentive to be diligent," and "kept [the parties] advised on a regular basis . . . of how much time each side ha[d] used and ha[d] remaining."[72] (*Crane*, at p. 21.) Fourth, the court was responsive to the need to revise its original time limit and to allow additional time at the end of the trial when a showing was made that more time was necessary. Indeed, the trial court went to great lengths to ensure that its "reasonable" time limits did not prevent any of the parties from having "a full and fair opportunity to present its case." (*Ibid.*)

Nor was there any abuse of discretion in the court's ruling on defendants' "mass of binders" presented at the end of the trial. As the trial court observed, this avalanche of "unreasonable and excessive" material was in direct violation of the court's prior "directives," consisted primarily of "individuals who were not listed on the trial witness lists," and was consistent with defendants' pattern of attempts "to skirt the time limits imposed by the Court." And even then the court exercised considerable patience with defendants, sorting through this mass of material and admitting about half of these deposition designations into evidence.

Under the circumstances, we can find no abuse of discretion in the trial court's imposition of time limits, enforcement of those time limits, and rejection of defendants' attempt to undermine those limits by sneaking in additional evidence in the form of a massive amount of deposition designations and offers of proof.

### 4. Lead Paint Rather than Lead Pigments

Defendants contend that the trial court deprived them of "fair notice" and a "fair trial" and "violated due process by changing the product at issue after trial" from lead "pigments" to lead "paint."

---

[72] This is not a case like *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, in which the trial judge abused its discretion by abruptly terminating the trial in the midst of a party's examination of a witness. (*Id.* at p. 289.)

Defendants' contention is frivolous. Since the outset of this case, it has been unmistakably clear that the focus of plaintiff's public nuisance cause of action was lead *paint*. In *Santa Clara I*, in 2006, this court expressly identified plaintiff's allegations as asserting that defendants "promot[ed] *lead paint* for interior use even though defendants had known for nearly a century that such a use of *lead paint* was hazardous to human beings." (*Santa Clara I*, *supra*, 137 Cal.App.4th at p. 306, italics added.) The California Supreme Court recognized in *Santa Clara II* in 2010 that this was an action concerning "lead paint . . . ." (*Santa Clara II*, *supra*, 50 Cal.4th at p. 43.) Plaintiff's opening statement at the 2013 trial of this action again targeted "lead paint." Even SWC's fellow defendant NL acknowledged in its opening statement that this action was about "Lead-based paint . . . ."

Notwithstanding the fact that it was well recognized years before trial that this case was about lead paint, after plaintiff's case-in-chief, SWC moved for judgment and argued to the trial court that it was entitled to judgment because "this is a pigment case" rather than a lead paint case. SWC claimed that this distinction was important because it could not be liable for promotion of lead pigments since it made white lead carbonate pigment only for use in its own paints and did not promote lead pigment to other paint manufacturers. SWC's view was that plaintiff had chosen not to base its case on promotion of lead paint to consumers. Plaintiff responded: "To argue that promoting lead pigment on its own can form the basis of liability, but that putting that lead pigment in paint and telling consumers to use it specifically in a residence somehow insulates you from public nuisance liability is just counterintuitive to the legal principles and to the evidence that's here in this case." The court denied SWC's motion.

SWC's argument below and on appeal has no merit. SWC and its fellow defendants have always known that this case was about lead paint. Neither plaintiff nor the court "chang[ed] the product" in this case. This case was always about lead paint.

## 5. RASSCLE Database

Defendants contend that the trial court erroneously "denied defendants a reasonable opportunity to obtain and analyze the full RA[S]SCLE database before trial." They claim that, if they had had full access to the "RASSCLE data" further in advance of trial, that data "would have refuted plaintiffs' outdated, inapposite national studies" on the sources of elevated BLLs that the trial court relied upon.

### a. Background

"RASSCLE is an acronym for Response and Surveillance System for Childhood Lead Exposure." The RASSCLE databases were created by the CLPPB. RASSCLE II is "a web-based system that is available in a number of the counties in the state" and contains data from 2006 and thereafter. RASSCLE I was its predecessor. RASSCLE I was closed in approximately 2009.

The "RASSCLE database . . . is a collection of the laboratory results of blood lead level testing results from all of the commercial laboratories in California." It is not random; it simply collects all of the data from children who happen to be tested for lead in California. California regulations require that all children receiving government assistance be tested for lead at age one and age two. State regulations also require that children living in pre-1978 housing with deteriorated paint or that has been recently renovated be tested for lead. These regulations produce about 700,000 tests each year. However, many of the high-risk children targeted by RASSCLE for testing do not get tested because testing occurs only if a health provider orders a test. Kaiser members are overrepresented in RASSCLE because Kaiser makes lead screening a priority. Only about 75 percent of the children required to be tested are actually tested. The RASSCLE databases contain all cases where a child tested at 10 mcg/dL or higher. Only about 30 percent of the children in the 10 jurisdictions are included in the two RASSCLE databases.

The defense conceded that RASSCLE I had been produced by all entities except Monterey County. Monterey County was unable to access its RASSCLE I database because

it did not know the password. When the court set the trial for July 15, 2013, the RASSCLE II database was expected to be produced by the state by June 21, 24 days before the beginning of trial. Defendants claimed that they needed the RASSCLE II data in order to support their argument that the lead problem had been taken care of because BLLs had fallen dramatically. They also claimed that the RASSCLE II data would show that the current blood levels were due to other sources besides lead paint. Plaintiffs were willing to stipulate that there had been a dramatic drop in BLLs.

Defendants received the complete RASSCLE II database on June 21, 2013, three weeks before trial. They immediately provided it to their experts. Defendants told the trial court that their experts estimated that they needed "eight to ten weeks to fully analyze" this information. They sought a continuance of the trial, but the court denied their request. The court expressed its belief that the data could be analyzed in a few days and queried: "What are they using yellow pads and number 2 pencils? Come on. An abacus."

During its opening statement on July 15, 2013, NL's trial counsel told the court that the defense was due to receive a report from its experts on the RASSCLE II database on July 22, 2013. Defense witnesses did not begin testifying until August 15, 2013. A defense expert witness testified on August 15 about his review of the RASSCLE data from 2007 through part of 2012. He testified that he had "go[ne] through the RASSCLE data in detail . . . ."

### b. Analysis

While defendants are less than clear about the precise nature of their contention, we understand them to be arguing that the trial court abused its discretion by denying their motion for a continuance of the trial to permit them more time to analyze the RASSCLE II data that was provided to them three weeks before trial.[73] "A trial court has great discretion

---

[73] Our endeavor is made more difficult by defendants' failure to cite any authority in support of this contention other an irrelevant passage in the United States Supreme Court's opinion in *Shelby County v. Holder* (2013) __ U.S. __ [133 S.Ct. 2612] (*Shelby*). *Shelby*

116

in the disposition of an application for a continuance. Absent a clear abuse of discretion, the court's determination will not be disturbed." (*Estate of Smith* (1973) 9 Cal.3d 74, 81.) Here, the trial court reasonably concluded that defendants did not need two entire months to have their experts analyze the RASSCLE II data. The trial had not yet begun when the experts received the RASSCLE II data, and the defense claim that analysis of this data would take a minimum of eight weeks was subject to considerable doubt, particularly as the defense had repeatedly sought to delay the trial. In fact, the defense experts were able to analyze the data in less than one month after receiving it, and the defense did not put on any witnesses until nearly two months after its experts received the RASSCLE II data. Under these circumstances, we can find no abuse of discretion in the trial court's denial of defendants' continuance motion.

### 6. Inspection of Properties

Defendants contend that the trial court's "pre-trial rulings prohibiting discovery" violated due process by "prevent[ing] defendants from mounting a defense to the condition of the supposed nuisance properties or to their culpability at each." They assert that the court "refused to allow defendants to inspect and exonerate themselves at the claimed nuisance properties" and "quashed defendants' attempt to inspect the alleged nuisance properties and to take discovery of property owners and the Jurisdiction's decisionmakers."

---

declared unconstitutional a section of the federal voting rights act that, in the court's view, selected jurisdictions for "preclearance" "based on 40-year-old facts having no logical relation to the present day." (*Shelby*, at p. 2629.) The court concluded that "[i]t would have been irrational for Congress [in 2006] to distinguish between States in such a fundamental way based on 40-year-old data, when today's statistics tell an entirely different story." (*Shelby*, at pp. 2630-2631.) The point that defendants may be trying to make is that the RASSCLE data would have updated prior studies. Of course this is not true. Because RASSCLE data was not compiled in a random fashion and did not even include all of the targeted population, it was not comparable to the data in the studies relied on by plaintiff. In any case, since defendants actually had full access to all of the RASSCLE data in time for their experts to fully analyze it before testifying at trial, defendants could not have been prejudiced by the court's refusal to further delay the trial.

Less than a month before trial, defendants filed an ex parte motion seeking "to serve inspection notices and notice depositions of landlords using the information disclosed in the RASSCLE databases, case files, and other documents recently produced or to be produced by plaintiffs and the State." Defendants claimed that their motion should be granted "because inspection of those addresses and depositions of landlords is necessary to gain evidence on several important topics including (a) whether a paint containing white lead pigment is even present, as plaintiffs assume to be the case but will not have proved; (b) the condition of any such paint and the reasons therefor including the landlord's violation of California Health & Safety Code §§ 17920.10 and 17980 *et seq.,* which require property-owners to abate 'lead hazards;' (c) the cause of any EBLLs [(elevated BLLs)] including alternative sources of lead in or around the residence; and (d) the effect of any remediation on BLLs and the efficacy of remediation." "This evidence will support defendants' position that, if there is any continuing problem at all, it is the result of poor maintenance, not mere presence." "Defendants recognize the practical limitations on the number of residences that can be inspected and landlords who can be deposed, especially with the short time between production of the case files and RASSCLE databases and the current trial date. Although the precise properties that defendants seek to inspect will depend on completing review of the recently, and to-be, produced documents, defendants have identified residences in San Mateo with lead hazards that it appears were not remediated despite numerous orders from the CLPPP to do so." One of defendants' attorneys declared that he had reviewed "case files produced by plaintiffs," some of which "identify residences in which it appears that lead hazards were not remediated, despite numerous orders from the CLPPP to do so." The court denied this ex parte motion.

Defendants claim that the court's "prohibition on discovery" amounted to a denial of due process, but the sole authority that they cite in support of their contention regarding inspection of properties is page 958 of the California Supreme Court's opinion in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953. Since defendants submit no

118

argument connecting this citation to their contention, we are given no guidance as to what this page of this case might have to do with defendants' appellate contention.[74] *Rutherford* was a strict products liability action seeking damages for harm caused by asbestos. The issue before the California Supreme Court was whether it was prejudicial error for the trial court to give a causation instruction that shifted the burden on causation to the defendants. The court held that the instruction was erroneous but not prejudicial. The page cited by defendants is a portion of the introduction to the opinion. Our best guess is that defendants are contending that they should have been permitted to attempt to disprove causation by establishing that the lead paint at particular properties did not come from their products.

Yet their actual contention is that the court erred in denying their ex parte motion to serve inspection notices on third parties.[75] "The standard of review for discovery orders is abuse of discretion." (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881.) Defendants cite no statutory or other authority for the court to grant an application to serve inspection notices on third parties. "[A] party's right to inspect documents or other physical evidence *in the possession or custody of the opposing party* depends upon compliance with the procedures set out in [Code of Civil Procedure] section 2031. On the other hand, there are situations where documents can be obtained without the other party's cooperation (for example, under the Public Records Act or from a friendly third party or by hiring a trained investigator or on the internet). . . . [P]roperty open to the public can be examined without recourse to section 2031 . . . provided that the examination can be conducted in a lawful fashion." (*Pullin v. Superior Court* (2000) 81 Cal.App.4th 1161, 1164-1165, italics added.) Since defendants have identified no authority upon which the trial court could have based a

---

[74] Like so many of defendants' appellate contentions, this one is difficult to understand. An appellate court should not be required to decipher the meaning of a contention that is not separately headed in any opening brief and for which no relevant authority is identified.

[75] We can find no indication in defendants' appellate briefing that they are challenging the court's denial of their request to depose "landlords."

119

decision to grant their application to serve inspection notices on third parties, the trial court did not abuse its discretion in denying the application.

## 7. Spoliation

Defendants claim that they were denied a fair trial because plaintiff's "spoliation of evidence" deprived them of evidence that was "important" to their defense.

Defendants identify in their opening brief only two items of "important" evidence that they claim were destroyed by plaintiff. First, they assert that Monterey County destroyed evidence when it changed a statement that had previously appeared on its Web site acknowledging that most cases of elevated BLLs in that county were attributable not to lead paint but to other sources. This statement was not destroyed evidence; evidence of the removed statement came in at trial. Second, they assert that San Francisco destroyed evidence because it did not retain lead test reports that did not detect a BLL of 5 mcg/dL or higher. Although the lead test reports themselves were "shredded," the evidence presented at trial reflected that the results in those reports were reported to the state and were contained in the state's records. Hence, no "important" evidence was destroyed.

SWC's reply brief suggests that two other types of evidence were destroyed. Monterey County did not retain any prior e-mails that were not in existence in January 2009, and it was unable to provide access to its RASSCLE I database because the only person who knew the password had died. The defense did not claim that there had been any "intentional destruction . . . ." Monterey County's failure to retain pre-2009 e-mails, while unfortunate, does not suggest that any important evidence was destroyed. While the RASSCLE I database was inaccessible, Monterey County provided its case files, and defendants had the more recent RASSCLE II database available to them. We see no indication that defendants were deprived of important evidence as the result of any "spoliation" and thus no basis for their claim that they were thereby deprived of a fair trial.

## K.  Appointment of Receiver

Defendants contend that their due process rights were violated because the trial court appointed the CLPPB to serve as the receiver of the abatement funds without holding an evidentiary hearing and in the absence of evidence that the CLPPB could qualify to serve as a receiver.

"A receiver may be appointed by the court in which an action or proceeding is pending, or by a judge thereof, . . . [a]fter judgment, to carry the judgment into effect." (Code Civ. Proc., § 564, subd. (b)(3).)  "Code of Civil Procedure section 564, subdivision (b)(3), gives trial courts the discretion to appoint receivers to carry judgments in abatement proceedings into effect." (*City and County of San Francisco v. Daley* (1993) 16 Cal.App.4th 734, 744.)  We review a trial court's order appointing a receiver for abuse of discretion.  (*Ibid.*)

The appointment of a receiver to oversee the disbursement of the abatement funds in this case was necessary.  Defendants were required to deposit funds into "a specifically designated, dedicated, and restricted abatement fund."  The funds in this account would be "disbursed" by the receiver only in response to grant applications from the 10 jurisdictions.[76]  To perform this function, the trial court ordered that the abatement fund would be "administered by" the CLPPB "on behalf of the people . . . ."[77]  While the trial court's decision to appoint a receiver in this case was a necessity, not an abuse of discretion, we agree with defendants that the record does not support the court's selection of the CLPPB to serve as the receiver in this case.

---

[76]    The court provided that the receiver's costs would be paid out of the abatement fund.

[77]    The trial court's order referred to the CLPPB sometimes as the "administrator" of the fund and other times as the "receiver" of the fund.  Since the parties assume that the CLPPB was appointed to serve as a receiver, we assume the same.

121

Defendants claim that the CLPPB cannot qualify to serve as a receiver because it is a nonparty over which the court lacks jurisdiction, has not consented to act as a receiver, and is not impartial due to its being a party-affiliated entity.

"No party, or attorney of a party, or person interested in an action . . . can be appointed receiver therein without the written consent of the parties, filed with the clerk."[78] (Code Civ. Proc., § 566.)  "A receiver is an agent and officer of the court, and is under the control and supervision of the court.  [Citations.]  The receiver is also a fiduciary who must act for the benefit of all parties interested in the property."  (*City of Chula Vista v. Gutierrez* (2012) 207 Cal.App.4th 681, 685.)  The receiver must be "neutral."  (Cal. Rules of Court, rule 3.1179(a).)

Since the trial court held no evidentiary hearing regarding the CLPPB's ability to serve as receiver, the record contains no evidence that the CLPPB has consented to serve as a receiver in this case or that it is sufficiently impartial to be deemed not "interested" in this action so that it can serve as a receiver.  On remand, we will direct the court to hold an evidentiary hearing on the receiver issue.

## L.  SWC's Cross-Claim

SWC maintains that the trial court erred in failing to issue a declaratory judgment in response to its cross-claim.[79]  SWC sought a declaration that "Intact Lead Paint" that is not a "'lead hazard'" under Health and Safety Code sections 17920.10 and 105251 "or in violation of a valid existing ordinance is not a public nuisance."  It also sought a declaration that owners of properties with "lead hazard[s]" are "solely responsible" for the creation and

---

[78]     The court's abatement order provided that if the CLPPB was "unwilling or unable" to administer the fund, the 10 jurisdictions "shall serve in this capacity."  That cannot be. The 10 jurisdictions are not impartial nonparties and therefore cannot serve as receivers. (Code of Civ. Proc., § 566.)

[79]     SWC's arguments on this issue simply incorporate its other contentions, which we have already rejected.

maintenance of "any public nuisance" and the abatement of any "lead hazard." In sum, SWC sought a declaration that intact lead paint could not be declared a public nuisance and that defendants were not responsible for the creation or abatement of lead hazards. The trial court rejected SWC's cross-claim.

The declaratory judgment that SWC sought was diametrically opposed to the trial court's judgment in favor of plaintiff. The trial court's statement of decision found that even intact interior residential lead paint was a public nuisance if it was on friction surfaces. The court also found that defendants were responsible for the creation and abatement of lead-paint-based public nuisances in residential housing in the 10 jurisdictions. As we have already determined, these findings are supported by substantial evidence. Because these findings precluded SWC from obtaining its requested declaratory relief, the trial court did not err in rejecting SWC's cross-claim.


## M. ConAgra's Liability As Fuller's Successor

ConAgra challenges the trial court's determination that it was liable as the successor to Fuller. It claims that substantial evidence does not support the trial court's finding.

The trial court found that "ConAgra succeeded to Fuller's liabilities as a result of a series of corporate mergers and/or the express assumption of liabilities." It ruled that "it is fair and appropriate in this case to so hold and necessary to prevent an injustice."

Our substantial evidence standard of review requires us to uphold the trial court's finding if " 'there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' " (*Foreman & Clark Corp. v. Fallon*, *supra*, 3 Cal.3d at p. 881.)

The ordinary rule for determining "whether a corporation purchasing the principal assets of another corporation assumes the other's liabilities" is "that the purchaser does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) *the transaction amounts to a consolidation or merger of the two corporations*, (3) the purchasing corporation is a mere continuation of the seller, or (4) the

123

transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28, italics added (*Ray*).)

Plaintiff produced evidence at trial that ConAgra had succeeded to Fuller's liabilities as a result of a series of mergers and consolidations. This evidence showed that W.P. Fuller & Co. (Fuller), a California corporation, merged into Hunt Foods and Industries, Inc. (Hunt), a Delaware corporation, in 1962. After Fuller merged into Hunt, "it [(Fuller)] was still the . . . [¶] . . . same operation." In 1968, three Delaware corporations, including Hunt, consolidated to become Norton Simon, Inc. (Norton Simon). In 1993, Norton Simon merged with another company to become Beatrice Company, which then merged with and into Hunt-Wesson, Inc. (Hunt-Wesson). In 1999, Hunt-Wesson changed its name to ConAgra. Since all of these transactions were mergers or consolidations, plaintiff's evidence was sufficient to support the court's finding that ConAgra succeeded to Fuller's liabilities.

ConAgra, relying on evidence it presented at trial, claims that the trial court could not have credited plaintiff's evidence that it succeeded to Fuller's liabilities. ConAgra's argument disregards the fundamental rule that a trial court may reject even uncontradicted evidence so long as it does not do so arbitrarily. (*Hicks v. Reis* (1943) 21 Cal.2d 654, 659.) The trial court could have reasonably concluded that the evidence upon which ConAgra relies was not credible.

ConAgra relies on evidence it produced that, in 1964, a corporation called "W.P. Fuller Paint Company" was incorporated. ConAgra asserts in its opening brief that "Hunt established WPFPC as a wholly-owned subsidiary" and cites nine pages of the appendix. Those nine pages consist of a "Certificate of Incorporation" for "W.P. Fuller Paint Company." The certificate contains no apparent reference to Hunt or to "W.P. Fuller Paint

124

Company" being a subsidiary of Hunt. Hence, this evidence did not establish that "W.P. Fuller Paint Company" was a "wholly-owned subsidiary" of Hunt.[80]

ConAgra claims that "undisputed evidence" establishes that all of Fuller's liabilities were transferred to "W.P. Fuller Paint Company" in 1967. It relies on a document that purports to be minutes of a December 1964 "first meeting" of the board of directors of "W.P. Fuller Paint Company." ConAgra asserts in its opening brief that these minutes "state WPFPC accepted Fuller's paint business, *including its liabilities*." These purported minutes, which were of uncertain origin, state that, at this meeting, the chairman of the board "stated Hunt Foods and Industries, Inc. had offered to transfer certain assets of W. P. Fuller & Co., a Division of Hunt, subject to certain liabilities, to this Corporation in exchange for Four Hundred Thousand (400,000) shares of common stock having a par value of $5 each plus certain long and short-term notes." The purported minutes also state that the board passed a resolution "that this Corporation accept the proposal that Hunt Foods and Industries, Inc., ('Hunt') transfer to this Corporation the inventories, rights, credits, good will and other assets, other than certain fixed assets, consisting principally of certain lands, buildings, machinery and equipment which have been mutually agreed upon, of the business carried on by W. P. Fuller & Co., a Division of Hunt, subject to all of its liabilities."

ConAgra's reliance on these purported 1964 minutes is misplaced.[81] The purported minutes, even if credited, would not establish that Hunt transferred "all of" Fuller's liabilities to "W.P. Fuller Paint Company." At most, these purported minutes might

---

[80] We note however that plaintiff does not dispute that Hunt created "W.P. Fuller Paint Company."

[81] ConAgra also quotes extensively from an unpublished Delaware trial court opinion, *The O'Brien Corp. v. Hunt-Wesson, Inc.* (Del. Ch., Feb. 25, 1999, No. CIV. A. 16562) 1999 WL 126996, which dismissed on ripeness grounds a complaint for declaratory relief that had been filed by O'Brien against ConAgra's predecessor. That action sought a declaration that ConAgra's predecessor, not O'Brien, was Fuller's successor. O'Brien's *allegations* in its complaint in that action relied on the purported 1964 minutes. The Delaware trial court's dismissal of that action, which resolved no factual issues, is of no relevance here.

125

demonstrate that Hunt had "offered to transfer certain assets" of Fuller "subject to certain liabilities." The nature of the "certain liabilities" that were purportedly part of Hunt's offer was not specified. While the purported minutes might show that "W.P. Fuller Paint Company" resolved to accept this offer, the purported minutes do not enumerate all of the terms of the Hunt offer, do not demonstrate that any acceptance was communicated to Hunt, and do not establish that the two corporations ever actually consummated any contemplated transfer of any of Fuller's assets or liabilities on any terms.[82] The trial court could have reasonably rejected the inferences that ConAgra attempts to draw from the purported minutes.

ConAgra also claims in its appellate brief that, "[i]n 1967, Hunt sold Fuller's paint business to O'Brien." ConAgra cites two pages from the appendix. One page is an excerpt from deposition testimony of a former Fuller employee to the effect that he left Fuller in 1967 after "Norton Simon announced that he was putting the company up for sale." Since Norton-Simon was not created until 1968, the trial court could have reasonably rejected this testimony. The other page is a 1967 newspaper article reporting that Hunt had announced that it had sold "the business and assets" of "Fuller, a wholly owned subsidiary" to O'Brien. The article states: "Specific details of the transaction weren't disclosed." Even if the article were to be deemed credible, it would not establish that Hunt's purported transaction with O'Brien transferred Fuller's liabilities to O'Brien.

Under *Ray*, the purchaser, here O'Brien, did not assume Fuller's liabilities "unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent

---

[82] ConAgra also produced evidence that, in 1967, "W.P. Fuller Paint Company" changed its name to "WPF, Inc.," and in 1968, "WPF, Inc." dissolved. We need not address this evidence, as its relevance depends on the validity of the propositions that ConAgra states in its brief but the trial court rejected.

126

purpose of escaping liability for the seller's debts." (*Ray*, *supra*, 19 Cal.3d at p. 28.) ConAgra produced no evidence of any of the four predicates that could have shown that Hunt transferred Fuller's liabilities to O'Brien. ConAgra suggests that the "product line exception" to the *Ray* test applied, but it also failed to provide any evidentiary support for the application of that exception, even if it were the case that this exception could be applied outside the strict products liability context in this public nuisance abatement action.[83] (See *Franklin v. USX Corp.* (2001) 87 Cal.App.4th 615, 628 [describing the requirements for product line exception and refusing to extend it beyond the strict liability context]; *Monarch Bay II v. Professional Service Industries, Inc.* (1999) 75 Cal.App.4th 1213, 1217 [limiting product line exception to strict liability actions].)

The trial court was not obligated to credit the truth of the assertions in the purported 1964 minutes or in the 1967 newspaper article. Since plaintiff's evidence supports the court's finding that Fuller's liabilities flowed from Hunt to Norton-Simon and through it to ConAgra, we must uphold the court's finding that ConAgra was Fuller's successor.

### V. Lead Paint Cases From Other Jurisdictions

Defendants repeatedly cite four cases from other jurisdictions in which courts rejected public nuisance actions against lead paint and lead pigment manufacturers.

*City of Chicago v. American Cyanamid Co.*, *supra*, 355 Ill.App.3d 209 (*Chicago*) was a public nuisance action seeking abatement[84] by Chicago against the manufacturers and distributors of lead pigments and lead paint. (*Id.* at pp. 210-211.) Chicago appealed after the action was dismissed for failing to state a claim. (*Id.* at pp. 211-212.) The Appellate

---

[83] ConAgra's reliance on *SCM Corp. v. Berkel, Inc.* (1977) 73 Cal.App.3d 49 is misplaced. That declaratory relief action was tried on stipulated facts and joint exhibits. (*Id.* at p. 52.)

[84] Chicago's action originally sought damages, but on appeal Chicago contended only that it should have been able to seek abatement and punitive damages. (*Chicago*, *supra*, 355 Ill.App.3d at pp. 211-212.)

Court of Illinois upheld the dismissal on the ground that Chicago had failed to adequately allege "proximate cause" because Chicago could not identify any specific defendant as the source of the lead pigment or lead paint at any particular location. (*Id.* at p. 216.) The court rejected Chicago's contention that the defendants were liable under a "market share" or "collective liability" theory. It held that Illinois did not recognize either theory. (*Id.* at pp. 217-218.) In addition, the court held that Chicago could not succeed because it had failed to allege that the defendants controlled the property where the alleged nuisance was located. (*Id.* at p. 221.)

*City of St. Louis v. Benjamin Moore & Co.* (Mo. 2007) 226 S.W.3d 110 (*St. Louis*) was a public nuisance action brought by a city against lead paint distributors seeking to recover "damages for assessing, abating, and remediating the nuisance." (*Id.* at pp. 113, 116 ["private tort action" seeking "damages"].) The trial court granted summary judgment to the defendants on the ground that the city could not prove causation without identification of the lead manufacturer whose paint had been remediated. (*Id.* at p. 113.) The Supreme Court of Missouri, relying on a case in which it had held that "market-share liability" was contrary to Missouri law, held that "actual causation can be established only by identifying the defendant who made or sold that product." (*Id.* at p. 115.)

*In re Lead Paint Litigation*, *supra*, 191 N.J. 405 [924 A.2d 484] (*New Jersey*) was a Supreme Court of New Jersey decision in a case where the trial court had dismissed for failure to state a cause of action a "common law" public nuisance action brought by municipalities against lead paint manufacturers. (*Id.* at p. 409.) The Supreme Court of New Jersey noted that the New Jersey Legislature had declared interior residential lead paint to be a public nuisance and assigned responsibility for it to the owners of the residences, not paint manufacturers. (*Id.* at pp. 429, 432-433.) Relying on the Restatement, the court found that only a tortfeasor "in control of the nuisance" could be held liable for public nuisance, and the paint manufacturers lacked such control. (*New Jersey*, at pp. 425, 429, 433.) The court also held that the action was barred because the municipalities sought damages, rather

128

than abatement, and damages were not available in a public nuisance action to a public entity plaintiff that had suffered no special injury. (*Id.* at pp. 435-436.) Finally, the court held that, because the complaint sought to premise liability on a failure to warn, it "sound[ed] in products liability" and could not be the basis for a public nuisance action. (*Id.* at pp. 437-439.)

State v. Lead Industries Ass'n, Inc.*, *supra*, 951 A.2d 428 (*Rhode Island*) was a Supreme Court of Rhode Island decision in a public nuisance action brought by the state in which a trial court had ordered three former lead pigment manufacturers to abate lead paint. The court held that the trial court should have dismissed the action for failing to state a cause of action. (*Id.* at p. 452.) It found lacking any allegation that the defendants had interfered with a public right and any allegation that the defendants controlled the lead pigment. (*Id.* at p. 453.) "The interference must deprive all members of the community of a right to some resource to which they otherwise are entitled. [Citation] The Restatement (Second) provides much guidance in ascertaining the fine distinction between a public right and an aggregation of private rights. 'Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons.'" (*Id.* at p. 453.) "[A] public right is a right of the public to shared resources such as air, water, or public rights of way." (*Id.* at p. 455.) The court also held, in reliance on *New Jersey*, that the complaint was inadequate because it had failed to "allege any facts that would support a conclusion that defendants were in control of the lead pigment at the time it harmed Rhode Island's children." (*Rhode Island*, at p. 455.)

These cases are readily distinguishable from the case before us. None of the courts in these other jurisdictions assessed the merits of a public nuisance action in light of the voluminous evidence that was presented at the trial in this case. Only the Rhode Island case had been tried, and the Supreme Court of Rhode Island considered only the pleadings. The Chicago and New Jersey cases were dismissed at the pleading stage, and the St. Louis case was dismissed on summary judgment. The evidence presented at the trial in this case

proved the elements of a representative public nuisance action, which might not have been apparent from the pleadings in the actions in these other jurisdictions. Only the Rhode Island and Chicago cases were actions for abatement rather than damages. As we have pointed out repeatedly, a representative public nuisance action seeking only remedial abatement is legally distinct from an action for damages.

None of the reasons that the courts in these other jurisdictions provided for their rejection of public nuisance liability applies to the case before us. The *Chicago* court relied on "lack of control" and a restrictive Illinois causation definition. As this court pointed out in *Santa Clara I*, a defendant's control of the nuisance is not necessary to establish liability in a representative public nuisance action in California. (*Santa Clara I*, *supra*, 137 Cal.App.4th at p. 306.) The Illinois causation test is not analogous to California's substantial factor test. *St. Louis* is similarly distinguishable because the court based its analysis on a Missouri causation test that is not analogous to California's substantial factor test.

The *New Jersey* court's analysis was based on lack of control, specific New Jersey laws assigning responsibility solely to property owners, and its conclusion that the action, which was for damages, "sound[ed]" in products liability rather than nuisance. Control is not required in California for a public nuisance action (*Santa Clara I*, *supra*, 137 Cal.App.4th at p. 306), and California's laws do not assign exclusive responsibility for lead paint remediation to property owners. This court held in *Santa Clara I* that a representative public nuisance action is not a disguised products liability action. "A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition. Here, the alleged basis for defendants' liability for the public nuisance created by lead paint is their affirmative promotion of lead paint for interior use, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards. [¶] In contrast, a products liability action may be brought only by one who has already suffered a physical injury to his or her person or

130

property, and the plaintiff in a products liability action is limited to recovering damages for such physical injuries." (*Santa Clara I*, at pp. 309-310.)

The *Rhode Island* court's decision was based on lack of control (which does not apply in California) and lack of interference with a public right. We disagree with the *Rhode Island* court's conclusion that lead paint does not interfere with "shared resources" (see section IV(B) of this opinion), and the *Rhode Island* court's Restatement-based analysis of the "public right" is not consistent with California's broader statutory definition of a public nuisance. (*Rhode Island*, *supra*, 951 A.2d at pp. 453, 455.)

We therefore reject defendants' reliance on these cases from other jurisdictions.

## VI. Amici Arguments

Seven amicus briefs have been filed in this case. Amici Civil Justice Association (CJA), Pacific Legal Foundation (PLF), and NFIB Small Business Center et al. (NFIB) have filed amicus briefs in support of defendants. Amici American Academy of Pediatrics, California (AAPCA), the Environmental Health Coalition and the Healthy Homes Collaborative (EHC), California Conference of Local Health Officers (CCLHO), and a group of organizations including Changelab, Consumer Attorneys of California and others[85] (Changelab) have filed amicus briefs in support of plaintiff.

## A. CJA

CJA contends that we should reject the trial court's judgment holding lead paint manufacturers liable for creating a public nuisance because courts in other states have rejected such actions and certain journal articles have criticized the extension of public nuisance liability to such cases. California law is not based on the rulings of courts in other

---

[85] The others are Equal Justice Society, National Center for Healthy Housing, Prevention Institute, and Public Health Institute.

131

states, which are based on their laws and the facts of their cases, nor would be it appropriate for us to reverse a judgment based on opinions expressed in journal articles. The trial court properly applied California law, and, with one exception, substantial evidence supports its abatement order.

CJA contends that this case should have been dismissed because it sought resolution of a "non-justiciable political question," but none of the cases it cites is remotely similar to the one before us. CJA's argument largely repeats the separation of powers arguments made by defendants, which we have already rejected in section IV(C) of this opinion.

CJA challenges the trial court's conclusion that a "public right" was at issue here. We have already addressed that issue in section IV(B) of this opinion. CJA also challenges the sufficiency of the evidence to support the trial court's causation finding and claims that the substantial factor test for causation does not properly encompass the cause-in-fact requirement. The substantial factor test is the law in California. We have already fully addressed the causation issue in section IV(A)(4) of this opinion.

## B. PLF

PLF's brief argues that application of public nuisance law in this case violates due process and is against public policy. The premise for PLF's due process contention is its claim that defendants' conduct "was lawful and non-tortious at the time the Defendants engaged in it . . . ." This misunderstanding of the basis for the trial court's judgment permeates PLF's brief, which makes a frontal assault on the constitutionality of California's public nuisance law. We reject PLF's unfounded assertions. Defendants were found liable because they promoted lead paint for interior residential use knowing that such use would pose a serious risk of harm to children. This conduct was just as unlawful and tortious when they engaged in it as it is now because the creation of a public nuisance has been

132

unlawful in California since the 1800s. Consequently, the due process problem that PLF perceives does not exist in this case.[86]

PLF fails to support its claim that the federal constitutional prohibition against vagueness in *criminal* statutes applies to *civil* liability for creating a public nuisance. PLF asserts: "Although most cases involving the 'constitutional requirement of definiteness,' [citation to criminal case], have dealt with criminal statutes, the requirement also applies to nuisance law." PLF goes on to cite as an "example" a *criminal* case in which a protester was convicted of violating a noise ordinance. PLF then states that "[t]hese principles also apply to civil laws." It proceeds to cite cases involving challenges to statutes that prohibited speech. PLF identifies no civil case not involving the suppression of speech in which a court found that a public nuisance abatement action could not be brought because the statute barring public nuisances was unconstitutionally vague. We reject PLF's due process argument as unfounded.

PLF claims that the trial court could not have found "unreasonableness" because it "declar[ed] a lawfully sold product to be a public nuisance." PLF continues to misconstrue the basis for the trial court's decision. The trial court found that defendants were liable for creating a public nuisance as a result of their conduct in promoting lead paint for interior residential use while knowing of the hazard that such use would create. The court did not find that lead paint itself was a public nuisance. As this court ruled in *Santa Clara I*, such conduct is unreasonable under the statutory definition of a public nuisance.

PLF argues that the trial court's judgment "impermissibly broadens the definition of 'public right'" by applying it to injuries caused by "products . . . bought and used by individuals . . . ." Once again, PLF misconstrues the trial court's judgment. No individual injuries are being redressed. The trial court's judgment requires only that defendants

---

[86] PLF also contends that the trial court's judgment violates separation of powers, a contention that we have already analyzed in section IV(C) of this opinion.

remediate the dangerous conditions they created in the housing stock in these 10 jurisdictions. PLF also attacks the trial court's finding of causation, but its argument ignores the evidence that we have already concluded, with one exception, supports the trial court's causation finding.

PLF contends that the judgment improperly affects the rights of individual property owners without notice. It does not. The abatement plan ordered by the trial court is premised on voluntary participation by property owners. No property owners will be forced to participate, and therefore their rights will not be involuntarily impacted. While it is true that the abatement plan contemplates that the 10 jurisdictions will make publicly available a list of properties that have not been enrolled in the abatement plan, this provision alone does not substantially impact the rights of individual property owners. Already, any property built before 1978 is presumed to contain lead paint. (Cal. Code Regs., tit. 17, § 35043.) That presumption eliminates any impact on a property owner from a publicly available list of only those presumptively lead-paint-containing properties that have not been enrolled in the abatement plan. Property owners can only gain from enrollment in the plan; they have nothing to lose. PLF insists that the court's abatement order has "declared a nuisance" on individual properties without notice to the property owners. Not so. The trial court ordered defendants to abate the public nuisance they had created, but it did not identify any specific properties. The abatement plan itself is designed to identify and remediate the individual properties upon which defendants' public nuisance exists.

PLF maintains that public policy and a "national trend" favor rejection of the application of public nuisance in this case. It relies in part on out-of-state cases that have rejected public nuisance liability in lead paint cases. Those cases did not apply California public nuisance law, so they are inapposite. PLF's reliance on *Firearm Cases* is no more helpful to its cause. In that case, the First District Court of Appeal found causation

lacking.[87] "Merely engaging in what plaintiffs deem to be a risky practice, without a connecting causative link to a threatened harm, is not a public nuisance." (*Firearm Cases*, *supra*, 126 Cal.App.4th at p. 988.) "In this case, there is no causal connection between any conduct of the defendants and any incident of illegal acquisition of firearms or criminal acts or accidental injury by a firearm." (*Id.* at p. 989.) Here, unlike in the First District's case, defendants did not merely sell a product that posed a risk of harm. Defendants promoted lead paint for interior residential use knowing that such use would create a serious risk of harm to children. As we have already determined, substantial evidence supports the trial court's decision that, with one exception, plaintiff established causation.

PLF argues that public policy weighs against recognizing a public nuisance cause of action in this case. "[I]f the lawful sale of a legal product can later serve as the basis of public nuisance liability of unlimited severity, businesses will be less willing to participate in the California market, or to provide citizens with products that might later prove hazardous or simply unpopular." This argument is divorced from the facts of this case. When a manufacturer promotes a product for a specific use that it knows will create a hazardous condition, public policy supports the use of California public nuisance law to require the manufacturer to remediate the hazards created by its conduct.

### C. NFIB

NFIB argues that the trial court failed to require plaintiff to establish that defendants acted with the requisite knowledge and that defendants' conduct caused the public nuisance. We have already addressed these issues in response to defendants' contentions. NFIB also repeats some of the same arguments that PLF makes, which we have already rejected. NFIB argues that courts have previously rejected large-scale public nuisance actions, but it

---

[87] PLF repeatedly identifies that case as being from "this Court." It is not from this court, but from the First District.

offers no detailed analysis of the reasons why those cases failed. It also notes that prior public nuisance actions in other states against lead paint manufacturers have failed. NFIB's main argument seems to be that courts should not allow public nuisance causes of action to be based on products, and it explicitly urges this court to "reconsider" *Santa Clara I.* We decline to do so for the reasons expressed in *Santa Clara I.*

### D. Amici Supporting Plaintiff

Changelab argues that public nuisance abatement orders like the trial court's decision are urgently needed due to the lack of resources to combat the "epidemic" of lead poisoning arising from lead paint in residential housing. AAPCA emphasizes the need for "primary prevention" to ensure safe housing for children to avoid the "potentially devastating effects" of childhood lead poisoning, including irreversible cognitive impairment and developmental problems. It notes that remediation of housing containing lead paint is "the most critical step" in primary prevention. CCLHO echoes these concerns and points out the burden on governmental resources created by childhood lead poisoning, which disproportionately impacts economically disadvantaged children. EHC observes that a large portion of the housing stock continues to contain deteriorating lead paint that poses a serious health risk to children. EHC expresses substantial concern about the fact that the children most at risk, the poor, who live in the oldest, most deteriorated housing, are those with the least access to healthcare and are therefore those who are the least likely to be tested for lead and treated for lead poisoning.

All of the concerns expressed by the amici in support of plaintiff support the trial court's decision to order remedial abatement as an equitable remedy for defendants' knowing creation of a public nuisance.

136

## VII.  Disposition

The judgment is reversed, and the matter is remanded to the trial court with directions to (1) recalculate the amount of the abatement fund to limit it to the amount necessary to cover the cost of remediating pre-1951 homes, and (2) hold an evidentiary hearing regarding the appointment of a suitable receiver.  Plaintiff shall recover its costs on appeal.

_____

Mihara, J.

WE CONCUR:



_____

Premo, Acting P. J.



_____

Elia, J.




People v. ConAgra et al.
H040880


138

Trial Court:                                                    Santa Clara County Superior Court


Trial Judge:                                                   Honorable James P. Kleinberg


Attorneys for Plaintiff, Cross-defendant and
Respondent:                                                   Orry P. Korb
                                                              Danny Y. Chou
                                                              Greta S. Hansen
                                                              Jenny S. Lam
                                                              Kavita Narayan
                                                              Meghan F. Loisel
                                                              Lorraine Van Kirk
                                                              Office of the County Counsel,
                                                              County of Santa Clara

                                                              Donna R. Ziegler
                                                              Andrew Massey
                                                              Office of the County Counsel,
                                                              Alameda County

                                                              Mark J. Saladino
                                                              Robert E. Ragland
                                                              Andrea Ross
                                                              Office of the County Counsel,
                                                              County of Los Angeles

                                                              Charles J. McKee
                                                              William M. Litt
                                                              Office of the County Counsel,
                                                              County of Monterey

                                                              Barbara Parker
                                                              Wendy M. Garbers
                                                              Office of the City Attorney,
                                                              City of Oakland

                                                              Christopher Kee

Jan I. Goldsmith
Daniel F. Bamberg
Paul F. Prather
Office of the City Attorney,
City of San Diego

Dennis J. Herrera
Owen J. Clements
Erin Bernstein
Office of the City Attorney,
City and County of San Francisco

John C. Beiers
Rebecca M. Archer
Office of the County Counsel,
County of San Mateo

Dennis Bunting
Office of the County Counsel,
Solano County

Leroy Smith
Eric Walts
Office of the County Counsel,
County of Ventura

Michael Rubin
Stacey M. Leyton
Altshuler Berzon LLP

Joseph W Cotchett
Nancy L. Fineman
Brian M. Schnarr
Cotchett, Pitre & McCarthy, LLP

Peter G. Earle
Law Office of Peter Earle, LLC

Fidelma Fitzpatrick
Robert J. McConnell
Motley Rice LLC

Mary E. Alexander
Jennifer L. Fiore
Sophia M. Aslami
Mary Alexander & Associates


Attorneys for Defendant and Appellant
ConAgra Grocery Products Company:

Raymond A. Cardozo
Margaret M. Grignon
Anne M. Grignon
Kasey J. Curtis
Reed Smith LLP

Allen J. Ruby
Jack P. DiCanio
Patrick Hammon
Skadden, Arps, Slate, Meagher &
Flom LLP

James P. Fitzgerald
James J. Frost
McGrath North Mullin & Kratz,
PC, LLO


Attorneys for Defendant and Appellant
NL Industries, Inc.:

Donald E. Scott
Andre M. Pauka
Jameson R. Jones
Bartlit Beck Herman Palenchar &
Scott LLP

James McManis
William Faulkner
McManis Faulkner

Richard A. Derevan
Todd E. Lundell
Snell & Wilmer, LLP

Attorneys for Defendant, Cross-complainant
And Appellant The Sherwin-Williams Company:

Robert A. Mittelstaedt
John W. Edwards II
Paul Michael Pohl
Charles H. Moellenberg, Jr.
Leon F. Dejulius, Jr.
Jones Day

David M. Axelrad
Lisa Perrochet
Horvitz & Levy LLP

Attorney for Changelab Solutions et al.,
as Amici Curiae on behalf of Plaintiff,
Cross-defendant and Respondent:

Ingrid M. Evans
Evans Law Firm Inc.

Attorney for California Conference of Local
Health Officers as Amicus Curiae on behalf of
Plaintiff, Cross-defendant and Respondent:

Paula Canny
Law Offices of Paula Canny

Attorneys for American Academy of Pediatrics,
California as Amicus Curiae on behalf of Plaintiff,
Cross-defendant and Respondent:

Dario de Ghetaldi
Clare Capaccioli Velasquez
Corey, Luzaich, de Ghetaldi,
Nastari & Riddle LLP

Attorney for Environmental Health Coalition and
Healthy Homes Collaborative as Amici
Curiae on behalf of Plaintiff, Cross-defendant
and Respondent:

Michael E. Wall
National Resources Defense
Council

Attorneys for Pacific Legal Foundation as Amicus
Curiae on behalf of Defendants and Appellants
ConAgra Grocery Products Company et al.:

Timothy Sandefur
Christopher M. Kieser
Pacific Legal Foundation


Attorneys for NFIB Small Business Legal
Center et al., as Amici Curiae on behalf of
Defendants and Appellants ConAgra Grocery
Products Company et al.:

Phil Goldberg
Amir Nassihi
Shook, Hardy & Bacon LLP


Attorney for Civil Justice Association of
California as Amicus Curiae on behalf of
Defendants and Appellants ConAgra Grocery
Products Company et al.:

Fred J. Hiestand

People v. ConAgra et al.
H040880